# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EMERGENCY PHYSICIAN SERVICES OF NEW YORK, BUFFALO EMERGENCY ASSOCIATES, EXIGENCE MEDICAL OF BINGHAMTON, EXIGENCE MEDICAL OF JAMESTOWN, and EMERGENCY CARE SERVICES OF NEW YORK | Case No: |
| | COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF |
| *Plaintiffs,* | |
| v. | |
| UNITEDHEALTH GROUP, INC., and MULTIPLAN, INC., | |
| Defendants. | |

## **COMPLAINT**

**Table of Contents**

Table of Contents ....................................................................................................................... i

Introduction ............................................................................................................................... 1

Summary of Claims ................................................................................................................... 3

Parties ....................................................................................................................................... 4

    A.  Plaintiffs .......................................................................................................................... 4

    B.  Defendants ....................................................................................................................... 5

Jurisdiction & Venue ................................................................................................................. 7

Factual Allegations .................................................................................................................... 7

    A.  The Legal Obligation to Pay Plaintiffs a "Reasonable" Rate ............................................ 10

    B.  Federal RICO Allegations ............................................................................................... 13

        (1)    The Ingenix Precursor ............................................................................................. 13

        (2)    The Defendants form an Enterprise to Fraudulently Avoid Paying "Reasonable" Payments ............................................................................................................ 17

        (3)    The FAIR Health Database ...................................................................................... 21

        (4)    Repricing Mechanics ............................................................................................... 23

        (5)    Claims submission mechanics .................................................................................. 27

        (6)    Rates of Payment .................................................................................................... 28

        (7)    The Data iSight Service .......................................................................................... 30

        (8)    Post Payment Concealment ...................................................................................... 36

    C.  Marketing the Conspiracy ............................................................................................... 39

        (1)    MultiPlan's Secret Annual Events: Meetings of the Enterprise ................................. 40

        (2)    MultiPlan's Secret Road Shows: Further Meetings of the Enterprise ......................... 42

        (3)    The Secret Internal Whitepapers .............................................................................. 42

        (4)    The Network Access Agreement .............................................................................. 44

    D.  Misrepresentations ......................................................................................................... 44

        (1)    Claims Processing ................................................................................................... 44

        (2)    Geographic Adjustment ........................................................................................... 48

        (3)    Defendants' False Statements ................................................................................... 50

        (4)    General Misrepresentations ...................................................................................... 54

        (5)    United's Bad Faith Negotiations with Plaintiffs ....................................................... 55

    E.  Defendants Racketeering Acts and Underpayment of Claims ............................................ 57

        (1)    Predicate Acts ......................................................................................................... 58

        (2)    Defendants' Fraudulent Representations Using the Mail and Wires .......................... 119

(3)     RICO Proximate Cause .................................................................................. 120

F.   The Continuing Nationwide Pattern and Other Victims Affected ..................................... 120

G.   The Law and Equity Must Intervene to Prevent Injustice ................................. 121

Causes Of Action ............................................................................................................ 122

Count I:       Violation of RICO, 18 U.S.C. § 1964(c) (as against all Defendants) .................. 122

Count II:      Violation of RICO conspiracy, 18 U.S.C. § 1964(d) (as against all Defendants). 125

Count III:     Breach of Implied-in-Fact Contract under New York Law (as against United) ... 126

Count IV:       Unjust Enrichment under New York Law (as against United) ......................... 128

Count V:       Declaratory Relief (as against all Defendants) ..................................... 129

Jury Demand ..................................................................................................................... 131

**Introduction**

1.      This case is brought in the context of a global coronavirus pandemic, which has already infected more than 9.2 million people and claimed over 230,000 lives[1] in this country. The pandemic is ongoing, with new infections and deaths being reported every day. State of New York has been especially hard hit. As of this writing, there have been over 514,000 cases and more than 33,000 deaths in this state.[2]

2.      Plaintiffs are hospital-based emergency room physicians who practice medicine throughout the State of New York. As emergency care providers, Plaintiffs are essential workers who risk their lives every day on the front lines of the coronavirus pandemic.

3.      Defendant UnitedHealth Group, Inc. is a commercial health insurer and the parent corporation of more than 1,300 "United" Companies. These United companies are not independent, rather they act in concert to maximize profits for the shareholders of United Health Group, Inc. Defendant Multiplan, Inc. is a 'cost management' company. Together, United and MultiPlan have formed an enterprise that furnishes a vehicle to deny proper payment for emergency medical services that the Plaintiffs provided to United's insureds.

4.      United and Multiplan have also conspired together to withhold proper payment for emergency medical services from Plaintiffs.

5.      All of the underpayments at issue in this litigation are for covered, emergency services that Plaintiffs' provided to United's insureds.

---

[1] *See e.g.*, *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/new-york-coronavirus-cases.html (last visited November 2, 2020)

[2] *Id.*

1

6.      United and Multiplan's actions, together, form the basis of Plaintiffs' federal RICO claim and state law claims.

7.      Plaintiffs seek injunctive and monetary relief.

8.      United is the largest commercial health insurer in the United States, reporting $6.7 billion in profits for the second quarter of 2020, a 97% increase from the same period in 2019.[3] United insures 80 million people and controls a significant percentage of the commercial healthcare marketplace.

9.      Multiplan is a privately owned 'cost-management' company that contracts with insurers to reduce the amount they pay doctors and hospitals.  Multiplan has projected its revenue for 2021 at over $1.1 billion dollars.[4]

10.     Together, United and Multiplan have designed and implemented a scheme that has prevented Plaintiffs from being properly reimbursed for the emergency medical services they provide.

11.     Defendants have formed an enterprise, conspired, and used the mail and wires in furtherance of a scheme to defraud Plaintiffs by paying them amounts well below the "usual and customary" or  "reasonable" rate required by both state and federal law.

12.     This scheme has injured each Plaintiff in its business and property.

---

[3] *U.S.' Largest Health Insurer Reports $6.7B In Profits Amid COVID, As N.Y. Cuts State Rates*, Newsweek, August 14, 2020, https://www.newsweek.com/us-largest-health-insurer-reports-67b-profits-amid-covid-ny-cuts-state-rates-1525210 (last visited September 14, 2020).

[4] Churchill MultiPlan Analyst Day Presentation, July 2020 p. 5 accessed at http://iii.churchillcapitalcorp.com/wp-content/uploads/2020/07/2020.07-Churchill-MultiPlan-Public-Announcement-Presentation.vFFF_.pdf, last visited October 3, 2020.

## Summary of Claims

13.     This action asserts claims under the Federal Racketeer Influenced and Corrupt Organizations ("RICO") Act and New York state law. Plaintiffs seek monetary, injunctive, and declaratory relief.

14.     Plaintiffs' federal RICO action is brought pursuant to 18 U.S.C. § 1964(c) and 18 U.S.C. § 1964(d).

15.     Together, and as explained more fully in the following sections, United and Multiplan have formed a federal RICO enterprise (the "Enterprise").

16.     The Enterprise is an ongoing, informal organization with the common purpose of engaging in a fraudulent scheme to underpay emergency room physicians who do not participate in United's provider network.

17.     The Enterprise functions as a continuing unit: it has existed since at least 2015, if not earlier.

18.     The Enterprise provides the vehicle through which the acts of racketeering activity are committed.

19.     The acts of racketeering activity, as detailed in later sections, are the development and implementation of the scheme to defraud and use of mail and interstate wire communications in furtherance of that scheme. Pursuant to the scheme, Defendants sought to, and did, under-reimburse Plaintiffs for emergency medical services provided to United's insureds, injuring Plaintiffs in their business and property.

20.     The relationships between United and Multiplan are not merely standard, commercial contracts; instead, United and Multiplan exploit their contractual arrangement and to provide a false impression of legitimacy for their hidden racketeering activity.

3

21.     The Enterprise has operated continually since 2015 as reflected in the thousands of underpaid claims at issue in this litigation and in tens of thousands, or more, of underpaid claims to other emergency room physicians in New York and elsewhere.

22.     Plaintiffs' state law claims rely upon the same facts as Plaintiffs' federal RICO claims.

23.     Plaintiff asserts state law claims for breach of implied-in-fact contract, unjust enrichment, and declaratory relief.

## Parties

### A.     Plaintiffs

24.     Plaintiffs are physician practice groups who staff the emergency rooms of numerous hospitals across The State of New York.  They are out-of-network healthcare providers with United and regularly provide emergency medical services to United's insureds.

25.     Plaintiff, Emergency Physicians of New York, P.C., is a professional emergency medicine group practice that staffs the emergency departments at: Claxton-Hepburn Medical Center in Ogdensburg, New York; Faxton St Luke's Healthcare in Utica, New York; Medina Memorial Hospital in Medina, New York; Northern Dutchess Hospital in Rhinebeck, New York; Putnam Hospital Center in Carmel Hamlet, New York; Rome Memorial Hospital in Rome, New York; St. Elizabeth Hospital in Utica, New York; St. Mary's Hospital in Amsterdam, New York; and Vassar Brothers Medical Center in Poughkeepsie, New York. Its principal place of business is in Erie County, New York.

26.     Plaintiff, Buffalo Emergency Associates, LLP is a professional emergency medicine group practice that staffs the emergency departments at: Kenmore Mercy Hospital in Kenmore, New York; Mercy Hospital of Buffalo in Buffalo, New York; Mount St. Mary's

Hospital in Lewiston, New York; Mercy Ambulatory Care Center in Orchard Park, New York; Sisters of Charity Hospital in Buffalo, New York; and Sisters of Charity Hospital – St. Joseph Campus in Cheektowaga, New York. Its principal place of business is in Erie County, New York.

27.     Plaintiff, Exigence Medical of Binghamton PLLC is a professional emergency medicine group practice that staffs the emergency department at Our Lady of Lourdes Memorial Hospital in Binghamton, New York. Its principal place of business is in Erie County, New York.

28.     Plaintiff, Exigence Medical of Jamestown, PLLC is a professional emergency medicine group practice that staffs the emergency department at WCA Hospital-Jamestown in Jamestown, New York. Its principal place of business is in Erie County, New York

29.     Plaintiff, Emergency Care Services of New York, PC is a professional emergency medicine group practice that staffs the emergency departments at: Oneida Healthcare Center in Oneida, New York; St. Joseph's Hospital Health Center in Syracuse, New York; and, Glens Falls Hospital in Glens Falls, New York.

**B.     <u>Defendants</u>**

30.     Defendant, UnitedHealth Group, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343. UnitedHealth Group, Inc. is the parent of more than 1200 wholly owned subsidiaries. These wholly owned subsidiaries act in concert and are under common control to maximize profits for the shareholders of UnitedHealth Group, Inc. The subsidiaries include the following companies:

- United Healthcare Services, Inc., a corporation organized under the laws of the State of Minnesota, does business as AmeriChoice, EverCare, Health Professionals Review, Healthmarc, HealthPro, Institute for Human Resources, Optum, United Management

Company, United Management Company, Inc., United HealthCare Corporation, United HealthCare Management Company, Inc., United HealthCare Management Services, United HealthCare Services of Minnesota, United HealthCare Services of Minnesota, Inc., United Resource Networks, United Resource Networks, Inc., and UnitedHealthcare Medicare.

- UnitedHealthcare of New York, Inc., a corporation organized under the laws of the State of New York, doing business as UnitedHealthCare Community Plan.

- UnitedHealthCare Insurance Company of New York, a corporation organized under the laws of the State of New York.

- UnitedHealthcare, Inc., a corporation organized under the laws of the State of Delaware.

- Optum Group, LLC (formerly known as "Ingenix"), a corporation organized under the laws of the State of Delaware.

31.     This is not an exhaustive list as, upon information and belief, other subsidiaries also participated in the scheme to underpay emergency room physicians.

32.     Each of the above wholly-owned subsidiaries participated in the fraudulent scheme that underpaid Plaintiffs for services provided by their emergency medicine physicians.

33.     These entities are all included among the approximately 1,200 subsidiaries of UnitedHealth Group, Inc. as identified in its 2019 10-K Annual Report to the SEC.[5]

34.     Defendant Multiplan is a New York corporation with its principal place of business at 115 Fifth Avenue, New York, NY 10003. MultiPlan develops and operates healthcare provider

---

[5] Form 10-K UnitedHealth Group, Inc., Annual Report [Section 13 and 15(d), not S-K Item 405], Exhibit 21.1; https://sec.report/Document/0000731766-20-000006/unhex21112312019.htm (last visited September 14, 2020).

networks and offers related cost management products to insurance companies and other payers of health benefits. One such product is Data iSight, which is offered by Multiplan to United and other payers.

**Jurisdiction & Venue**

35.     This Court has subject matter jurisdiction over this case pursuant to 18 U.S.C. § 1964(c), 28 U.S.C. § 1332 (federal question) and 28 U.S.C. § 1367 (ancillary jurisdiction).

36.     This Court has personal jurisdiction over the Defendants.

37.     Venue is proper in this District pursuant to 18 U.S.C. § 1965 as Defendants reside, are found in, and/or transact their affairs in this District.

**Factual Allegations**

38.     Plaintiffs provide life-saving emergency medical care to residents of the State of New York.

39.     The claims at issue in this action are for services Plaintiffs rendered to patients insured by commercial insurance plans sold and/or administered by United,[6] including plans purchased from the healthcare exchanges.[7]

40.     The underpaid claims at issue do not relate to or involve any government funded products such as Medicare Advantage and managed Medicaid.

41.     As providers of emergency medical services, Plaintiffs do not and cannot verify a patient's insurance benefits and obtain authorization for treatment from insurance companies prior to rendering treatment.

---

[6] "United" refers to United as well as all of its subsidiaries and affiliates.

[7] Healthcare Exchanges refers to those exchanges established by the Affordable Care Act ("ACA") and may be operated by either the federal or state government. New York operates its own ACA exchange. See https://nystateofhealth.ny.gov/ (last visited September 16, 2020).

42.     This is due to the practical impossibility of obtaining insurance eligibility information or insurance pre-certification in emergency medical situations and the legal requirements imposed upon emergency medical professionals.

43.     Emergency medical providers depend upon health insurance companies to meet their legal responsibility and pay a "reasonable" rate to providers such as Plaintiffs who are not "in-network" and are not "participating" providers.[8]

44.     For every claim at issue here, the hospital where the emergency services were provided was responsible for obtaining and did obtain the patient's insurance information and demographics.

45.     The hospital's billing department then sent the patient's demographics, medical records, and insurance information to the Plaintiffs.

46.     This is the standard practice for hospitals that contract with outside groups to provide emergency services.

47.     The Plaintiffs' billing departments transcribed patients' medical charts into standardized billing codes, created invoices with standard charges, medical coding, patient demographics, and submitted the invoices electronically to United via interstate wire communications.

48.     Regardless of the specific United subsidiary or entity responsible for administering the patient's plan, all invoices were submitted through a common United portal.

---

[8] "A provider network is a list of the doctors, other health care providers, and hospitals that a [insurance] plan has contracted with to provide medical care to its insureds. These providers are called "network providers" or "in-network providers." A provider that hasn't contracted with the [insurance] plan is called an "out-of-network provider."" https://marketplace.cms.gov/outreach-and-education/what-you-should-know-provider-networks.pdf (last visited September 29, 2020).

49. Detailed examples of claims and racketeering activities for each Plaintiff are provided in the following sections.

50. Every claim at issue was approved for payment.

51. Instead of paying a "reasonable" rate to Plaintiffs, Defendants used Data iSight to fabricate a fraudulent "reasonable" rate as justification for withholding a substantial part of the payment owed to Plaintiffs.

52. For every claim at issue, the Plaintiffs were paid at a rate that was not reasonable or "usual and customary".

53. The Enterprise used Data iSight, a payment adjusting product owned by MultiPlan, to justify the fraudulent withholding of part of the payment owed on each and every claim at issue, thereby directly injuring Plaintiffs in their businesses and property.

54. United and Multiplan exercised management and control over the Enterprise.

55. Defendants used the Enterprise to fraudulently represent that their payments were "reasonable," using the wires for telephone calls and other communications and the mail for to communicate these misrepresentations. It was represented to Plaintiffs and other out-of-network emergency service providers that the rate they were paid was the "reasonable" rate and commensurate with the rates paid similar providers in the same geographic area.

56. Multiple acts of racketeering activity were committed against each of the Plaintiffs as set forth in more detail in the following sections.

57. United and Multiplan profited from their participation in the Enterprise.

58. Specifically, the insureds of the Enterprise shared some or all of the amount by which the Plaintiffs and others were underpaid.

59.     The Defendants acted in concert to achieve this objective and the Enterprise was under their common control as set forth in detail in the following sections.

60.     The payment amount generated by Data iSight is significantly less than a reasonable amount, a usual and customary amount, or a market rate.

61.     United unlawfully retained monies paid in premiums that should have been paid to Plaintiffs and other healthcare providers.

62.     Multiplan and its Data iSight division are paid fees by United based on the amount by which the healthcare claims at issue are underpaid. Hence, Multiplan and Data iSight are heavily incentivized to calculate the lowest rates they can invent.

63.     Over the years, this scheme has cost providers such as Plaintiffs billions of dollars, with United and MultiPlan sharing the savings and the profits.

64.     United pays Multiplan as much as 7% or more of the "margin" between the price set by United for a claim and the amount Data iSight can underpay the claim by. Because of the sheer volume of claims sent to Data iSight by United, these fees total hundreds of millions of dollars per year in revenue for MultiPlan.

A.      **The Legal Obligation to Pay Plaintiffs a "Reasonable" Rate**

65.     For the healthcare claims at issue, Plaintiffs did not have a written contract with United that would establish a contractual rate of payment for their services.

66.     This is true for all out-of-network providers.

67.     As out-of-network providers, Plaintiffs are legally entitled to be paid a "reasonable" rate for their services.

68.     The "reasonable" rate is the lesser of Plaintiffs' billed charges or the "usual and customary rates" for similar providers in the same geographic area.

69.     As emergency medical providers, both federal and New York law obligate Plaintiffs to provide treatment to all patients who present at emergency departments.

70.     Under the federal Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. §§ 1395dd(a)-(b), (d), and (h), hospitals and physicians who staff hospital emergency rooms have a duty to "provide for an appropriate medical screening examination" when an individual comes to the emergency department. If "the individual has an emergency medical condition," they are required to "stabilize the medical condition" without inquiry into "the individual's method of payment or insurance status." *Id*.

71.     Hospitals are subject to civil liability for a violation of EMTALA's mandates. 42 U.S.C. § 1395dd(d)(2)(A) and "any physician who is responsible for the examination, treatment, or transfer of an individual in a participating hospital" who negligently violates EMTALA is subject to civil monetary penalties of up to $50,000 per violation. 42 U.S.C. § 1395dd(d)(1)(B).

72.     New York law goes even further than EMTALA and imposes criminal liability on emergency room physicians who fail to satisfy its requirements. New York Public Health Law § 2805-b(2)(b) provides that "[a] NY licensed medical practitioner who refuses to treat a person arriving at a general hospital to receive emergency medical treatment…shall be guilty of a misdemeanor and subject to a term of imprisonment not to exceed one year and a fine not to exceed one thousand dollars."[9]

---

[9] Not only are emergency room doctors duty-bound to follow the foregoing federal and state law requirements, but they often are obligated to provide emergency medical care under their contractual arrangements with the hospitals. Hospitals subject to EMTALA are permitted to contract for emergency services, provided they comply with certain regulatory requirements. 42 C.F.R. § 482.12.

73.     In the State of New York, insurers that sell fully insured health insurance products have an obligation to pay Emergency Room Providers at rates equivalent to the 80th Percentile of the FAIR Health Database.

74.     In other words, federal and state law required Plaintiffs' to provide treatment to the patients whose claims are at issue in this litigation.

75.     There are no exceptions to the emergency medicine providers' legal obligation to render services based on a patient's ability to pay or the presence of health insurance.

76.     The obligations imposed on providers by EMTALA are to further its purpose "to prevent 'patient dumping,' the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before emergency conditions [are] stabilized." *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 792 (2d Cir. 1999) (internal citations omitted).

77.     New York and federal law also impose obligations upon payers.

78.     If the law did not require reasonable payment, emergency service providers would be at the mercy of insurance plans, forcing them to accept payment at any rate dictated by insurers under threat of receiving no payment at all.

79.     Providers *are* protected by the law and commercial insurers like United must pay the providers at a reasonable rate.

80.     Specifically, New York's Financial Services Law § 605(a) provides that out-of-network emergency medical providers must be paid a reasonable amount for their services.

81.     In addition, courts across the country, noting EMTALA's requirements and purpose, have, applying "variations on a basic theme," found that "an insurance company is unjustly enriched if it fails to pay the hospital in full for the costs incurred in rendering the

necessary treatment to the insurer's enrollees." *New York City Health & Hosps. Corp. v. Wellcare of New York, Inc.*, 937 N.Y.S.2d 540, 545 (Sup. Ct. 2011).

82.     Receiving payment for a reasonable amount or usual and customary amount is essential because, unlike other situations involving out-of-network providers, when a commercially insured patient receives emergency medical services in New York, the emergency healthcare provider is prohibited from balance-billing[10] the patient.

**B.      Federal RICO Allegations**

*(1)      The Ingenix Precursor*

83.     The enterprise formed between United and MultiPlan seeks to reproduce a scheme involving a fraudulent database created and operated by a wholly-owned United subsidiary formerly known as "Ingenix."  (Ingenix is now called "Optum.")

84.     The Ingenix scheme led United to pay $400 million in settlements in 2009.

85.     This time around, instead of using their own fraudulent databases as was done with Ingenix, United has employed MultiPlan and Data iSight to play the role of Ingenix and in so doing has created a federal RICO enterprise.

86.     An investigation into Ingenix by then New York Attorney General Andrew Cuomo, "uncovered a fraudulent and conflict-of-interest ridden payment system affecting millions of

---

[10] Balance-billing is "[w]hen a provider bills you for the difference between the provider's charge and the allowed amount." https://www.healthcare.gov/glossary/balance-billing/ (last visited September 18, 2020). Allowed amount is "[t]he maximum amount a [insurance] plan will pay for a covered health care service. May also be called "eligible expense," "payment allowance," or "negotiated rate." https://www.healthcare.gov/glossary/allowed-amount/ (last visited September 18, 2020).

patients and their families and costing Americans hundreds of millions of dollars in unexpected and unjust medical costs."[11]

87.     In 2009 United and its affiliates paid four hundred million dollars to settle cases arising from this misconduct. Three hundred fifty million dollars was paid to settle a class action against those entities.[12] Another fifty million dollars was paid for the establishment of the FAIR Health database and website. The settlement agreement dictated that "United shall use [FAIR Health] as the basis for determining Allowed Amounts for Covered Out-Of-Network Services or Supplies."[13] The Settlement Agreement stated UCR was equivalent to "reasonable and customary," "average," or "prevailing" charges.[14]

88.     Also in 2009, the Office of the Attorney General for the State of New York announced the results of its investigation into Ingenix in a landmark agreement entitled "Assurance of Discontinuance Under Executive Law § 63(15)" ("Assurance Order"). According to the Assurance Order, the payment rates compiled by Ingenix were based on a "conflict of interest." As the attorney general concluded that the system "meant to reimburse consumers fairly as a

---

[11] Attorney General Cuomo Announces Historic Nationwide Reform Of Consumer Reimbursement System For Out-Of-Network Health Care Charges, NY AG Press Release, October 27, 2009. https://ag.ny.gov/press-release/2009/attorney-general-cuomo-announces-historic-nationwide-reform-consumer (last visited September 16, 2020).

[12] This matter, *American Medical Association v. United HealthCare* was brought in New York and United finds itself hailed before a New York court for engaging in the same manner of fraudulent conduct. Plaintiffs in that matter were the American Medical Association, the Medical Society of the State of New York, the Missouri State Medical Association, individual physicians and subscribers, and several unions of New York State employees.

[13] *Settlement Agreement Between United Healthcare Corporation et. al. Settling Plaintiffs*, January 14, 2009, Pg. 14, term no. 4.4: https://www.mssny.org/App_Themes/MSSNY/pdf/Practice_Resources_Class_Action_Settlements_United_Healthcare-Ingenix_United_Healthcare-Ingenix_Settlementpdf.pdf (last accessed July 2, 2020).

[14] *Id.*

reflection of the market is[,] instead[,] wholly owned and operated by the [insurance] industry" who have an "incentive to manipulate the data they submit to Ingenix so as to depress payment rates they determine using the Ingenix schedules, given their own payment obligations toward consumers."

89.     The prices generated by Ingenix were inadequate because: 1) Ingenix did not audit the data provided by insurers to make sure that the charges properly reflect what providers actually charged in the marketplace; 2) Ingenix used statistically invalid "edits" to exclude a disproportionate amount of high charges from its UCR calculations; and, 3) Ingenix "lumped" charges for the same service together regardless of whether the service was provided by a certified specialist with many years of experience or a less experienced provider such that the aggregate UCR rate calculated by the database was artificially low.

90.     Although this matter did not ultimately go to a jury, the allegations clearly show that this conduct was fraudulent.

91.     The fraud alleged in this case is even worse because the data that Multiplan uses here to price the claims of out of network providers is even further removed from true usual and customary or reasonable rates than it was in Ingenix.

92.     The Assurance Order required the insurance industry to cease using the Ingenix database and create a "new, independent database, not controlled by any insurer, to be used for determining fair and accurate reimbursement rates." The Assurance Order also established a "Healthcare Information Transparency Website" to inform and educate the public about payment rates.

93.     This new database was funded by Defendant UnitedHealth Group ($50 million), Aetna ($20 million), Wellpoint ($10 million), CIGNA ($10 million), MVP Health Care Inc.

($535,000), Independent Health ($475,000), and HealthNow ($212,500). Out of this settlement, the independent not-for-profit "FAIR Health, Inc." (which stands for "Fair and Independent Research") was created.

94.     When the settlement was announced, Thomas L. Strickland, at the time the Executive Vice President and Chief Legal Officer of Defendant UnitedHealth Group, stated: "We are committed to increasing the amount of useful information available in the health care marketplace so that people can make informed decisions, and this agreement is consistent with that approach and philosophy… We are pleased that a not-for-profit entity will play this important role for the marketplace."[15]

95.     United's subsequent conduct belies this statement.

96.     As a result of the bad press surrounding the Ingenix name, United changed Ingenix's name to "Optum" in 2010.

97.     Unfortunately, for healthcare providers and the insurance buying public, United's legal obligations under the Assurance Agreement to utilize FAIR Health and pay out-of-network claims at a fair rate predicated upon UCR terminated five years after the creation of FAIR Health, in or about 2015.

98.     Not long after the termination of its obligations under the Assurance Agreement, free from its terms and without a court order requiring it pay out of network healthcare providers using a UCR rate, United sought out the services of a third party, MultiPlan, to perpetrate the same fraud.

---

[15] Attorney General Cuomo Announces Historic Nationwide Health Insurance Reform; Ends Practice Of Manipulating Rates To Overcharge Patients By Hundreds Of Millions Of Dollars, NY OAG Press Release January 13, 2009.

99.     This case, in its essence, is about the substitution of Multiplan and Data iSight for Ingenix.

100.    The present litigation differs from the prior litigation in that the methodology employed by MultiPlan through Data iSight now plays the role formerly filled by the Ingenix databases.[16] By incorporating MultiPlan's and Data iSight into the fraud, United's attempt to avoid liability has instead created a RICO enterprise.

        *(2)     The Defendants form an Enterprise to Fraudulently Avoid Paying "Reasonable" Payments*

101.    Federal "RICO is widely regarded as a broad statute; indeed, RICOs text itself provides that its terms are to be liberally construed to effectuate its remedial purposes." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (internal quotations omitted).[17] RICO's breadth of language and construction is particularly evident in the enterprise concept. Included within the definition of enterprise is "*any* union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added).

102.    An association-in-fact RICO enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle* at 946.

103.    As to the first factor, purpose, Defendants, United and MultiPlan, have associated to form an ongoing informal organization, engaged in and the activities of which affect trade or

---

[16] See "Attorney General Cuomo Announces Historic Nationwide Health Insurance Reform; Ends Practice Of Manipulating Rates To Overcharge Patients By Hundreds Of Millions Of Dollars" (Jan. 13, 2009), available at https://ag.ny.gov/press-release/2009/attorney-general-cuomo-announces-historic-nationwide-health-insurance-reform-ends (last accessed June 19, 2020)

[17] *See also, Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 497 (1985) ("RICO is to be read broadly.").

commerce, with the common purpose of engaging in a course of conduct that includes the development and implementation of a scheme to fraudulently underpay out-of-network emergency medical services.

104.   United and MultiPlan have joined together to create and exploit a false and fraudulently manipulated database as an excuse for under-reimbursing Plaintiffs for services provided, to the Defendants' financial benefit.

105.   The presence or absence of a commercial contract between United and MultiPlan is irrelevant.

106.   An association does not stop becoming an association because the relationship between its insureds are documented in a contract, nor does anything in the definition of enterprise insulate from liability those whose common purpose may include some legal activity. RICO's definition of enterprise "include[s] both legitimate and illegitimate enterprises within its scope; it no more excludes criminal enterprises than it does legitimate ones." *Turkette*, 452 U.S. 576, 580-81 (1981). *See also, Sedima,* 473 U.S. at 499 ("Yet Congress wanted to reach both 'legitimate' and 'illegitimate' enterprises. The former enjoy neither an inherent capacity for criminal activity nor immunity from its consequences.") (internal citation omitted).

107.   The enterprise formed by United and MultiPlan is the vehicle for the illegal, racketeering activity of mail and wire fraud. Examples of these activities performed at the direction of both Defendants are set forth in the following sections for every Plaintiff.

108.   The Defendants share a common purpose in performing these activities which includes financial gain as the direct result of the fraudulent scheme.

109.   As to the second *Boyle* factor, there are relationships among the entities associated with the enterprise.

110.     United also has relationships with MultiPlan. United has contracts with MultiPlan, coordinates their efforts with MultiPlan, and shares with MultiPlan money obtained from Plaintiffs and other victims of the scheme.

111.     The relationships between the members of the association-in-fact enterprise are sufficient to permit them to pursue the enterprise's purpose. The United entities cooperate closely with MultiPlan to implement the scheme and share the benefits of the scheme with MultiPlan. These relationships continue to the present as the enterprise continues to pursue its purpose.

112.     The relationships and purpose are clearly set forth in "Whitepapers" described in the following sections. The Whitepapers provided the roadmap that United and MultiPlan jointly developed to produce specific, fraudulent, payment rates.

113.     United exercised control by sending "target prices" to Multiplan to beat, and by determining the method and "routing" that would be used by Multiplan to arrive at the underpayment amount. United also sent the eventual payment to the provider along with written misrepresentations regarding the payment.

114.     MultiPlan exercised control by designing and implementing Data iSight to achieve the low payment rates under the target price determined by United, without regard to actual usual and customary rates and using purposely faulty data that Multiplan had purchased.

115.     For all of the claims, United compensates MultiPlan based on the amount by which the claims are underpaid. Plaintiffs and providers have a property interest in accounts receivable related to the payment of claims for their professional services.

116.     Underpaying the claims by fraudulent means deprives Plaintiffs and providers of their property. United and MultiPlan have profited and continue to profit from this fraud.

117.     United profits by fraudulently retaining money from self-funded plans' trust accounts and lowering the costs for the claims United pays out of its own funds for fully funded plans.

118.     MultiPlan profits when United shares with it the money obtained by implementing the fraudulent Data iSight.

119.     MultiPlan's implementation of Data iSight to further the fraudulent scheme and further the purpose of the enterprise shows MultiPlan's management over and participation in the enterprise.

120.     United contracts with MultiPlan to provide a false impression of legitimacy to their activities.

121.     United and MultiPlan coordinate their efforts in undertaking the racketeering activities.

122.     United and MultiPlan share the money obtained from Plaintiffs and other victims of the scheme.

123.     The relationships between United and MultiPlan are sufficient to permit them to pursue the enterprise's purpose.

124.     As the third *Boyle* factor, longevity, the enterprise functions as a continuing unit.

125.     United and MultiPlan each participates purposefully and knowingly in the affairs of the enterprise by engaging in activities that seek to further, assist or help effectuate the goals of the enterprise.

126.     United and MultiPlan each agreed to participate in the affairs of the enterprise with knowledge of the enterprise's unlawful goals and purposes, including the scheme, to commit acts

in furtherance of the enterprise's common purpose, and to share in monies obtained through the scheme.

127. United and MultiPlan each has engaged and continues to engage in incidents of racketeering activity in furtherance of the Enterprise's common unlawful purpose.

128. United and MultiPlan each agreed to, and do act through the Enterprise to, manipulate reimbursement rates and control allowed payments to the Plaintiffs and other out-of-network emergency room providers.

129. The relationships between United and MultiPlan continue to the present and the enterprise continues to pursue its purpose.

130. As set forth in more detail below, the enterprise has functioned as a continuing unit for more than two years and has existed such that United and MultiPlan have pursued the enterprise's purpose during this time.

      *(3)    The FAIR Health Database*

131. United could have avoided this litigation if they had employed a "reasonable" method for determining Plaintiffs' payments.

132. The creation of the FAIR Health database was intended to be one such "reasonable" method. New York Attorney General Andrew Cuomo believed that the FAIR Health database would solve the inherent conflicts of interest that plagued the Ingenix databases.

133. The FAIR Health database claims "to provide reliable information about healthcare costs because each year health insurers around the country send [it] over a billion healthcare bills, which are added to FAIR Health's database of more than 31 billion claims."[18] No providers submit

---

[18] FAIR Health Consumer, "About FAIR Health," accessed at https://www.fairhealthconsumer.org/#about, last accessed June 19, 2020

pricing information, only insurers do so.  FAIR Health claims that it then uses "information from those claims to estimate what providers charge, and what insurers pay, for providing healthcare to patients."[19] New York, Connecticut and many other states use the FAIR Health database as a guidepost for healthcare consumer protection.[20]

134.    The purpose and intent behind the establishment of the FAIR Health Database is to prevent insurers from using skewed methodologies to calculate payments, as was done using Ingenix.

135.    United had utilized the Ingenix databases to significantly under pay valid claims.

136.    In past litigation, United has asserted to courts that FAIR Health "analyzes and groups medical procedures by codes, the geographical area where the procedures were performed, and the amount charged by the providers. This database is often used by private health insurers to calculate the "usual and customary" fee for specific procedures and inform the amounts that they will be willing to pay to out-of-network providers." *UnitedHealthcare Servs., Inc. v. Asprinio*, 16 N.Y.S.3d 139, 145 (N.Y. Sup. Ct. 2015).

137.    United was required to use FAIR Health or a database with identical parameters to calculate "reasonable" charges until 2015 when the settlement agreement with the New York Attorney General expired.[21]

---

[19] *Id*.

[20] *Id*.

[21] United Health Ingenix Settlement Agreement Term 4.4 pp. 14 accessed at https://www.mssny.org/App_Themes/MSSNY/pdf/Practice_Resources_Class_Action_Settlements_United_Healthcare-Ingenix_United_Healthcare-Ingenix_Settlementpdf.pdf ) last accessed September 21, 2020)

138.    When the FAIR Health requirement expired, United began planning to resurrect its fraudulent payment scheme by forming an enterprise with MultiPlan wherein MultiPlan assumed the functions previously performed by Ingenix, with Data iSight standing in for the Ingenix databases.

139.    As part of this iteration of the scheme, United attempts to make the general public and its victims believe that FAIR Health is still the basis for its payment decisions for out-of-network services.

140.    United represents that where payment for out-of-network services is to be made at the usual and customary rate, United "most commonly refer[s] to a schedule of charges created by FAIR Health, Inc. ('FAIR Health') to determine the amount of the payment."  *See* "Information on Payment of Out-of-Network Benefits."[22]

141.    As described more fully in the following sections, this statement is demonstrably false.

    *(4)     Repricing Mechanics*

142.    Every day, thousands of patients are admitted to emergency rooms in New York. Every single one of those patients has a right to be screened and stabilized regardless of their ability to pay. That right, created by Congress when it passed the Emergency Medical Services System Act, 35 Pa.C.S. § 8101, *et seq*. (hereinafter "EMTALA"), created a corresponding duty on the part of hospitals and the physicians that staff them to provide care regardless of a patient's ability to pay.

---

[22] https://www.United.com/legal/information-on-payment-of-out-of-network-benefits (last visited June 10, 2020).

143.    EMTALA also created an obligation for insurers such as Defendants ensure that a patient's cost-sharing obligation for emergency treatment was the same regardless of whether such treatment was performed by in-network or out-of-network providers. *Id.*

144.    The physicians that care for ER patients depend, for their livelihood, on fair compensation for the services they provide.

145.    The companies that underwrite and administer commercial Insurance, medicare, and Medicaid are the buyers of healthcare services.

146.    The claims at issue in this action are for services Plaintiffs' ER practices provided to patients insured by commercial insurance plans sold and/or administered by United, including plans purchased from the healthcare exchanges.

147.    Thus, ER practices like Plaintiffs' depend on Defendants to conduct business honestly and pay reasonable rates for their services. Where there is not a rate-setting contract between ER physicians and the companies that administered health insurance, ER physicians rely on fair and reasonable "out-of-network" payment practices.

148.    United does not conduct business honestly and does not pay reasonable rates.

149.    Instead of paying fair and reasonable rates, United deployed a scheme to underpay claims for its own benefit, and for the benefit of its associates, forming an enterprise with MultiPlan to reap profits from underpaying claims. This scheme injured not only Plaintiffs but all out-of-network providers of emergency services to United insureds.

150.    The goals of United's scheme are to pocket the difference between the fair and reasonable price of healthcare and the underpaid amount; for United and its subsidiaries and affiliates to retain premium amounts that healthcare consumers believed were applied towards healthcare services; to eliminate competition between contracting and non-contracting providers;

to push non-contracting providers into unfavorable contracts with United; and to avoid liability for the scheme (the "underpayment scheme"). United conspired with MultiPlan Inc. to perpetrate the underpayment scheme.

151.   MultiPlan Inc. promotes itself across the health insurance industry as an "unregulated" cost management company.[23] MultiPlan offers a menu of services for "cost control." Some of the above are legitimate, but others are fraudulent.

152.   Specifically, MultiPlan Inc. makes available Data iSight, billed as "[t]he most effective, defensible way to value a medical claim when an agreed reduction isn't available."[24]

153.   Multiplan describes Data iSight as a "last resort" pricing option. MultiPlan also represents, in its marketing material, that its services are "completely transparent."

154.   MultiPlan Inc. offers a host of mechanisms for "cost-containment." MultiPlan has an internal engine, known within the company as FRED.

155.   FRED takes inputs from the claims United forwards it, and routes them to the respective repricing tool, runs the respective tool, and produces an output.

---

[23] Churchill MultiPlan Analyst Day Presentation, July, 2020 pp. 14 accessed at http://iii.churchillcapitalcorp.com/wp-content/uploads/2020/07/2020.07-Churchill-MultiPlan-Public-Announcement-Presentation.vFFF_.pdf, last visited September 22, 2020; "MultiPlan currently operates in the growing US healthcare market; however, its business is not directly burdened by state or federal regulation, underwriting, malpractice, or credit / reimbursement risk."

[24] https://www.multiplan.us/services/analytics-based/data-isight/ (last visited September 16, 2020).

156.    Data iSight can be generally summarized by the following flowchart:



157.    In fact, Data iSight's calculations are not completely or even partially transparent; *i.e.* they are deliberately opaque. Data iSight is a complex product implemented by a software engine that is designed to cull the lowest possible number from a flawed, proprietary database of healthcare claims data that is wholly unrepresentative of amounts actually charged by or paid to similar medical providers in Plaintiffs' surrounding area.

158.    MultiPlan, as payment for use of the Data iSight, receives a percentage of the difference between a target rate[25] of payment set by United, and the artificially low number Data iSight delivers as a rate of payment. The artificially low Data iSight number is based solely on a manipulated rate that has no basis in objectively gathered and analyzed data.

159.    All of the healthcare claims at issue in this case were drastically underpaid.  For the majority of them, United conspired with MultiPlan to utilize Data iSight to generate and pay artificially depressed payment rates with no resemblance to the methodology United claimed to have used in mailed correspondence, electronic correspondence,  its published media and telephone conferences with plaintiffs.

160.    Plaintiffs were harmed in their businesses and property by Defendants' scheme. They were deprived of the fair value of their services, and lied to by the Defendants who told them that their payments were consistent with an objective calculation of reasonable rates and comparable with rates charged by their competitors.

161.    Plaintiffs bring this suit to recover the fair value of their services, to enjoin Defendants from continuing their fraud, and to ensure appropriate damages are levied against Defendant for its racketeering enterprise such that the verdict shall be precautionary for all payers contemplating using the false and fraudulent pricing tool.

*(5)    Claims submission mechanics*

162.    The emergency healthcare billing process operated as follows: first patients are admitted to Emergency Departments ("EDs") of hospitals where they are screened and stabilized.

163.    As set forth above, this is done without inquiry into their ability to pay.

---

[25] The "Target Rate" is an initial amount provided by United to be passed with the claim as it goes through FRED and subsequent processes that the final payment amount should be less than in pricing terms.

164.    The screening and stabilizing providers record the services they provided in medical record "charts."

165.    If patients are insured, their insurance information is obtained along with patient demographics by the hospital's billing department.

166.    The Hospital's billing department then sends patient demographics, medical records, and insurance demographics to the ER practice group's billing department.

167.    The ER practice group's billing department translates the charts into standardized billing codes, creates invoices with standard charges, coding and patient demographics, and submits the invoices to United.

168.    The invoices were all submitted using standardized claims forms called HCFA-1500 forms. Every claim at issue in this case was submitted directly to United or one of its subsidiaries, all via the same common portal.

169.    After receiving the claims, they were processed, approved for payment, the payment amount was determined, and the claims were paid to the hospital and providers with accompanying notes about how much the patient owed and United's explanation for the amount it paid.

170.    Within the billing process, known in the healthcare industry as the "revenue cycle." United and its subsidiaries used MultiPlan's Data iSight in a scheme to underpay Plaintiffs claims for Defendants' benefit.

*(6)    Rates of Payment*

171.    Instead of looking at the actual insurance benefits or the law to determine how much to pay for a claim, and despite having billions of lines of claim data and years of claims history to

reference, and a database of payment information it paid to create, and its own in-house data analytics company, United enlisted the help of MultiPlan.

172.     United knew that most of its plans required it to pay out-of-network ER services at payment rates equivalent to amounts charged for similar services by similar providers in the providers' geographic areas.

173.     United also knew that it had a legal obligation to ensure that its insureds receiving care from out-of-network doctors did not have a higher out-of-pocket expense than if they were treated by an in-network doctor.

174.     Instead of using the FAIR Health Database or its own internal data, United used MultiPlan, Inc. to produce payment rates. The lower the rate that MultiPlan produced, the more money MultiPlan was paid.

175.     Multiplan literally has the FAIR Health data at their fingertips, built into their computer systems, but they chose not use it *every time*.

176.     MultiPlan offered a menu of pricing tools that it knew would be used to derive different payment rates for the same quoted insurance term, *i.e.* "amounts charged for services by similar providers in a similar geographic area."

177.     MultiPlan offered three general categories of services to United: 1) United could rent access to MultiPlan's contracts with providers through "rental-network" agreements; 2) United could have MultiPlan negotiate individual claims on behalf of United for individual agreements with providers for payment; or 3) United and MultiPlan could use Data iSight to calculate payment rates.

178.     For the majority of claims underpaid to the Plaintiffs' over the years at issue, United and MultiPlan agreed to use Data iSight instead of MultiPlan's negotiations or rental network services.

179.     United deliberately avoided using MultiPlan's other "legitimate" products because those services priced claims at rates higher than what United wanted to pay. United opted to use Data iSight pricing because it knew, based on MultiPlan's marketing and on meetings between United and Data iSight, that the payment rates Data iSight would produce would be artificially low.

*(7)     The Data iSight Product*

180.     The following summary represents a high-level overview of the Data iSight product for pricing claims:

181.     In general, Data iSight derives a rate, then compares the rate to the "benchmark" or Target Price selected by United. If the Data iSight rate is lower than the Target Price and the provider's billed charges, then the Data iSight rate is used to pay claims.

182.     The pricing process starts with United forwarding a claim to MultiPlan. At its sole discretion, United chooses which claims to price internally, which claims to send for one of MultiPlan's other pricing products, and which claims to price through Data iSight.

183.     United sends claim information to MultiPlan electronically via a software "electronic data interchange" program (hereinafter "EDI"). The EDI process allowed United to communicate several critical inputs to MultiPlan:

A.  Claims Information (Policy Type, Charge Amount, CPT/HCPCS Billing Codes)

B.  Routing to Designated Repricing Tool: *i.e.* whether to route the claim to Data iSight or to other Multiplan pricing products such as "Negotiations" or "Rental Networks".

30

C.  The Benchmark "Target Price" for the claim (i.e. the benchmark price that determined MultiPlan's compensation); or

D.  The percentile of Data iSight's proprietary database to use to set a benchmark rate.

184.    Once MultiPlan received information from United, it started the repricing process by sending United's inputs through its "Claims Savings Engine" known internally as FRED which routed the claim to Data iSight.

185.    The most commonly used and pernicious repricing method utilized by Data iSight, "DiP", is discussed below.

186.    Significantly, the FRED system has FAIR Health usual and customary data loaded into it, available at the click of a mouse, but Multiplan consciously chose not to use it *every time*.

     **a.  DiP: The Data iSight Software Engine**

187.    Upon receipt of the data, Data iSight deployed its proprietary claims repricing method. The method first classified and sorted claims information based on type of care. For hospital or facility services, the claims are then sent to the next step in the Data iSight process that is used cost to determine payment.

188.    Professional claims, like those billed by the Plaintiffs in this action, are distinct from hospital or facility claims. The professional claims are for the treatment provided directly by physicians, like Plaintiffs in this case. Professional claims were priced by a specific Data iSight process known internally at MultiPlan as "DiP", internal shorthand for "Data iSight Professional."

189.    DiP is a computer program that takes the codes transmitted by United and applies a convoluted algorithm to "edit" and recalculate claims payment rates.

### b.    Claims Editing

190.    Data iSight's first step in processing claims is to apply 'edits.' "Editing" claims modifies the billing codes on Providers' billing forms to reduce the payment rates that the engine generates. Claims editing (or how to underpay the specific claim) is conducted pursuant to input from the financial marketing departments, rather than a medical or clinical department, at MultiPlan.

191.    United and MultiPlan each oversee different aspects of the claims editing, further evidence of their joint management and control of the enterprise.

192.    Three technical variables fuel the rates the Data iSight engine produces: Conversion Factors, Relative Value Units, and Geographic Practice Cost Indices. Data iSight borrowed these terms and their application from the Medicare Program.

### c.    Medicare Inputs

193.    The DiP software applies cost adjustments from Medicare in calculating physician payments. DiP adjusts the payment amounts based on "Conversion Factors" (hereinafter "CFs"), "Relative Value Units" (hereinafter "RVUs") and "Geographic Practice Cost Index" (hereinafter GPCI) inputs.

### d.    Conversion Factors

194.    The application of Medicare billing mechanics is incompatible with calculation of "reasonable" or UCR payment rates. Medicare reimbursement rates are not established based on the charges of similar providers in the same geographic area and are not subject to state regulation.

195.    To generate a "reasonable" or UCR payment rate, the Data iSight product applies a "conversion factor" or "CF" to the Medicare payment rate.

196.    These hidden transformations lie at heart of the underpayment scheme.

197.     Medicare does not have a unique payment rate for the professional services of emergency room physicians.

198.     Data iSight has created its own CF for the professional services of emergency room physicians.

199.     Data iSight applies an undisclosed statistical analysis to create this unique CF that does not exist in Medicare. Medicare applies a single CF to every single professional service, while Data iSight applies at least 7 CFs depending on type of service. This departure from Medicare's professional fee schedule further obscures the methodology Data iSight uses to underpay claims.

200.     The CF Data iSight applies is derived from a database created by Intercontinental Medical Statistics ("IMS"), a company that purchases data from pharmacies, insurers, and electronic medical record software, anonymizes it, and sells the data back, primarily to drug companies.

201.     While MultiPlan represents that the IMS database contains billions of claims, it actually only contains tens of millions of claims. In terms of scale, the FAIR Health dataset contains approximately 100 data points for every one contained within the IMS dataset.

202.     IMS is now known as IQVIA. The database is not public, is not vetted, is not comprehensive, and is designed to sell itself. MultiPlan paid hundreds of thousands of dollars a year to access the information IMS compiled. MultiPlan chose this database despite having access to the FAIR Health Database discussed *infra*.

203.     By using the IQVIA data set, the payment rate that is ultimately calculated through Data iSight is even further removed from the usual and customary rate than was the Ingenix rate. The deeply flawed Ingenix data set contained commercial charge data, albeit heavily manipulated.

204.    Despite IQVIA costing substantially more to utilize, at least one hundred thousand dollars every six months, while FAIR Health data is available to United and MultiPlan for a nominal fee, the IQVIA expense is well worth it to United and MultiPlan because of its opaque nature and ready susceptibility of its data to manipulation. Further, IQVIA is not accessible to the general public preventing any independent verification or accountability of its contents and use.

205.    MultiPlan chose this database because it knew that the IMS/IQVIA data could be readily manipulated using the Data iSight product, producing the artificially lower payments rates that MultiPlan and United desired.

206.    The IMS/IQVIA database more readily lent itself to the "reverse engineering" accomplished by Data iSight, whereby the payment rate was predetermined.

207.    The IMS database that Data iSight used to power its calculations was secret, proprietary, and unvetted. In other words, the IMS database fulfilled the same purpose as the Ingenix database. Both were manipulated to produce fraudulently low underpayment rates.

208.    The implication of a single anonymous CF as the basis for all emergency professional services is that the rates DiP creates are untethered to services actually provided. Instead, they are based on a formula whose base value stems from a methodology with no clear relationship to the amounts accepted by other providers for the services provided.

209.    DiP used the IMS database on an undifferentiated nationwide basis, meaning that geography was not taken into consideration when calculating the CF. Instead of choosing to adjust CF based on data from Plaintiffs' local competitors, DiP applied Medicare's location based GPCI cost adjustment factor discussed below.

### e.     RVUs and GPCIs

210.    RVUs[26] and GPCIs[27] are components that are used to calculate the amount that Medicare will pay for a claim. They are not based on usual and customary rates; instead, the Medicare formula is based on the resources that Medicare believes go into providing a specific service.

211.    Data iSight uses the Medicare RVUs and GPCIs to derive the payment amount. The problems in doing so are at least two-fold. RVUs and GPCIs are all based on Medicare's assessment of how resources are used in providing specific services, not the charges of similar providers in the same geographic areas.

212.    Further, these factors do not account for or correct the intentionally skewed data that is inputted and to which the methodology is then applied. The truism learned by generations of statisticians, "GIGO: garbage in, garbage out," applies.

### f.     Target Pricing: Meet or Beat

213.    Once the engine yields the DiP, United and Data iSight engaged the second phase of the underpayment scheme: the "meet or beat."

214.    DiP was always compared to a target payment, or benchmark, amount. Within MultiPlan this was known as the "meet or beat" price.

---

[26] An RVU is a Relative Value Unit. It is a measure of value used in Medicare's reimbursement formula. Medicare's reimbursement formula is based on the resources that it takes to provide a service, not the usual and customary charges. RVUs are based on Medicare's determination of the value of the resources used to provide a service divided into three separate RVU values: one for physician work, one for practice expense, and one for malpractice insurance expense.

[27] A geographic practice cost index (GPCI) has been established for every Medicare payment locality for each of the three components of a procedure's relative value unit (i.e., the RVUs for work, practice expense, and malpractice). The GPCI has 112 different geographic areas. By contrast, there are 1,471 geographic zip codes. The GPCI is intended to account for the varying cost of resources by geographic area, not the varying cost of billed services.

215.     The target payment is controlled by United, who either provides a target price, or indicates the methodology MultiPlan should use to derive a target price. This target is then passed with the claim as it goes through FRED and subsequent processes. It is the rate MultiPlan compares to the rate FRED and its subsequent processes derive.

216.     In all cases, United had complete control over the Target Price and MultiPlan had complete control over its implementation of Data iSight.

217.     The Data iSight engine's objective was to beat United's target payment.

218.     MultiPlan was paid based on how much it undershot the target payment.

219.     Typically, MultiPlan was paid a fee equal to between 6% and 9% of the "margin" amount, i.e. the difference between the target amount sent over by United with the claim, and the amount of the new, lower payment that Multiplan's Data iSight engine calculated.

220.     The dollar amount that United ultimately paid for the claims in this case was the lowest of three numbers: Target Price, Billed Amount, or DiP. In every case, the compensation structure agreed upon between MultiPlan and United incentivized artificially low payments.

221.     While United would represent, among other things, that Data iSight derived payment was comparable to, and based on, what similar providers in Plaintiffs' geographic area charged for the same or similar services, in fact the purpose of the scheme was to produce a rate that was far lower than any reasonable or customary rate.

(8)     *Post Payment Concealment*

222.     For every claim at issue in this litigation, documents concealing the true means and basis for payment were issued electronically, in the mail, and on inquiry, over the phone.

223.     Provider Remittance Advice letters ("PRAs") were mailed documents that allegedly provided a detailed explanation of the price reductions. In most PRA documents, the role

of Data iSight in determining the rate of payment was admitted, but the description of Data iSight in its methodology was designed to deceive Providers into accepting reduced rates.

224.    The PRAs contained standardized notes allegedly explaining payment reductions. The repriced claims at issue received inconsistent PRA notes, none of which accurately explained that United and MultiPlan had conspired to pay claims at artificially reduced rates. Instead, the codes provided generic notes or no notes at all. The purpose of the notes on every PRA was to pass the claims prices off as legitimate and objective. The PRA notes were part of the scheme to deceive providers into accepting the reduced rates.

225.    The Data iSight Portal information also contributed to the scheme. The Data iSight Portal purported to describe a transparent basis for the reductions in billed amounts. In every single case, the Data iSight Portal contained numerous misrepresentations, including that the claims were paid at median levels, claims about the objectivity and transparency of the IMS database, and claims about relationships to amounts similar provides accepted for similar codes. Furthermore, Claims Edits, and the basis for them, were never disclosed in any explanations of payments received.

### a.    The DiP Misrepresentations

226.    DiP misrepresented the "reasonable" payment amount, concealed how the price was arrived at, and defrauded Plaintiffs and other providers at several steps.

227.    Claims edits are illegitimate, secret modifications to prices. Claim "editing" changed the billed service inputs. The practice of claim editing causes inputs to the Data iSight software to be false and fraudulent from the start.

228.   The Data iSight engines applies its claims edits secretly, for reasons solely driven by cost reduction, with no clinical basis. The editing is performed by persons without clinical training and without consultation of clinical records.

229.   Any representation that numbers the derived from the Data iSight database are commensurate with the service billed are thus false and fraudulent, because the inputs to the Data iSight engine are not equivalent to the services billed and rendered.

230.   The IMS Database that fueled the underpayment scheme was statistically invalid, inadequate, unvetted, and secret. Its inputs were undisclosed, and its purpose was to produce prices lower than the objectively provided prices available from the FAIR Health database. MultiPlan represents and markets transparency, but never provides the true basis for the data it uses to price claims.

231.   United and MultiPlan applies the same, undifferentiated CF, described previously, for every physician provided emergency service. That means the only differentiation between paid amounts for distinct services in distinct areas is a Medicare formula.

232.   As a result, any representation that payments are based on amounts charged for similar services by similar providers in the same geographic area is false. Instead, there is an arbitrary median rate selected for the whole universe of emergency services, which is then modified by a Medicare formula. The result is paid amounts that do not differentiate between different types of emergency room services, rendered by different types of emergency room providers. It is based on one lump number derived from an unvetted secret database.

233.   Medicare pricing methodologies, including RVU's and GPCI's are inappropriately applied for many of the plans that cover patients whose claims are at issue here, and were omitted from the explanations of benefits for those plans.

234.     GPCI's in particular do not comport with an amount charged by a provider in the treating provider's geographic area, and are fraudulent as applied to requirement that "reasonable" prices to be paid for out of network services.

235.     Meet or Beat pricing incentivizes and causes deviation from objective pricing. The secret goal of the Enterprise, to underpay claims, belies its many representations that the rates the Data iSight engine produced are transparent, objective or fair.

236.     Post-payment concealment via PRAs and Data iSight portal information and telephone conversations are fraudulent and intended to further the purposes of the Enterprise.

**C.**     **Marketing the Conspiracy**

237.     MultiPlan markets Data iSight to United and other insurers as a product capable of underpaying claims discreetly and with minimal complaints from health care providers. MultiPlan explained to United that its Data iSight tool could be deployed in the ER provider context to drastically reduce United's payments to non-participating ER providers.

238.     MultiPlan and United developed and implemented a scheme to underpay ER physicians without facing pushback from their insureds, precisely because patient responsibility is limited by statute.

239.     United believes that use of the "independent" Data iSight product will shield it from liability.

240.     United also misrepresents to insureds and insurance plans how much it pays out in claims by claiming certain amounts of "savings."

241.     Neither healthcare providers or insureds agree to the "savings" as implemented by United and MultiPlan.

242.     This enterprise has allowed United and MultiPlan to make billions of dollars, tens of millions of which are at the expense of Plaintiffs.

243.     MultiPlan and United worked out the details of their enterprise through frequent in-person meetings and electronic and wire communications and through the exchange of internal non-public documents called Whitepapers.

*(1)     MultiPlan's Secret Annual Events: Meetings of the Enterprise*

244.     MultiPlan secretly discussed the Data iSight Professional ("DiP") methodology with United at annual events hosted by the Client Advisory Board of MultiPlan ("CAB"). The "CAB" consists of the senior marketing individuals at MultiPlan including Susan Mohler, MultiPlan's Vice President of Marketing, and Dale White, the Executive Vice President of Sales, Bruce Singleton, Senior Vice President of Network Strategy Network and Michael McEttrick, the Vice President Healthcare Economics.

245.     At these events, United and MultiPlan and Multiplan's other customers would come together, at various discrete locations around the country, to discuss, among other topics, the DiP repricing scheme and how to make more money off it.

246.     These secret meetings established a forum for United to form an Enterprise with MultiPlan to suppress the rates paid to healthcare providers.

247.     During these events, MultiPlan presents slide shows outlining the profits and "savings" that could be made using DiP methodology.

248.     The DiP methodology is specifically designed to be adapted and customized based on input and direction from the insurer and these events and the Road Shows described below allow United and its competitors to discuss the customizations they want in the claim pricing with MultiPlan, directly.

249.    Both United and MultiPlan have management and oversight of the RICO enterprise that they formed to use the DiP methodology in their racketeering activities.

250.    The CAB implies the utility of a "liability shield" provided by DiP methodology. The insurer, under MultiPlan's arrangement, is able to direct underpayments from behind the false appearance of independence.

251.    The CAB emphasizes that MultiPlan's healthcare repricing tools are unregulated.

252.    The absence of regulation allows United and MultiPlan, unfettered, to develop jointly the underpayment scheme.

253.    United partners with MultiPlan to use the DiP methodology so that the "Paid Claims" rate produced through DiP's methodology can be presented as "independent" and "defensible," permitting United and other insurers to abdicate their responsibility for the derived rates. All of this is a smokescreen meant to hide the fraud.

254.    MultiPlan emphasizes to United and other at these meetings that if they are ever subject to pushback or scrutiny about their reasonable or UCR rates, they need only to point to the unregulated DiP methodology and assert that they relied on DiP's use of mysterious "objective" and "data-backed" pricing methodology, the true details of which are never revealed.

255.    At the annual meetings, United and MultiPlan discuss situations where dissatisfied patients and/or providers pushed back or challenged underpaid amounts. In such situations, the DiP methodology and rate are deceitfully presented to patients as a "fair" and "transparent" justification for the underpayment.

256.    MultiPlan and United depended on keeping the actual terms and methodology of DiP secret.

41

(2)    *MultiPlan's Secret Road Shows: Further Meetings of the Enterprise*

257.    MultiPlan's CAB, including representatives Susan Mohler of MultiPlan and Dale White, MultiPlan's Executive Vice President of Sales, also brought secret "Road Shows" or client status updates mixed with sales pitches directly to United and presented PowerPoint slideshows detailing the profits that could be realized by insurers using the DiP pricing methodology.

258.    During the Road Shows and in subsequent interactions, The CAB produces detailed descriptions of DiP's methodology through internal non-public "Whitepapers" with input from United on how it would like its claims routed through the myriad of MultiPlan payment engines, including DiP, to maximize the enterprise's profits.

259.    Representatives of United and MultiPlan discuss the DiP pricing methodology in detail at these Road Shows along with MultiPlan's other methodologies available to illegally lower the prices paid for healthcare services to patients with United administered insurance.

260.    In particular, representatives such as Rebecca Paradise, the Vice President of Out of Network Payment Strategies at United, are involved in these talks.

261.    The text of the underpayment methodology is described in Whitepapers, which are essentially user-manuals for the implementation of the scheme and formation of the enterprise between United and MultiPlan to carry out their racketeering and other illegal activities.

262.    The Whitepapers are developed over the course of the collaboration between United and MultiPlan.

(3)    *The Secret Internal Whitepapers*

263.    MultiPlan's marketing and sales departments, including Jaqueline Kienzle, Vice President of Sales and Account Management at MultiPlan, and manager of United's account, Susan Mohler, and Dale White, exchange with United these internal non-public Whitepapers. The

Whitepapers ae created by the Multiplan marketing department in concert with Multiplan's data engineers.

264. Whitepapers are secret internal documents that explain, in detail, exactly how the DiP methodology can be implemented to derive any payment price United or any other payer wants, regardless of what the language of a patient's health plan actually mandates.

265. Executives from United, including Rebecca Paradise, the Vice President of Out of Network Payment Strategies, review, comment, and provide feedback on MultiPlan's Whitepapers in order to structure United's relationship with MultiPlan and implement the DiP methodology to underpay claims and violate patients' plan language in whatever manner makes the most money for United and Multiplan.

266. United's representatives provide direction to MultiPlan such that MultiPlan revises its Whitepapers to ensure that the DiP methodology will underpay claims in violation of plan language.

267. The Whitepapers explain that United sets performance standards which are defined by target prices. MultiPlan uses DiP to derive a price below the target price. Generally, United pays MultiPlan approximately 6%-9% of the "savings" generated by use of the DiP methodology.

268. The Whitepapers also explain that United can represent "savings" to its customers (purchasers of health insurance) that are not the actual amounts it paid for those services.

269. As such, these jointly developed Whitepapers provide a partial blueprint of the Enterprise, the vehicle that is being used to carry out fraudulent racketeering acts that directly damage Plaintiffs through underpayment of valid, medically necessary claims.

*(4)     The Network Access Agreement*

270.    The National Network Access Agreement ("Agreement") is a written contract between United and MultiPlan the sets out how United and MultiPlan profit from the proceeds of the DiP-generated underpayments.

271.    Rebecca Paradise of United and Jaqueline Kienzle of MultiPlan are the custodians of this Agreement.

272.    Exhibits and Amendments to this Agreement detail the fee and incentive structure between the parties and how United compensates MultiPlan for access to the DiP methodology. It also discusses how MultiPlan receives a percentage of the margin between the target rate and the artificially low number Data iSight delivers as a rate of payment.

273.    Although a benign legal contract between business on its face, the Agreement actually is intended to provide cover and a vehicle for the parties to share the ill-gotten gains of the DiP pricing methodology.

**D.     Misrepresentations**

*(1)     Claims Processing*

274.    Every time a claim is processed by United, United's claim handling system sends to the healthcare provider an alleged explanation of how and why the claim was processed in a specific way. That document, called an "Provider Remittance Advice" (hereinafter "PRA"), is generally transmitted to the treated patient and the treating provider via the United States Postal Service.

275.    The PRAs that United sent in this action are false and were created with the intent to deceive the documents' recipients.

276.     United has sent tens, if not hundreds, of thousands of PRAs making misstatements about pricing methodologies via the United States Postal Service, facsimiles, and electronic data interchanges.

277.     Every PRA for claims repriced by Multiplan's Data iSight tool was misleading. Specific descriptions of PRAs received by each Plaintiff are provided in the following sections.

278.     Under-payments to all Plaintiffs began on around the same time in 2018.

279.     As Plaintiffs share common control, this widespread under-payment was detected and Plaintiffs' representative contacted MultiPlan on behalf of Plaintiffs to attempt to determine the cause of the sudden drop-in payment rates.

280.     As the PRAs received by Plaintiffs all indicated that payment rates were produced by Data iSight, Plaintiffs' agent initially contacted MultiPlan regarding the decrease.

281.     The cost to Plaintiffs of providing emergency medical services had not decreased and there were no other significant changes in the market that would justify the sudden extreme drop in payments.

282.     Plaintiffs' representatives were initially redirected by MultiPlan's agents to United.

283.     On or about November 2, 2018, Plaintiffs' representative spoke with John Haben, VP UnitedHealth Network, Greg Dosedel, VP National Ancillary Contracting for UnitedHealth Network, and Chris Parillo, VP Network Management.

284.     In this conversation, United's team focused on their intent to lower the amount that was paid to Plaintiffs and would do so through 'benchmark' pricing.

285.     On or about December 14, 2018, Plaintiffs' representative was able to speak with John Haben, VP UnitedHealth Networks at UnitedHealthcare.

286.     Plaintiffs' representative continued to press the issue of appropriate payment rates and that Plaintiffs were being underpaid.

287.     Mr. Haben refused to discuss the rates that United had recently negotiated with Envision Healthcare, despite Envision Healthcare providing similar services as Plaintiffs in the same geographic areas as Plaintiffs.

288.     Mr. Haben did little more that reiterate that United would utilize benchmark pricing software to achieve lower rates.

289.     United did exactly that.

290.     Prior to 2018, United processed by Multiplan claims had paid Plaintiffs 90% of their billed charges.

291.     Mr. Haben was aware of this and stated to Plaintiffs' representative that it was not his problem to determine appropriate market rates of payment; instead, it was his problem to stop MultiPlan from paying 90% of Plaintiffs' billed charges.

292.     United and MultiPlan conspired to do exactly that and did exactly that.

293.     On or about April 18, 2019, Plaintiffs' representative spoke with Dan Schumacher, the President and Chief Operating Officer of UnitedHealthcare and other senior management from United.

294.     Plaintiffs' representative challenged United's team on the underpayments of Plaintiffs' ER claims.

295.     United's team responded that payments would continue to decrease and would be paid at 250% of Medicare rates beginning in 2020 simply because they could.

296.     This has now occurred despite the PRAs received by Plaintiffs that state Data iSight was utilized to determine the payment amount.

297.    After many failed attempts to receive any answers, Plaintiffs' representative was able to secure a discussion with MultiPlan executives, Bruce Singleton, SVP Network and Development Strategy, and Michael McEttrick, VP Healthcare Economics.

298.    Plaintiffs' representative was told that Data iSight looks at "a lot" or claims to derive a median accepted charge amount and would not provide any further transparency or specifics into how the amount was determined.

299.    Even though very little was said, by admitting that a median accepted charge was used, MultiPlan admitted that the payment amount was derived from the usual and customary rate of similar providers in the same geographic area.

300.    Neither Singleton nor McEttrick would state what data sources were used to derive the payment amounts despite Plaintiffs' representative specifically asking if FAIR Health was used.

301.    When challenged on price transparency, Singleton and McEttrick replied that the price determination is made transparent.

302.    Such a statement is nonsensical as the price determination is, by its very nature, "transparent" since it is the price that appears on PRAs, and in payments.

303.    Singleton and McEttrick acknowledged that payers such as United could affect pricing and then quickly backtracked to attempt to assert the independence of the Data iSight product.

304.    Overall, the conversation clearly pointed to the conspiracy between United and MultiPlan to 'fix' pricing outcomes and underpay Plaintiffs.

305.    Upon information and belief, the same pattern was also present for other providers of emergency services in New York.

306.    The Defendants know that the rates that Data iSight have allowed for Plaintiffs' claims in 2019 and 2020 are unreasonable and are not, in fact, based on objective, reliable data designed to arrive at a reasonable payment rate and have told Plaintiffs' representatives as much.

307.    Nevertheless, the PRAs sent to Plaintiffs continue to fraudulently represent that the claims are paid at rates commensurate with those of similar providers in the same geographic area arrived at through a transparent, objective methodology.

*(2)    Geographic Adjustment*

308.    In addition to false statements regarding transparency and their methodologies, the Defendants furthered the scheme by using false statements promising geographic adjustments to allowed rates. Indeed, on its online provider portal, Data iSight falsely claims that "[a]ll reimbursements are adjusted based on your geographic location and the prevailing labor costs for your area."

309.    MultiPlan further falsely states on its website that:

For professional claims where actual costs aren't readily available, Data iSight determines a fair price using amounts generally accepted by providers as full payment for services. Claims are first edited, and then priced using widely-recognized, AMA created Relative Value Units (RVU), to take the value and work effort into account [and] CMS Geographic Practice Cost Index, to adjust for regional differences . . . [then] Data iSight multiplies the geographically-adjusted RVU for each procedure by a median based conversion factor to determine the reimbursement amount. This factor is specific to the service provided and derived from a publicly- available database of paid claims.

310.    Contrary to those statements, however, payments for claims from providers in different geographic locations show that Data iSight does not adjust for geographic differences but, instead, works with United to cut uniformly out-of-network provider payments across

geographic locations as shown in the following graph related to payments for services rendered under emergency medical services billing code 99284.[28]

311.    As the graph below shows, the Data iSight payment rates across six states are identical. In those states, where the cost of living, expense of providing care, and ready access to physicians, varies dramatically, Data iSight claims that there is 0 variation in the geographically adjusted claims price. The FAIR Health Database, as a comparison point, indicates the vastly different standard 80th percentile of charge amounts. The flat rate that Data iSight pays shows that rate calculations are not, in fact, geographically adjusted.



_____

[28] Code 99284 is for "Emergency department visit for the evaluation and management of a patient, which requires these 3 key components: A detailed history; A detailed examination; and Medical decision making of moderate complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of high severity, and require urgent evaluation by the physician but do not pose an immediate significant threat to life or physiologic function."

312.    United falsely claims on their website that they "frequently use the 80th percentile of the FAIR Health Benchmark Databases to calculate how much to pay for out-of-network services of health care professionals."[29] None of the claims at issue in this litigation were paid at the 80th percentile of the FAIR Health benchmark despite both United and Multiplan having access to it.

313.    The 80th percentile of FAIR Health Benchmark databases clearly shows that payment for the above non-participating provider charges, when based on a geographically adjusted basis, would not only vary widely, but also be higher than the allowed $413.39 in every instance.

314.    Multiplan has FAIR Health data built into its FRED system, but chooses not to use it every time.

(3)     *Defendants' False Statements*

a.      ***Data iSight's Lack of Transparency***

315.    Defendant Data iSight's website claims to offer "Transparency for You, the Provider," and that the "website makes the process for determining appropriate payment transparent to [providers]. . . so all parties involved in the billing and payment process have a clear understanding of how the reduction was calculated."

316.    Contrary to these claims, Data iSight, uses layers of obfuscation to hide and avoid providing the basis or method it uses to derive its purportedly "appropriate payment."

---

[29] https://www.uhc.com/legal/information-on-payment-of-out-of-network-benefits (last visited October 1, 2020)

317.    This concealment was designed to, and does, prevent providers such as Plaintiffs from discovering that the payment they receive is anything but "appropriate." However, Plaintiffs were able to discover that United's payments were anything but "appropriate."

318.    Defendants do not state, on the PRAs, or anywhere else, any actual reason for the dramatic decreases in payment amounts. Instead, the PRAs for each claim that were mailed to the Plaintiffs contain a misleading note to call a toll-free number *at Data iSight* (not United) if there are questions about the claim.

319.    Claims processed by Data iSight contain the notation "IS" and the following remark:

> MEMBER: THIS SERVICE WAS RENDERED BY AN OUT-OF- NETWORK PROVIDER AND PROCESSED USING YOUR NETWORK BENEFITS. IF YOU'RE ASKED TO PAY MORE THAN THE DEDUCTIBLE, COPAY AND COINSURANCE AMOUNTS SHOWN, PLEASE CALL DATA ISIGHT AT 866-835-4022 OR VISIT DATAISIGHT.COM, THEY WILL WORK WITH THE PROVIDER ON YOUR BEHALF. **PROVIDER: THIS SERVICE HAS BEEN REIMBURSED USING DATA ISIGHT, WHICH UTILIZES COST DATA IF AVAILABLE (FACILITIES) OR PAID DATA (PROFESSIONALS).** PLEASE DO NOT BILL THE PATIENT ABOVE THE AMOUNT OF DEDUCTIBLE, COPAY AND COINSURANCE APPLIED TO THIS SERVICE. IF YOU HAVE QUESTIONS ABOUT THE REIMBURSEMENT CONTACT DATA ISIGHT.

(emphasis added).

320.    On June 18, 2019, Plaintiffs' representative called the toll free number listed in the PRAs to ask about two claims for the same emergency services billing code, 99285, at the same facility at approximately the same time that were paid at two dramatically different payment rates ($295.28 and $413.39, respectively).

321.    When a Data iSight representative named "Phina" spoke with Plaintiffs' representative, she was unable to explain why the two claims, for the same procedure at the same facility and billed at the same charge, had two dramatically different payment rates.

322.    Further, when asked to provide the basis for the dramatic cut in payment and the differing amounts for the claims, she did not and could not explain how the amount was derived or how it was determined.

323.    She stated that the payments on the claims represented a certain percentage of the Medicare fee schedule. She did not explain how Data iSight had arrived at that payment for either of the two claims, why it allowed a different amount for each claim, or why the Medicare fee schedule was used. Instead, she simply stated that the rates were developed by Data iSight *and United*

324.    For more than two weeks in June 2019, Plaintiffs' representative continued to pursue the issue with Data iSight and eventually spoke with a supervisor named "James." Plaintiffs' representative asked James the basis for low payments. James stated that "it is just an amount that is recommended and sent over to United." James had no response when challenged on Data iSight's false claim that it is transparent with providers such as Plaintiffs.

325.    On this call United gave Plaintiffs' representative the reference number 48598806 to confirm the above conversation.

326.    In its healthcare provider portal, Data iSight describes its methodology for payment determinations as "calculated using paid claims data from millions of claims…The Data iSight reimbursement calculation is based upon standard relative value units where applicable for each CPT/HCPCS code, multiplied by a conversion factor."

327.    MultiPlan's website describes Data iSight's process as using "cost- and reimbursement-based methodologies" and notes that it has been "[v]alidated by statisticians as effective and fair." All of these statements are demonstrably false.

328.     As set forth in the foregoing and following sections Plaintiff, it is clear that Data iSight is not using any externally-validated methodology to establish a reasonable payment rate. Its rates are not defensible or reasonable.

### b.     Data iSight's Inconsistent Payment Determinations

329.     In addition to the vast number of underpayments generated by Data iSight's use of DiP described above, Data iSight and United utilized other underpayment tools and methodologies as well.

330.     For example, over a period of four months in 2019, the Plaintiffs submitted claims for three separate patients under the billing code 99285 but received payments rates that varied widely as shown in the following paragraphs.

331.     Patient CD was treated on January 12, 2019, by Plaintiff Emergency Care Services of New York. Plaintiff billed United $1,110.00 for following the process set out above.  Defendants determined that the allowed rate of payment for the claim to be just 25% of billed charges, or $277.63.

332.     For patient GH, treated again by Plaintiff Emergency Care Services of New York only a few weeks after CD on May 18, 2019, Defendants determined the payment rate to be $435.20, or 37%, of Plaintiff's billed charges of charges of $1,184.00.

333.     For patient IJ, again treated by Plaintiff Emergency Care Services of New York, on January 24, 2019, Plaintiff billed $1,100.00 to United. For this claim Defendants arrived at a payment rate of $609.28, or 55% of billed charges.

334.     As the above examples clearly show, Defendants' cannot even get their own fraud straight.  The methodologies being utilized by Defendants do not use externally validated data and are sometimes not even consistent amongst themselves.  None of Defendants' payments at issue

in this case are defensible, or reasonable and are completely contrary to their false assertions designed to mislead the Plaintiffs (and similar providers) into believing they have received fair payment for their services.

        *(4)    General Misrepresentations*

335.    United represents to its insureds that it will pay reasonable rates for emergency services, including by representing it will pay emergency room claims based on amounts charged by similar providers in its geographic area.

336.    United represents to its insureds that for non-network ER services, patients will be liable for amounts parallel to their "in-network" cost sharing responsibilities.

337.    United represents to the employee benefits plans it administers that the amounts it deducts from the benefits trust accounts reflected amounts actually paid to providers claims.

338.    MultiPlan, Inc. represents that its pricing methodologies are transparent and that the data it uses is reflective of prices actually charged by similar providers in the geographic area.

339.    United never discloses the "meet or beat" mechanism or the source of target prices to its insureds, the employee benefits plans it administers, to providers, and to Plaintiffs.

340.    United and MultiPlan never disclose how and why they edited claims to generate reduced prices for the covered, medically necessary services.

341.    United has sent and continues to send, tens, if not hundreds, of thousands of documents making misstatements about pricing methodologies via the United States Postal Service, electronic data interchanges, and telephone conversations, to healthcare providers including the Plaintiffs.

342.    United and MultiPlan conspire to use Data iSight's online portal to cover the tracks of their scheme.

*(5)      United's Bad Faith Negotiations with Plaintiffs*

343.    From late 2017 through 2019, Plaintiffs' representatives attempted to negotiate with United for Plaintiffs to become contracted, participating, in-network providers with United.

344.    This occurred over the course of multiple meetings in person, by phone, and by email correspondence.

345.    As part of these negotiations, Plaintiffs' representative met with United representatives Dan Rosenthal, President of Defendant UnitedHealth Networks, Inc.; John Haben, Vice President of Defendant UnitedHealth Networks, Inc.; and Greg Dosedel, Vice President of National Ancillary Contracting & Strategy at Defendant UnitedHealthcare Services, Inc.

346.    In or around December 2017, Mr. Rosenthal told Plaintiffs' agent that United intended to implement a new benchmark pricing program to reduce out-of-network payments.

347.    United then proposed to Plaintiffs' agent a contractual rate that was roughly half the average reasonable rate at which United had historically paid Plaintiffs, a drastic and unjustified discount from what United had been paying Plaintiffs for years on their non-participating claims in these plans, and an amount materially less than what United was paying other contracted providers in the same geographic market.

348.    United's proposed rate was neither reasonable nor fair.

349.    In May 2018, after Plaintiffs rejected United's proposal Mr. Rosenthal threatened that if Plaintiffs' agent did not agree to contract for the drastically reduced rates, United would implement benchmark pricing that would reduce all Plaintiffs' non-participating payment by one-third.

350.    This is exactly what happened, even though the PRAs received by Plaintiffs all showed that Data iSight's "objective" methodology had been used to determine payment rates.

351.     Another United agent, Dan Schumacher, the President and Chief Operating Officer of UnitedHealthcare and part of the Office of the Chief Executive of Defendant UnitedHealth Group, Inc., told Plaintiffs' agent that by April 2019, United would cut each Plaintiffs' non-participating payment by half.

352.     Again, this is exactly what happened, even though the PRAs received by Plaintiffs all showed that Data iSight's "objective" methodology had been used to determine payment rates.

353.     When asked why United was forcing such dramatic cuts on Plaintiffs' payment, Mr. Schumacher responded "because we can."

354.     This admission by United's agent is clear evidence that United knew the representations it made through wires and mail communication about Plaintiffs' payment rates were fraudulent.

355.     Continuing the scheme, on July 7, 2019, Mr. Schumacher advised in a phone call to Plaintiffs' agent that United planned to cut every Plaintiffs' rates over three years to just 42% of the average and reasonable rate of payment that Plaintiffs had received in 2018.

356.     Mr. Schumacher additionally advised that United leadership was aware of and supported the drastic cuts while providing no objective basis for them.

357.     The next day, July 8, 2019, United's representative Angie Nierman, a Vice President of Networks at Defendant UnitedHealth Group, Inc., sent via interstate wires a written proposal to Plaintiffs' agent reflecting Mr. Schumacher's stated cuts.

358.     In addition to denying Plaintiffs what is owed to them for the claims at issue in this litigation, Defendants' scheme is an attempt to use their market power to reset the rate of payment to unreasonably low levels, distorting the entire market.

359.    Despite having announced their intent to slash payment rates to Plaintiffs' agent, and even stating the amount that rates would be reduced, United and MultiPlan continue to represent to Plaintiffs, other providers, and the public that the payment rates paid for out-of-network emergency services reflect the rate of similar payers in the same geographic region.

360.    As set forth in detail in the following section, this is demonstrably false for every Plaintiff.

**E.    <u>Defendants Racketeering Acts and Underpayment of Claims</u>**

361.    The payment claims within the scope of this action are (a) non-participating commercial claims (including for patients covered by Affordable Care Act Exchange products), (b) that were adjudicated as covered, and allowed as payable by the Insurance Companies, (c) at rates below the billed charges and a reasonable payment for the services rendered, (d) as measured by the community where they were performed and by the person who provided them.   The Plaintiffs are professional emergency medical group practices that staff hospital emergency departments and treat emergency room patients at numerous hospitals in the State of New York.

362.    Physicians that care for ER patients depend, for their livelihood, on fair compensation for the services they provide.  Plaintiffs in this action are ER physician groups who have been denied fair compensation.

363.    United does not conduct business fairly and does not pay reasonable rates. United has formed a federal RICO enterprise with Multiplan to fraudulently under-pay claims. The Enterprise has underpaid every claim at issue in the present litigation. The Enterprise profits by unlawfully retaining the difference between the fair and reasonable price of healthcare and the underpaid amount.

364.    In addition to profit, the Enterprise has the effect of eliminating competition between contracting and non-contracting providers; pushing non-contracting providers into unfavorable contracts with United; and avoid liability for Enterprise and racketeering acts.

*(1)    Predicate Acts*

### a.    Overview of Predicate Acts and Inequitable Conduct

365.    Each Plaintiff in this case had dozens of individual healthcare claims systematically underpaid by the Defendants, who acted in concert. A sampling of these claims for the emergency medical services billing codes 99284[30] and 99285[31], from the years 2018, 2019, and 2020, are alleged in detail below.



30 Code 99284 is for "Emergency department visit for the evaluation and management of a patient, which requires these 3 key components: A detailed history; A detailed examination; and Medical decision making of moderate complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of high severity, and require urgent evaluation by the physician but do not pose an immediate significant threat to life or physiologic function."

31 Code 99285 is for "Emergency department visit for the evaluation and management of a patient, which requires these 3 key components within the constraints imposed by the urgency of the patient's clinical condition and/or mental status: A comprehensive history; A comprehensive examination; and Medical decision making of high complexity. Counseling and/or coordination

### b.      Predicate Acts as to Emergency Physician Services of NY

*Patient KEB*

366.    On 08/04/2020, Emergency Physician Services of NY, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient KEB. These services fell under the description associated with the universally accepted hospital billing code 99285.

367.    Also on 08/04/2020, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

368.    On 08/25/2020, Plaintiff electronically submitted an invoice to United for $1,243.00, the amount Emergency Physician Services of NY typically received for services related to billing code 99285. Emergency Physician Services of NY' charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

369.    As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 08/25/2020. It was received by United on the same date.

370.    The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

371.    United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $395.40 to the Plaintiff.

---

of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of high severity and pose an immediate significant threat to life or physiologic function."

372.    At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount," that the Plaintiff would receive. The Allowed Amount on the PRA for this claim was $439.33.

373.    The FAIR Health amount for this claim is $1,062.

374.    The PRA also contained a note reading "IS", indicating that United had used Data iSight to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

375.    The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

376.    United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

377.    The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

378.    All of this information is demonstrably false for reasons discussed at length in this complaint.

379. The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient JD*

380. On 07/12/2020, Emergency Physician Services of NY, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient JD. These services fell under the description associated with the universally accepted hospital billing code 99285.

381. Also on 07/12/2020, the treating hospital requested and obtained insurance demographic information from the Patient, who provided their United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

382. On 07/28/2020, Plaintiff electronically submitted an invoice to United for $1,281.00, the amount Emergency Physician Services of NY typically received for services related to billing code 99285 in the area services were rendered. Emergency Physician Services of NY' charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

383. As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 07/28/2020. It was received by United on the same date.

384. The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

385. United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $395.40 to the Plaintiff.

386.     At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount," that the Plaintiff would receive. The Allowed Amount on the PRA for this claim was $439.33.

387.     The FAIR Health amount for this claim is $1,062.

388.     The PRA also contained a note reading "IS", indicating that United had used the Data iSight service to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

389.     The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

390.     United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

391.     The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

392.     All of this information is demonstrably false for reasons discussed at length in this complaint.

393.    The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient MJE*

394.    On 07/18/2020, Emergency Physician Services of NY, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient MJE. These services fell under the description associated with the universally accepted hospital billing code 99285.

395.    Also on 07/18/2020, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

396.    On 08/13/2020, Plaintiff electronically submitted an invoice to United for $1,243.00, the amount Emergency Physician Services of NY typically received for services related to billing code 99285. Emergency Physician Services of NY' charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

397.    As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 08/13/2020. It was received by United on the same date.

398.    The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

399.    United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $395.40 to the Plaintiff.

400.    At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount," that the Plaintiff would receive. The Allowed Amount on the PRA for this claim was $439.33.

401.    The FAIR Health amount for this claim is $1,062.

402.    The PRA also contained a note reading "IS", indicating that United had used Data iSight to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

403.    The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

404.    United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

405.    The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

406.    All of this information is demonstrably false for reasons discussed at length in this complaint. The DiP methodology was utilized as directed by United to yield payment rates

consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

      **c.**    **Facts Relevant to All Emergency Physician Services of NY Claims**

407.    Defendants derived the payment amount using hidden methodology that they sought to conceal 1) in notes on PRAs sent by U.S. mail by United to the Plaintiff and 2) by Multiplan publishing false information on the Data iSight website.

408.    The data Defendants use to price these claims is <u>not</u> based on calculations related to similar providers in a similar geographic area, but on a secret, artificially low national number it has manipulated and adjusted from suspect data it purchases from third parties.

409.    At no time material to this action did the Plaintiff negotiate with United, MultiPlan or Daat iSight or agree to accept a discounted rate for its services, or to be bound by United's, MultiPlan's or Data iSight's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services it provided to this Patient or any patient with United insurance.

410.    Notwithstanding the absence of any such agreement, United and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid the Plaintiff for emergency services rendered to the Patient and to other United patients.

411.    The Plaintiff has been directly harmed by this underpayment.

412.    United's and MultiPlan's use of Data iSight to underprice the claim deprived the Plaintiff of property – money – that should have been paid to the Plaintiff for the claim.

413.    This money had already been paid to United through the Patient's insurance premiums.

414. The profit or 'margin' from this underpayment was shared by United and MultiPlan.

415. For more than two years before the date of the filing of this action and continuing, for many similar Patients with identical healthcare claims, the Plaintiff has been systematically misled and underpaid by United, MultiPlan and Data iSight.

### d.     Predicate Acts as to Buffalo Emergency Associates

*Patient KB*

416. On 12/15/2018, Buffalo Emergency Associates, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient KB. These services fell under the description associated with the universally accepted hospital billing code 99285.

417. Also on 12/15/2018, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

418. On 12/31/2018, Plaintiff electronically submitted an invoice to United for $1,011.00, the amount Buffalo Emergency Associates typically received for services related to billing code 99285. Buffalo Emergency Associates' charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

419. As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 12/31/2018. It was received by United on the same date.

420. The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

421.    United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $608.51 to the Plaintiff.

422.    At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount," that the Plaintiff would receive. The Allowed Amount on the PRA for this claim was $608.51.

423.    The FAIR Health amount for this claim is $1,062.

424.    The PRA also contained a note reading "IS", indicating that United had used Data iSight to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

425.    The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

426.    United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

427.    The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

428.    All of this information is demonstrably false for reasons discussed at length in this complaint.

429.    The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient AB*

430.    On 12/1/2018, Buffalo Emergency Associates, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient AB. These services fell under the description associated with the universally accepted hospital billing code 99285.

431.    Also on 12/1/2018, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

432.    On 12/31/2018, Plaintiff electronically submitted an invoice to United for $1,011.00, the amount Buffalo Emergency Associates typically received for services related to billing code 99285. Buffalo Emergency Associates's charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

433.    As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 12/31/2018. It was received by United on the same date.

434.    The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

435.    United received the invoice, processed it, and issued payment in the amount of $0.00 to the Plaintiff.  (This zero-payment amount was reduced from the already low Allowed Amount, described below, because of this patient's allegedly unmet deductible.)

436.    At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount," that the Plaintiff could receive for the claim. The Allowed Amount on the PRA for this claim was $608.51.

437.    The FAIR Health amount for this claim is $1,062.

438.    The PRA also contained a note reading "IS", indicating that United had used the Data iSight service to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

439.    The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

440.    United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

441.    The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

442.    All of this information is demonstrably false for reasons discussed at length in this complaint.

443.    The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient MA*

444.    On 2/19/2019, Buffalo Emergency Associates, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient MA. These services fell under the description associated with the universally accepted hospital billing code 99285.

445.    Also on 2/19/2019, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

446.    On 3/11/2019, Plaintiff electronically submitted an invoice to United for $1,011.00, the amount the Buffalo Emergency Associates typically received for services related to billing code 99285. Buffalo Emergency Associates's charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

447.    As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 3/11/2019. It was received by United on the same date.

448.    The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

449.    United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $435.00 to the Plaintiff.

450.     At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount," that the Plaintiff would receive. The Allowed Amount on the PRA for this claim was $435.00.

451.     The FAIR Health amount for this claim is $1,062.

452.     The PRA also contained a note reading "IS", indicating that United had used Data iSight to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

453.     The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

454.     United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

455.     The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

456.     All of this information is demonstrably false for reasons discussed at length in this complaint.

457. The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient AST*

458. On 3/8/2019, Buffalo Emergency Associates, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient AST. These services fell under the description associated with the universally accepted hospital billing code 99285.

459. Also on 3/8/2019, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

460. On 3/21/2019, Plaintiff electronically submitted an invoice to United for $1,011.00, the amount Buffalo Emergency Associates typically received for services related to billing code 99285. Buffalo Emergency Associates's charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

461. As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 3/21/2019. It was received by United on the same date.

462. The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

463. United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $348.16 to the Plaintiff.

464. At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount," that showed to total

amount that the Plaintiff could receive. The Allowed Amount on the PRA for this claim was $435.20.

465. The FAIR Health amount for this claim is $1,062.

466. The PRA also contained a note reading "IS", indicating that United had used Data iSight to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

467. The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

468. United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

469. The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

470. All of this information is demonstrably false for reasons discussed at length in this complaint.

471.    The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient MDG*

472.    On 5/3/2019, Buffalo Emergency Associates, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient MDG. These services fell under the description associated with the universally accepted hospital billing code 99285.

473.    Also on 5/3/2019, the treating hospital requested and obtained insurance demographic information from the Patient, who provided her United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

474.    On 5/23/2019, Plaintiff electronically submitted an invoice to United for $1,011.00, the amount Buffalo Emergency Associates typically received for services related to billing code 99285. Buffalo Emergency Associates's charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

475.    As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 5/23/2019. It was received by United on the same date.

476.    The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

477.    United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of $348.16 to the Plaintiff.

478.    At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount" as the total amount that

the Plaintiff could collect on this claim. The Allowed Amount on the PRA for this claim was only $435.20.

479.     The FAIR Health amount for this claim is $1,062.

480.     The PRA also contained a note reading "IS", indicating that United had used Data iSight to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

481.     The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

482.     United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

483.     The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

484.     All of this information is demonstrably false for reasons discussed at length in this complaint.

485.     The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient NT*

486.     On 1/23/2020, Buffalo Emergency Associates, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient NT. These services fell under the description associated with the universally accepted hospital billing code 99285.

487.     Also on 1/23/2020, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

488.     On 2/13/2020, Plaintiff electronically submitted an invoice to United for $1,115.00, the amount Buffalo Emergency Associates typically received for services related to billing code 99285. Buffalo Emergency Associates's charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

489.     As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 2/13/2020. It was received by United on the same date.

490.     The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

491.     United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $436.56 to the Plaintiff.

492.    At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount," that the Plaintiff would receive.  The Allowed Amount on the PRA for this claim was $436.56.

493.    The FAIR Health amount for this claim is $1,062.

494.    The PRA also contained a note reading "IS", indicating that United had used Data iSight to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

495.    The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

496.    United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

497.    The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

498.    All of this information is demonstrably false for reasons discussed at length in this complaint.

499. The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient DAK*

500. On 6/17/2020, Buffalo Emergency Associates, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient DAK. These services fell under the description associated with the universally accepted hospital billing code 99285.

501. Also on 6/17/2020, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

502. On 8/14/2020, Plaintiff electronically submitted an invoice to United for $1,115.00, the amount Buffalo Emergency Associates typically received for services related to billing code 99285. Buffalo Emergency Associates's charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

503. As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing "clearinghouse' on 8/14/2020. It was received by United on the same date.

504. The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

505. United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $439.33 to the Plaintiff.

506.    At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount," that the Plaintiff would receive. The Allowed Amount on the PRA for this claim was $439.33.

507.    The FAIR Health amount for this claim is $1,062.

508.    The PRA also contained a note reading "IS", indicating that United had used the Data iSight service to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

509.    The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

510.    United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

511.    The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

512.    All of this information is demonstrably false for reasons discussed at length in this complaint.

79

513. The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

### e. Facts Relevant to All Buffalo Emergency Associates' Claims

514. Defendants derived the payment amount using hidden methodology that they sought to conceal 1) in notes on PRAs sent by U.S. mail by United to the Plaintiff and 2) by Multiplan publishing false information on the Data iSight website. The data Defendants use to price these claims is not based on calculations related to similar providers in a similar geographic area, but on a secret, artificially low national number it has manipulated and adjusted from suspect data it purchases from third parties.

515. At no time material to this action did the Plaintiff negotiate with United, MultiPlan or Daat iSight or agree to accept a discounted rate for its services, or to be bound by United's, MultiPlan's or Data iSight's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services it provided to this Patient or any patient with United insurance. Notwithstanding the absence of any such agreement, United and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid the Plaintiff for emergency services rendered to the Patient and to other United patients.

516. The Plaintiff has been directly harmed by this underpayment.

517. United's and MultiPlan's use of Data iSight to underprice the claim deprived the Plaintiff of property – money – that should have been paid to the Plaintiff for the claim. This money had already been paid to United through the Patient's insurance premiums. The profit or 'margin' from this underpayment was shared by United and MultiPlan.

518.    For more than two years before the date of the filing of this action and continuing, for many similar Patients with identical healthcare claims, the Plaintiff has been systematically misled and underpaid by United, MultiPlan and Data iSight.

519.    Defendants derived the payment amount using hidden methodology that they sought to conceal 1) in notes on PRAs sent by U.S. mail by United to the Plaintiff and 2) by Multiplan publishing false information on the Data iSight website.  The data Defendants use to price these claims is not based on calculations related to similar providers in a similar geographic area, but on a secret, artificially low national number it has manipulated and adjusted from suspect data it purchases from third-parties.

520.    At no time material to this action did the Plaintiff negotiate with United, MultiPlan or Data iSight or agree to accept a discounted rate for its services, or to be bound by United's, MultiPlan's or Data iSight's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services it provided to this Patient or any patient with United insurance.  Notwithstanding the absence of any such agreement, United and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid the Plaintiff for emergency medical services rendered to the Patient and to other United patients.

521.    The Plaintiff has been directly harmed by this underpayment.

522.    United's and MultiPlan's use of Data iSight to underprice the claim deprived the Plaintiff of property – money - that should have been paid to the Plaintiff for the claim.  This money had already been paid to United through the Patient's insurance premiums.  The profit or 'margin' from this underpayment was shared by United and MultiPlan.

523.    For more than two years before the date of the filing of this action and continuing, for many similar Patients with identical healthcare claims, the Plaintiff has been systematically misled and underpaid by United, MultiPlan and Data iSight.

**f.      Predicate Acts as to Exigence Medical of Binghamton**

*Patient ANB*

524.    On 11/6/2018, Exigence Medical of Binghamton, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient ANB.  These services fell under the description associated with the universally accepted hospital billing code 99284.

525.    Also on 11/6/2018, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

526.    On 1/7/2019, Plaintiff electronically submitted an invoice to United for $696.00, the amount Exigence Medical of Binghamton typically received for services related to billing code 99284. Exigence Medical of Binghamton's charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

527.    As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing "clearinghouse' on 1/7/2019. It was received by United on the same date.

528.    The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

529.    United received the invoice, processed it, and issued payment in the amount of $0.00 to the Plaintiff.  (This zero-payment amount was reduced from the already low Allowed Amount, described below, because of this patient's unmet deductible.)

530.    At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount" as the total amount that the Plaintiff could collect for this claim. The Allowed Amount on the PRA for this claim was only $294.95.

531.    The FAIR Health amount for this claim is $700.

532.    The PRA also contained a note reading "IS", indicating that United had used Data iSight to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

533.    The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

534.    United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

535.    The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

536.    All of this information is demonstrably false for reasons discussed at length in this complaint.

537.    The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient ANI*

538.    On 1/11/2020, Exigence Medical of Binghamton, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient ANI. These services fell under the description associated with the universally accepted hospital billing code 99285.

539.    Also on 1/11/2020, the treating hospital requested and obtained insurance demographic information from the Patient, who provided her United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

540.    On 1/11/2020, Plaintiff electronically submitted an invoice to United for $1,206.00, the amount Exigence Medical of Binghamton typically received for services related to billing code 99285. Exigence Medical of Binghamton's charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

541.    As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 1/11/2020. It was received by United on the same date.

542.    The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

543.    United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $436.58 to the Plaintiff.

544.    At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount" that the Plaintiff would

receive. The Allowed Amount on the PRA for this claim was $436.58. The FAIR Health amount for this claim is $1,062.

545.    The PRA also contained a note reading "IS", indicating that United had used the Data iSight service to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

546.    The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

547.    United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

548.    The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

549.    All of this information is demonstrably false for reasons discussed at length in this complaint.

550.    The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient HSM*

551.    On 1/15/2020, Exigence Medical of Binghamton, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient HSM.  These services fell under the description associated with the universally accepted hospital billing code 99285.

552.    Also on 1/15/2020, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

553.    On 2/1/2020, Plaintiff electronically submitted an invoice to United for $1,206.00, the amount Exigence Medical of Binghamton typically received for services related to billing code 99285. Exigence Medical of Binghamton's charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

554.    As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 2/1/2020. It was received by United on the same date.

555.    The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

556.    United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of $349.26 to the Plaintiff.

557.    At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount" as the total amount that the Plaintiff could collect for this claim. The Allowed Amount on the PRA for this claim was only $436.58.

558.    The FAIR Health amount for this claim is $1,062.

559.    The PRA also contained a note reading "IS", indicating that United had used the Data iSight service to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

560.    The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

561.    United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

562.    The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims." All of this information is demonstrably false for reasons discussed at length in this complaint.

563.    The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

### g. Facts Relevant to All Exigence Medical of Binghamton's Claims

564. Defendants derived the payment amount using hidden methodology that they sought to conceal 1) in notes on PRAs sent by U.S. mail by United to the Plaintiff and 2) by Multiplan publishing false information on the Data iSight website.

565. The data Defendants use to price these claims is not based on calculations related to similar providers in a similar geographic area, but on a secret, artificially low national number it has manipulated and adjusted from suspect data it purchases from third-parties.

566. At no time material to this action did the Plaintiff negotiate with United, MultiPlan or Data iSight or agree to accept a discounted rate for its services, or to be bound by United's, MultiPlan's or Data iSight's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services it provided to this Patient or any patient with United insurance.

567. Notwithstanding the absence of any such agreement, United and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid the Plaintiff for emergency medical services rendered to the Patient and to other United patients.

568. The Plaintiff has been directly harmed by this underpayment. United's and MultiPlan's use of Data iSight to underprice the claim deprived the Plaintiff of property – money - that should have been paid to the Plaintiff for the claim.

569. This money had already been paid to United through the Patient's insurance premiums.

570. The profit or 'margin' from this underpayment was shared by United and MultiPlan.

571.     For more than two years before the date of the filing of this action and continuing, for many similar Patients with identical healthcare claims, the Plaintiff has been systematically misled and underpaid by United, MultiPlan and Data iSight.

### h.     Predicate Acts as to Exigence Medical of Jamestown

*Patient DLB*

572.     On 10/7/2018, Exigence Medical of Jamestown, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient DLB. These services fell under the description associated with the universally accepted hospital billing code 99284.

573.     Also on 10/7/2018, the treating hospital requested and obtained insurance demographic information from the Patient, who provided her United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

574.     On 12/18/2018, Plaintiff electronically submitted an invoice to United for $651.00, the amount Exigence Medical of Jamestown typically received for services related to billing code 99284. Exigence Medical of Jamestown's charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

575.     As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 12/18/2018. It was received by United on the same date.

576.     The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

577.     United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of $322.59 to the Plaintiff.

578.    At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount" as the total amount that the Plaintiff was entitled to collect on this claim. The Allowed Amount on the PRA for this claim was only $403.24.

579.    The FAIR Health amount for this claim is $700.00.

580.    The PRA also contained a note reading "IS", indicating that United had used the Data iSight service to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

581.    The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

582.    United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

583.    The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

584.    All of this information is demonstrably false for reasons discussed at length in this complaint.

585.    The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient AC*

586.    On 10/9/2018, Exigence Medical of Jamestown, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient AC. These services fell under the description associated with the universally accepted hospital billing code 99284.

587.    Also on 10/9/2018, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

588.    On 12/24/2018, Plaintiff electronically submitted an invoice to United for $651.00, the amount Exigence Medical of Jamestown typically received for services related to billing code 99284. Exigence Medical of Jamestown's charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

589.    As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 12/24/2018. It was received by United on the same date.

590.    The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

591.    United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of $322.59 to the Plaintiff.

592.    At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount" as the amount that

Plaintiff could collect on this claim. The Allowed Amount on the PRA for this claim was only $403.24.

593.    The FAIR Health amount for this claim is $700.00.

594.    The PRA also contained a note reading "IS", indicating that United had used the Data iSight service to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

595.    The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

596.    United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

597.    The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

598.    All of this information is demonstrably false for reasons discussed at length in this complaint.

599.   The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient EQ*

600.   On 10/24/2018, Exigence Medical of Jamestown, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient EQ. These services fell under the description associated with the universally accepted hospital billing code 99284.

601.   Also on 10/24/2018, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

602.   On 12/21/2018, Plaintiff electronically submitted an invoice to United for $651.00, the amount Exigence Medical of Jamestown typically received for services related to billing code 99284. Exigence Medical of Jamestown's charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

603.   As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 12/21/2018. It was received by United on the same date.

604.   The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

605.   United received the invoice, processed it, and issued payment in the amount of $0.00 to the Plaintiff.  (This zero-payment amount was reduced from the already low Allowed Amount, described below, because of this patient's allegedly unmet deductible.)

606.    At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount," as the total amount that the Plaintiff is entitled to collect on this claim. The Allowed Amount on the PRA for this claim was only $403.24.

607.    The FAIR Health amount for this claim is $700.

608.    The PRA also contained a note reading "IS", indicating that United had used the Data iSight service to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

609.    The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

610.    United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

611.    The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

612.    All of this information is demonstrably false for reasons discussed at length in this complaint.

613.     The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient JW*

614.     On 8/19/2019, Exigence Medical of Jamestown, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient JW.  These services fell under the description associated with the universally accepted hospital billing code 99285.

615.     Also on 8/19/2019, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

616.     On 10/17/2019, Plaintiff electronically submitted an invoice to United for $1,073.00, the amount Exigence Medical of Jamestown typically received for services related to billing code 99285. Exigence Medical of Jamestown's charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

617.     As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 10/17/2019. It was received by United on the same date.

618.     The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

619.     United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $435.20 to the Plaintiff.

620.    At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount" that the Plaintiff would receive. The Allowed Amount on the PRA for this claim was $435.20.

621.    The FAIR Health amount for this claim is $1,062.

622.    The PRA also contained a note reading "IS", indicating that United had used the Data iSight service to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

623.    The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

624.    United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

625.    The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

626.    All of this information is demonstrably false for reasons discussed at length in this complaint.

627.     The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient DRD*

628.     On 10/29/2019, Exigence Medical of Jamestown, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient DRD.  These services fell under the description associated with the universally accepted hospital billing code 99285.

629.     Also on 10/29/2019, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

630.     On 1/13/2020, Plaintiff electronically submitted an invoice to United for $1,073.00, the amount Exigence Medical of Jamestown typically received for services related to billing code 99285. Exigence Medical of Jamestown's charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

631.     As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing "clearinghouse' on 1/13/2020. It was received by United on the same date.

632.     The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

633.     United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $304.64 to the Plaintiff.

634.     At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount" as the total amount that

the Plaintiff is entitled to collect on this claim. The Allowed Amount on the PRA for this claim was only $435.20.

635.     The FAIR Health amount for this claim is $1,062.

636.     The PRA also contained a note reading "IS", indicating that United had used the Data iSight service to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

637.     The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

638.     United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

639.     The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

640.     All of this information is demonstrably false for reasons discussed at length in this complaint.

641.     The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient VLS*

642.     On 12/1/2019, Exigence Medical of Jamestown, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient VLS. These services fell under the description associated with the universally accepted hospital billing code 99285.

643.     Also on 12/1/2019, the treating hospital requested and obtained insurance demographic information from the Patient, who provided her United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

644.     On 1/14/2020, Plaintiff electronically submitted an invoice to United for $1,073.00, the amount the Exigence Medical of Jamestown typically received for services related to billing code 99285. Exigence Medical of Jamestown's charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

645.     As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 1/14/2020. It was received by United on the same date.

646.     The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

647.     United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $435.20 to the Plaintiff.

648.     At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount" that the Plaintiff would receive.  The Allowed Amount on the PRA for this claim was $435.20.

649.     The FAIR Health amount for this claim is $1,062.

650.     The PRA also contained a note reading "IS", indicating that United had used the Data iSight service to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

651.     The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

652.     United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

653.     The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

654.     All of this information is demonstrably false for reasons discussed at length in this complaint.

100

655.    The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

### i.    Facts Relevant to All Exigence Medical of Jamestown's Claims

656.    Defendants derived the payment amount using hidden methodology that they sought to conceal 1) in notes on PRAs sent by U.S. mail by United to the Plaintiff and 2) by Multiplan publishing false information on the Data iSight website.  The data Defendants use to price these claims is not based on calculations related to similar providers in a similar geographic area, but on a secret, artificially low national number it has manipulated and adjusted from suspect data it purchases from third-parties.

657.    At no time material to this action did the Plaintiff negotiate with United, MultiPlan or Data iSight or agree to accept a discounted rate for its services, or to be bound by United's, MultiPlan's or Data iSight's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services it provided to this Patient or any patient with United insurance.  Notwithstanding the absence of any such agreement, United and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid the Plaintiff for emergency medical services rendered to the Patient and to other United patients.

658.    The Plaintiff has been directly harmed by this underpayment.

659.    United's and MultiPlan's use of Data iSight to underprice the claim deprived the Plaintiff of property – money - that should have been paid to the Plaintiff for the claim.  This money had already been paid to United through the Patient's insurance premiums.  The profit or 'margin' from this underpayment was shared by United and MultiPlan.

660.    For more than two years before the date of the filing of this action and continuing, for many similar Patients with identical healthcare claims, the Plaintiff has been systematically misled and underpaid by United, MultiPlan and Data iSight.

### j.    Facts Relevant to Emergency Care Services of NY

*Patient BM*

661.    On 12/16/2018, Emergency Care Services of NY, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient KEB. These services fell under the description associated with the universally accepted hospital billing code 99285.

662.    Also on 12/16/2018, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

663.    On 1/2/2018, Plaintiff electronically submitted an invoice to United for $1,220.00, the amount Emergency Care Services of NY typically received for services related to billing code 99285. Emergency Care Services of NY' charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

664.    As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 1/2/2018. It was received by United on the same date.

665.    The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

666.    United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $486.81 to the Plaintiff.

667.     At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount," that the Plaintiff would receive. The Allowed Amount on the PRA for this claim was $608.51.

668.     The FAIR Health amount for this claim is $1,062.

669.     The PRA also contained a note reading "IS", indicating that United had used the Data iSight service to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

670.     The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

671.     United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

672.     The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

673.     All of this information is demonstrably false for reasons discussed at length in this complaint.

103

674.     The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient EB*

675.     On 12/8/2018, Emergency Care Services of NY, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient KEB. These services fell under the description associated with the universally accepted hospital billing code 99285.

676.     Also on 12/8/2018, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

677.     On 12/31/2018, Plaintiff electronically submitted an invoice to United for $1,162.00, the amount Emergency Care Services of NY typically received for services related to billing code 99285. Emergency Care Services of NY' charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

678.     As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 12/31/2018. It was received by United on the same date.

679.     The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

680.     United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $459.75 to the Plaintiff.

681.    At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount," that the Plaintiff would receive. The Allowed Amount on the PRA for this claim was $608.51.

682.    The FAIR Health amount for this claim is $1,062.

683.    The PRA also contained a note reading "IS", indicating that United had used the Data iSight service to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

684.    The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

685.    United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

686.    The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

687.    All of this information is demonstrably false for reasons discussed at length in this complaint.

688.    The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient KY*

689.    On 12/18/2018, Emergency Care Services of NY, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient KEB. These services fell under the description associated with the universally accepted hospital billing code 99285.

690.    Also on 12/18/2018, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

691.    On 1/3/2019, Plaintiff electronically submitted an invoice to United for $1,220.00, the amount Emergency Care Services of NY typically received for services related to billing code 99285. Emergency Care Services of NY' charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

692.    As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 1/3/2019. It was received by United on the same date.

693.    The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

694.    United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $510.11 to the Plaintiff.

695.    At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount," that the Plaintiff would receive. The Allowed Amount on the PRA for this claim was $608.51.

696.    The FAIR Health amount for this claim is $1,062.

697.    The PRA also contained a note reading "IS", indicating that United had used the Data iSight service to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

698.    The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

699.    United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

700.    The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

701.    All of this information is demonstrably false for reasons discussed at length in this complaint.

702.    The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient NBA*

703.    On 2/10/2019, Emergency Care Services of NY, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient KEB. These services fell under the description associated with the universally accepted hospital billing code 99285.

704.    Also on 2/10/2019, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

705.    On 3/5/2019, Plaintiff electronically submitted an invoice to United for $1,220.00, the amount Emergency Care Services of NY typically received for services related to billing code 99285. Emergency Care Services of NY' charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

706.    As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 3/5/2019. It was received by United on the same date.

707.    The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

708.    United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $304.64 to the Plaintiff.

709.    At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount," that the Plaintiff would receive. The Allowed Amount on the PRA for this claim was $435.20.

710.    The FAIR Health amount for this claim is $1,062.

711.    The PRA also contained a note reading "IS", indicating that United had used the Data iSight service to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

712.    The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

713.    United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

714.    The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

715.    All of this information is demonstrably false for reasons discussed at length in this complaint.

716.     The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient BSB*

717.     On 2/24/2019, Emergency Care Services of NY, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient KEB. These services fell under the description associated with the universally accepted hospital billing code 99285.

718.     Also on 2/24/2019, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

719.     On 3/14/2019, Plaintiff electronically submitted an invoice to United for $1,184.00, the amount Emergency Care Services of NY typically received for services related to billing code 99285. Emergency Care Services of NY' charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

720.     As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 3/14/2019. It was received by United on the same date.

721.     The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

722.     United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $487.42 to the Plaintiff.

723. At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount," that the Plaintiff would receive. The Allowed Amount on the PRA for this claim was $609.28.

724. The FAIR Health amount for this claim is $1,062.

725. The PRA also contained a note reading "IS", indicating that United had used the Data iSight service to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

726. The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

727. United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

728. The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

729. All of this information is demonstrably false for reasons discussed at length in this complaint.

730.    The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient WVB*

731.    On 3/26/2019, Emergency Care Services of NY, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient KEB. These services fell under the description associated with the universally accepted hospital billing code 99285.

732.    Also on 3/26/2019, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

733.    On 5/16/2019, Plaintiff electronically submitted an invoice to United for $1,220.00, the amount Emergency Care Services of NY typically received for services related to billing code 99285. Emergency Care Services of NY' charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

734.    As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 5/16/2019. It was received by United on the same date.

735.    The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

736.    United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $0.00 to the Plaintiff.  (This zero-payment amount was reduced from the already low Allowed Amount, described below, because of this patient's allegedly unmet deductible.)

737.    At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount," that the Plaintiff would receive. The Allowed Amount on the PRA for this claim was $435.20.

738.    The FAIR Health amount for this claim is $1,062.

739.    The PRA also contained a note reading "IS", indicating that United had used the Data iSight service to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

740.    The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

741.    United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

742.    The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

743.    All of this information is demonstrably false for reasons discussed at length in this complaint.

744.     The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient DD*

745.     On 2/10/2020, Emergency Care Services of NY, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient KEB. These services fell under the description associated with the universally accepted hospital billing code 99285.

746.     Also on 2/10/2020, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

747.     On 2/25/2020, Plaintiff electronically submitted an invoice to United for $1,243.00, the amount Emergency Care Services of NY typically received for services related to billing code 99285. Emergency Care Services of NY' charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

748.     As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 2/25/2020. It was received by United on the same date.

749.     The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

750.     United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $436.58 to the Plaintiff.

751.    At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount," that the Plaintiff would receive. The Allowed Amount on the PRA for this claim was $436.58.

752.    The FAIR Health amount for this claim is $1,062.

753.    The PRA also contained a note reading "IS", indicating that United had used the Data iSight service to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

754.    The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

755.    United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

756.    The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

757.    All of this information is demonstrably false for reasons discussed at length in this complaint.

115

758.    The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

*Patient DH*

759.    On 7/13/2020, Emergency Care Services of NY, the Plaintiff, rendered statutorily mandated emergency treatment to United's insured, Patient KEB. These services fell under the description associated with the universally accepted hospital billing code 99285.

760.    Also on 7/13/2020, the treating hospital requested and obtained insurance demographic information from the Patient, who provided his United policy number. The treating hospital forwarded Patient's information to Plaintiff's billing department.

761.    On 7/31/2020, Plaintiff electronically submitted an invoice to United for $1,281.00, the amount Emergency Care Services of NY typically received for services related to billing code 99285. Emergency Care Services of NY' charge for this service was about the same, or less, than what is paid to other similar providers, offering similar services, in the same geographic area.

762.    As is the practice of the industry and for United, the invoice was submitted electronically via a healthcare billing 'clearinghouse' on 7/31/2020. It was received by United on the same date.

763.    The invoice was submitted by the clearinghouse to the electronic Payer ID for United: 87726.

764.    United received the invoice, processed it, and issued an electronic funds transfer payment in the amount of only $439.51 to the Plaintiff.

765.     At the same time, United also electronically issued to the Plaintiff, a Provider Remittance Advice ("PRA"). The PRA described the "Allowed Amount," that the Plaintiff would receive. The Allowed Amount on the PRA for this claim was $439.51.

766.     The FAIR Health amount for this claim is $1,062.

767.     The PRA also contained a note reading "IS", indicating that United had used the Data iSight service to calculate to Allowed Amount. The PRA stated that Data iSight used an actual database of "paid" claim data to determine the rate of payment. This statement is materially misleading. As shown in this complaint, the "paid" claim data used in the DiP calculation is fundamentally flawed from the start and then adjusted and manipulated in such a way that the final Allowed Amount number bears no resemblance to the usual and customary rates of similar providers in the same geographic area.

768.     The data is also "national" generic data, not data culled from similar providers of the same specialty the same geographic area, as the Plaintiff, the hospital and insurance consumers had been led to believe.

769.     United used Multiplan and Data iSight to reverse engineer rates that would make money for United and Multiplan rather than compensate the Plaintiff fairly for its services.

770.     The Plaintiff consulted MultiPlan's Data iSight website as suggested by United on the PRA. On its website, via its claims portal, Data iSight's online dashboard states that payment is based on a Medicare formula, of which one factor was the "*median* reimbursement amount received by physicians and specialists" nationwide based on a database of "millions of claims."

771.     All of this information is demonstrably false for reasons discussed at length in this complaint.

117

772.    The DiP methodology was utilized as directed by United to yield payment rates consistent with the threats previously made to the Plaintiffs by United's representatives, that United would illegally and unjustly underpay claims "because they can."

**k.    Facts Relevant to All Emergency Care Services of NY Claims**

773.    Defendants derived the payment amount using hidden methodology that they sought to conceal 1) in notes on PRAs sent by U.S. mail by United to the Plaintiff and 2) by Multiplan publishing false information on the Data iSight website. The data Defendants use to price these claims is <u>not</u> based on calculations related to similar providers in a similar geographic area, but on a secret, artificially low national number it has manipulated and adjusted from suspect data it purchases from third parties.

774.    At no time material to this action did the Plaintiff negotiate with United, MultiPlan or Daat iSight or agree to accept a discounted rate for its services, or to be bound by United's, MultiPlan's or DataiSight's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services it provided to this Patient or any patient with United insurance. Notwithstanding the absence of any such agreement, United and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid the Plaintiff for emergency services rendered to the Patient and to other United patients.

775.    The Plaintiff has been directly harmed by this underpayment.

776.    United's and MultiPlan's use of Data iSight to underprice the claim deprived the Plaintiff of property – money – that should have been paid to the Plaintiff for the claim. This money had already been paid to United through the Patient's insurance premiums. The profit or 'margin' from this underpayment was shared by United and MultiPlan.

777.     For more than two years before the date of the filing of this action and continuing, for many similar Patients with identical healthcare claims, the Plaintiff has been systematically misled and underpaid by United, MultiPlan and Data iSight.

    *(2)     Defendants' Fraudulent Representations Using the Mail and Wires*

778.     Indeed, to this end, as described above, the provider remittance advice documents ("PRAs") the Plaintiffs receive from the Insurance Companies accompanying Insurance Companies' underpayments of claims instruct the Plaintiffs not to bill patients above the amount of the deductible, copay, and coinsurance applied to the service. These documents explain the Insurance Companies' payment in pertinent part as follows: "PROVIDER: THIS SERVICE HAS BEEN REIMBURSED USING DATA ISIGHT, WHICH UTILIZES COST DATA IF AVAILABLE (FACILITIES) OR PAID DATA (PROFESSIONALS). PLEASE DO NOT BILL THE PATIENT ABOVE THE AMOUNT OF THE DEDUCTIBLE, COPAY, AND COINSURANCE APPLIED TO THIS SERVICE." The PRAs the Insurance Companies generate and remit to the Plaintiffs further identify the "Patient Responsibility" for the Plaintiffs' services as only encompassing applicable deductibles, copays, or coinsurance insurance amounts. That is, the Insurance Companies advise the Plaintiffs that their insureds are not liable for the difference between the Plaintiffs' billed charges and the amounts allowed as payable by the Insurance Companies.

779.     In addition to the fraudulent representations that United made using the mail and the wires as described above, United illegally converted plan assets for "self-funded" plans where claims are paid from plan sponsor and employer assets, rather than from United's own assets. Plans where United pays claims from its own assets are known as "fully-funded" or "fully-insured".

780.     United illegally converted plan assets for the "self-funded" plans they administered by deducting more from the plans' accounts than had actually been paid to the Plaintiffs.

781.     Instead, the Plaintiffs were paid the Enterprise rate that was obtained using the Data iSight service.

782.     The "savings" achieved by the Enterprise was not then returned to the plan.

783.     Instead, this amount was then retained by the Enterprise and distributed to its insureds.

    *(3)    RICO Proximate Cause*

784.     Every Plaintiff has been directly injured by Defendants' scheme.

785.     The objective of the scheme is to formulate a fraudulent basis for underpayment of out-of-network emergency physicians. Every Plaintiff is a target of Defendants' scheme.

786.     In implementing this scheme, Defendants have under paid Plaintiffs on thousands of claims.  They have done so on a systematic basis as part of their regular way of doing business and will continue to do so until the legal process forces them to stop.

787.     There are no other victims of this scheme who have been directly injured, or more directly injured than Plaintiffs, by Defendants' fraudulent conduct. As the most directly injured victims, Plaintiffs can be counted on to vindicate the law as private attorneys general. Plaintiffs' injuries are not just the foreseeable and natural consequence of Defendants' scheme, they are the objective of the scheme.

**F.**    <u>**The Continuing Nationwide Pattern and Other Victims Affected**</u>

788.     This Complaint sets forth the manner in which the Enterprise was the vehicle for Plaintiffs' injuries; however, the Enterprise causes injuries beyond those done to Plaintiffs that they seek to recover.

789.    These injuries are separate and apart from the injuries to Plaintiffs; this is a nationwide scheme injuring thousands of other ER providers.

790.    Thousands of  ER providers across the country have received payments that are well below their billed charges and the difference is retained by the Enterprise as their profit.

**G.    The Law and Equity Must Intervene to Prevent Injustice**

791.    Under New York law, a cause of action for unjust enrichment is stated where the defendant is enriched at the plaintiff's expense, and it is against equity and good conscience to permit the defendant to retain what the plaintiff seeks to recover.

792.    The essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.

793.    Thus, courts in New York and other states have held that, where an out-of-network health care provider "is required by law to treat patients in an emergency room, an insurance company is unjustly enriched if it fails to pay the [health care provider] in full for the costs incurred in rendering the necessary treatment to the insurer's enrollees." *N.Y. City Health & Hosps. Corp. v. WellCare of N.Y., Inc.,* 937 N.Y.S.2d 540, 545 (N.Y. Sup. Ct. 2011) (citing case law in Texas, Tennessee, and Pennsylvania in which courts held that out-of-network emergency service providers could maintain a claim for unjust enrichment against an insurer who failed to pay the emergency).

794.    Here, to comply with their ethical and legal obligations under federal and New York law, the Plaintiffs provided, and continue to provide, medically necessary emergency medical care to United's insureds in good faith.

795.    United cannot lawfully prevent their insureds from seeking emergency medical care from the Plaintiffs.

796.    As such, the parties are, in effect, compelled to do business with each other.

797.    Given the nature of these relationships, an equitable obligation arises to account for the benefit provided by the Plaintiffs to the Defendants.

798.    In the absence of such an obligation, the Defendants would enrich themselves unjustly at the expense of the Plaintiffs and their local communities. This obligation requires that the Defendants pay the Plaintiffs the reasonable value of the services rendered, as measured by the community where the services were performed and by the person who provided them.

799.    Thus, Defendants are obligated to pay the Plaintiffs for the reasonable value of the services they provided.

## Causes Of Action

**Count I:**      **Violation of RICO, 18 U.S.C. § 1964(c) (as against all Defendants)**

800.    The Plaintiffs re-allege and restate the facts set forth above as if they were fully set forth herein.

801.    The Plaintiffs are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

802.    United and MultiPlan are each a "person" within the meaning of 18 U.S.C. § 1961(3).

803.    As set forth above, since at least January 2015, United and MultiPlan have been and continue to be, a part of an association-in-fact RICO enterprise within the meaning of 18 U.S.C. § 1961(4).

804.    The Enterprise is comprised of at least United and Multiplan.

805.     United and MultiPlan each have an existence separate and distinct from the Enterprise.

806.     United and MultiPlan are each associated with the Enterprise.

807.     The Enterprise was and is engaged in interstate commerce and its activities affect interstate commerce.

808.     United and MultiPlan have each conducted and participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

809.     United and Multiplan each exercise management and/or control over the affairs of the Enterprise.

810.     United and Multiplan each has engaged in at least two incidents of racketeering activity that have the same or similar purposes, results, participants, victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

811.     The incidents of racketeering activity engaged in by United and Multiplan each embrace criminal conduct that has the same or similar purposes, in that they sought to, and did, unlawfully avoid reimbursing Plaintiffs as required by law.

812.     The incidents of racketeering activity engaged in by United and Multiplan each embrace criminal conduct that has similar results, in that they sought to, and did, unlawfully avoid reimbursing Plaintiffs as required by law.

813.     The incidents of racketeering activity engaged in by United and Multiplan each embrace criminal conduct that has the same or similar participants, including but not limited to Defendants.

814.   The incidents of racketeering activity engaged in by United and Multiplan each embrace criminal conduct that has the same or similar victims, consisting of the Plaintiffs and other out-of-network providers, whom Defendants have schemed to under reimburse based upon false and fraudulent data.

815.   United and MultiPlan utilize the Data iSight service to obtain fraudulent payment rates that are then communicated out across state lines using the mail and wires as set forth above.

816.   The incidents of racketeering activity engaged in by the Defendants embrace criminal conduct that is not isolated, rather those incidents are part of the Defendants regular way of doing business and are regularly and systematically engaged in by them to deny out-of-network providers, including Plaintiffs, appropriate reimbursement.

817.   The incidents of racketeering activity involve under-reimbursement for services provided to different persons, on different dates, at different locations, by different physicians employed by different providers.

818.   Defendants' conduct poses a continuing threat of racketeering activity.

819.   United and Multiplan each has engaged in thousands, or more, of incidents of racketeering activity directed at Plaintiffs and other providers.

820.   United and Multiplan each has engaged in these incidents of racketeering activity and criminal activity on a continuing basis.

821.   The incidents of racketeering activity engaged in by United and Multiplan have been and continue to be part of the Defendants' regular way of doing business.

822.   The incidents of racketeering activity are extremely lucrative for United and Multiplan. The Defendants will continue to engage in similar incidents of racketeering activity indefinitely, unless forced to cease by judicial intervention.

823.    United and MultiPlan have been engaged in racketeering activity for at least two years and that activity remains ongoing.

824.    United and MultiPlan have conducted and participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity consisting of multiple instances of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343, which conduct constitutes racketeering activity under 18 U.S.C. § 1961(1)(B).

825.    As a direct and proximate result of United and Multiplan's violations of 18 U.S.C. § 1964(c), the Plaintiffs were injured in their business, suffering financial losses within the meaning of 18 U.S.C. § 1964(c).

### Count II:       Violation of RICO conspiracy, 18 U.S.C. § 1964(d) (as against all Defendants)

826.    The Plaintiffs reassert and reallege the facts set forth above as if fully set forth herein.

827.    The Plaintiffs are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

828.    United and MultiPlan are each a "person" within the meaning of 18 U.S.C. § 1961(3).

829.    As set forth above, since at least January 2015, the Defendants have been, and continue to be, part of an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), comprised of at least United and MultiPlan.

830.    United and MultiPlan each has each committed overt acts which are also acts of racketeering activity as defined in 18 U.S.C. § 1961(1)(B). These overt acts and acts of racketeering activity consist of multiple instances of mail fraud and wire fraud, as set forth above.

831.    Defendants have agreed to a conspiracy that has as its objective a substantive violation of the federal RICO Act.

832.    Each Defendant has agreed to participate directly or indirectly in the conduct of the affairs of the Enterprise by agreeing to commit, or aid other members of the conspiracy to commit, at least two predicate acts.

833.    The Defendants acted knowingly and purposely with knowledge of the unlawful objective of the conspiracy and with the intent to further its unlawful objective.

834.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1964(d), the Plaintiffs have been injured in their businesses and property, suffering financial losses.

835.    As a direct and proximate result of the RICO Defendants' violations of 18 U.S.C. § 1964(d), the Plaintiffs were injured in their business, suffering financial losses within the meaning of 18 U.S.C. § 1964(c).

**Count III:     Breach of Implied-in-Fact Contract under New York Law
                 (as against United)**

836.    The allegations set forth in the facts above are incorporated herein by reference as though fully set forth.

837.    From August 26, 2013 to the present, the Plaintiffs have undertaken to provide valuable emergency medical care to United' insureds in good faith

838.    United are obligated, in good faith, to pay for such services provided to their insureds.

839.    At all material times, United were aware that the Plaintiffs were entitled to, and expected to be paid, the reasonable value of their services.

840.    Through the parties' conduct and respective undertaking of obligations concerning emergency medical services provided by the Plaintiffs to United' insureds, the parties implicitly

agreed, and the Plaintiffs had a reasonable expectation and understanding, that United would pay the Plaintiffs for non-participating claims at a rate reflecting the reasonable value of the Plaintiffs' services.

841.    At all material times, the Plaintiffs have directly billed the Insurance Companies for the non-participating claims arising from the emergency medical care the Plaintiffs rendered to their insureds, based on the Insurance Companies' implied agreement to pay the Plaintiffs for those services at rates equal to the reasonable value of their services.

842.    At all material times, United received and accepted the Plaintiffs' bills for the emergency care they provided, and continue to provide, to United' insureds.

843.    In breach of their implied contract with the Plaintiffs, at all material times, United have adjudicated, and continue to systematically adjudicate, the non- participating claims at rates substantially below the reasonable value of the professional emergency medical services provided.

844.    The Plaintiffs did not agree and have never agreed that the lower payment rates paid by United were reasonable or sufficient to compensate the Plaintiffs for the emergency medical services provided.

845.    The Plaintiffs have suffered damages in an amount equal to (i) the difference between the amounts unilaterally allowed as payable for the non-participating claims and the lesser of the Plaintiffs' charges and the reasonable value of their professional emergency medicine services, plus (ii) the Plaintiffs' loss of use of that money.

**Count IV:**    **Unjust Enrichment under New York Law**
**(as against United)**

846.    The allegations set forth in the facts above are incorporated herein by reference as though fully set forth herein.

847.    For the non-participating claims, United have failed to pay the Plaintiffs for the reasonable value of the services.

848.    United therefore have been enriched by the amount of the difference between (i) the reasonable value of the Plaintiffs' services and (ii) the amount allowed by United, as well as the time-value of the money withheld from the Plaintiffs.

849.    For all of the non-participating claims, United failure to pay the Plaintiffs the reasonable value of their services comes at the Plaintiffs' expense, because the Plaintiffs are entitled to payment at the reasonable value of the services they have rendered.

850.    It would be against inequitable to permit United to retain the amount at issue. The Plaintiffs are entitled to such amounts, which represent the difference between the reasonable value of the services the Plaintiffs have rendered, and the amounts allowed by United for such services, plus the time-value of that money.

851.    Furthermore, the Plaintiffs conferred a benefit on United by providing valuable emergency medical care to their insureds, for which United were responsible for payment.

852.    In exchange for premiums and other forms of compensation, United owe their insureds an obligation to make sure the insureds receive covered medical services and to pay for the covered medical services.

853.    United voluntarily accepted, retained, and enjoyed, and continue to accept, retain, and enjoy, the benefits conferred on them by the Plaintiffs, knowing that the Plaintiffs expected to be paid the reasonable value of their services.

854.    United have been unjustly enriched by their failure and refusal to pay the Plaintiffs the reasonable value of the emergency medical care provided to their insureds.

855.    It would be against equity and good conscience to allow United to reap a benefit by underpaying the Plaintiffs for valuable emergency medical care provided to United insureds' that the Plaintiffs were compelled to render.

856.    The Plaintiffs seek compensatory damages, as permitted by applicable law, in an amount which will continue to accrue through the date of trial as a result of United continuing unjust enrichment, equal to (i) the difference between the amount United adjudicated as payable for those services and the reasonable value of the Plaintiffs emergency medicine care, plus (ii) the loss of use of that money.

### Count V:        Declaratory Relief (as against all Defendants)

857.    The Plaintiffs incorporate by reference the facts set forth above as though fully set forth herein.

858.    This is an action for declaratory relief pursuant 28 U.S.C. § 2201, which is necessary and appropriate to clarify the parties' respective rights, status, and legal relations concerning United' payment obligations to the Plaintiffs and MultiPlan's obligations and duties in the calculation of payment rates for the emergency services provided by Plaintiffs.

859.    All adverse parties are presently before the court.

860.    The Plaintiffs have been, and continue to be, harmed by United underpayments for emergency services and MultiPlan's determination of fraudulent "reasonable" payment rates for emergency medical services rendered by the Plaintiffs.

861.    The Plaintiffs therefore seek a declaration establishing the appropriate payment rates and payment methodology to be used to prevent further harm to the Plaintiffs.

862.     The Plaintiffs specifically seek a determination that (i) United have an obligation to pay the Plaintiffs for the services rendered at rates equal to the reasonable value of the emergency services rendered; (ii) that the rates calculated by MultiPlan using the Data iSight service are fraudulent and (iii) that the rates paid by United for the claims at issue are inadequate and violate United' obligation to pay the Plaintiffs for their services rendered at a reasonable value.

863.     To avoid the potential for successive, separate actions enforcing the Plaintiffs' rights, the Plaintiffs seek a declaration from the Court stating that United are obligated to pay the Plaintiffs prospectively for the emergency medical services rendered by the Plaintiffs at the reasonable value thereof and that the Data iSight service shall not be used in the calculation of said rates.

**WHEREFORE**, Plaintiffs pray for relief and judgment against all Defendants, jointly and severally, as follows:

1.     Payment for the reasonable value of services rendered by Plaintiffs to United Subscribers;

2.     Compensatory and consequential damages against United and Multiplan as set forth above and to be further established at trial;

3.     Treble damages against all Defendants as to Plaintiffs' RICO claims;

4.     Statutory interest in the maximum amount permitted by law;

5.     The costs of this suit (including reasonable attorneys' fees) and pre-judgment and post-judgment interest;

6.     The imposition of reasonable restrictions on the future activities of the Defendants, including but not limited to prohibiting them from engaging in the same type of endeavor as the enterprise alleged herein;

7.      Ordering the dissolution of the enterprise;

8.      Entering a cease and desist order which specifies the acts or conduct which is to be discontinued;

9.      Order the restitution monies and property unlawfully obtained or retained by the Defendants;

10.     Exemplary and/or punitive damages under applicable State law for Defendants' intentional, willful, wanton, outrageous or malicious misconduct, characterized by their evil or rancorous motive, ill will and intent to injure Plaintiffs; or Defendants' gross recklessness or gross negligence evincing a conscious disregard for Plaintiffs' rights.

Such other and further relief as the Court deems just and proper.

## **Jury Demand**

864.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Plaintiffs hereby demand a trial by jury of any issue trial of right by a jury.

Dated: November 2, 2020

**NAPOLI SHKOLNIK, PLLC**

By: */s/ Matthew M. Lavin*
Matthew M. Lavin, Esq. (*pro hac vice anticipated*)
mlavin@napolilaw.com
Salvatore Badala, Esq.
SBadala@napolilaw.com
Aaron R. Modiano, Esq. (*pro hac vice anticipated*)
amodiano@napolilaw.com
NAPOLI SHKOLNIK, PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Telephone: (212) 397-1000
Facsimile: (646) 843-7603

*Attorneys for Plaintiffs*