UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   9/28/21
```

| | |
|---|---|
| Emergency Physician Services of New York, *et al.*, <br><br> Plaintiffs, <br><br> –v– <br><br> UnitedHealth Group, Inc., *et al.*, <br><br> Defendants. | 20-cv-9183 (AJN) <br><br> OPINION & ORDER |

ALISON J. NATHAN, District Judge:

Plaintiffs Emergency Physician Services of New York, Buffalo Emergency Associates, Exigence Medical of Binghamton, Exigence Medical of Jamestown, and Emergency Care Services of New York are hospital-based emergency room physicians who practice medicine in the State of New York. They bring this action against Defendants UnitedHealth Group, Inc. and Multiplan, Inc., alleging that Defendants conspired to create a healthcare claim repricing mechanism in order to systematically underpay invoices submitted to them, in violation of the federal Racketeer Influenced and Corrupt Organizations Act and New York law. Defendants have moved to dismiss the Complaint. For the reasons that follow, Defendants' motions are granted in part and denied in part.

## I.     Background

For the purpose of resolving Defendants' motions to dismiss, the Court accepts all well-pled facts in the Complaint as true, and draws all reasonable inferences in Plaintiffs' favor. *See Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir. 2007). The following account is therefore taken from Plaintiffs' factual allegations contained in the Complaint.

### A.  Factual background

Plaintiffs are all physician practice groups who staff the emergency rooms of numerous hospitals across New York.  Compl. ¶¶ 24–29, Dkt. No. 1.  They are out-of-network healthcare providers with United and regularly provide emergency medical services to United's insureds.  *Id.* ¶¶ 24–29.  Defendant United is the parent company of over 1,200 wholly owned subsidiaries, including non-parties United Healthcare Services, Inc., UnitedHealthcare of New York, Inc., UnitedHealthCare Insurance Company of New York, UnitedHealthcare, Inc., and Optum Group, LLC.  *Id.* ¶ 30.  Defendant MultiPlan develops and operates healthcare provider networks and offers related cost-management products to insurance companies and other payers of health benefits.  Id. ¶ 34.  Among these products is Data iSight, which Multiplan is offers to United and other payers.  *Id.*

### 1.  The relevant legal structure

As emergency room physicians, Plaintiffs have a professional obligation to render treatment on their patients even if they are unable to verify a patient's insurance benefits and obtain authorization for treatment from insurance companies like United.  *Id.* ¶¶ 38–42.  As a result, Plaintiffs rely on health insurance companies to comply with their legal obligations to pay a "reasonable" rate to providers after treatment is rendered, including providers (like Plaintiffs) who are not "in-network" or "participating" providers.  *Id.* ¶ 43.  In order to implement this system, hospitals that provide emergency services obtain the patient's insurance information and demographics and send the patient's demographics, medical records, and insurance information to Plaintiffs.  *Id.* ¶¶ 44–45.  Plaintiffs' billing departments transcribe the medical charts into standardized billing codes, generate invoices with standard charges, medical coding, and patient demographics, and send those invoices to United through interstate wire communications.  *Id.*

¶¶ 45–48. All invoices are submitted through a common United portal, regardless of which United subsidiary or entity administers a particular patient's plan. *Id.*

Both Plaintiffs and United are bound by legal obligations to engage in this system in good faith. On Plaintiffs' side, Plaintiffs are required under state and federal law to provide treatment to all patients who present at emergency departments. The federal Emergency Medical Treatment and Labor Act ("EMTALA") provides that hospitals and physicians who staff hospital emergency rooms have a duty to "provide for an appropriate medical screening examination" when an individual comes to the emergency department. 42 U.S.C. §§ 1395dd(a)–(b), (d), (h). If "the individual has an emergency medical condition," Plaintiffs are required to "stabilize the medical condition" without inquiry into "the individual's method of payment or insurance status." *Id.*; *see also* Compl. ¶¶ 69–71. Under New York law, "[a]ny licensed medical practitioner who refuses to treat a person arriving at a general hospital to receive emergency medical treatment . . . shall be guilty of a misdemeanor and subject to a term of imprisonment not to exceed one year and a fine not to exceed one thousand dollars." N.Y. Pub. Health Law § 2805-b(2)(b); *see also* Compl. ¶ 72 & n.9.

United is also bound by legal obligations to participate in this system in good faith. At the federal level, some courts have interpreted EMTALA's requirement and purpose as requiring compensation at reasonable rates, for in the absence of such an obligation, "an insurance company is unjustly enriched if it fails to pay the hospital in full for the costs incurred in rendering the necessary treatment to the insurer's enrollees." *N.Y.C. Health & Hosps. Corp. v. Wellcare of N.Y., Inc.*, 937 N.Y.S. 2d 540, 545 (Sup. Ct. 2011); Compl. ¶ 81. State law similarly requires that health insurance companies pay a reasonable amount for the services of out-of-network emergency medical providers. N.Y. Fin. Serv. Law § 605(a); Compl. ¶ 80.

That basic structure governs all of the claims at issue in this litigation.  Plaintiffs did not have a written contract with United that would establish a contractual rate of payment for their services.  Compl. ¶¶ 65–66.  So what Plaintiffs are owed comes down to reasonableness.  As relevant here, a "reasonable" rate is calculated as the lesser of Plaintiffs' billed charges or the "usual and customary rates" for similar providers in the same geographic area.  *Id.* ¶¶ 67–68.

### 2.  The alleged RICO enterprise

Plaintiffs allege that Defendants conspired to implement a repricing mechanism that would systematically underpay Plaintiffs for the claims they submitted.  According to Plaintiffs, this is not the first time that United has engaged in such a scheme.  Just over a decade ago, a United subsidiary, Ingenix, was investigated by the New York Attorney General for allegedly running a fraudulent payment system.  *Id.* ¶¶ 83–87.  United paid around $400 million in settlements in 2009, including $50 million that went to the establishment of the FAIR Health database and website.  *Id.* ¶¶ 84, 93.  The settlement agreement also indicated that United must use FAIR Health as the basis for determining the Allowed Amounts for Covered Out-Of-Network Services or Supplies.  *Id.* ¶ 87.

Also in 2009, the New York Attorney General's Office announced the result of its investigation into Ingenix in an agreement titled "Assurance of Discontinuance Under Executive Law § 63(15)."  *Id.* ¶ 88.  It detailed that the prices generated by Ingenix were inadequate and it required the insurance industry to cease using Ingenix and to create a new, independent database for the purpose of determining fair and accurate reimbursement rates.  *Id.* ¶¶ 88–92.  The settlement led to the creation of FAIR Health, Inc., a non-profit that was funded by insurance companies that included United Group.  *Id.* ¶ 93.  As relevant here, FAIR Health operated a database that uses information directly from insurers to estimate what providers charge, and what

4

insurers pay, for providing healthcare to patients. *Id.* ¶¶ 131–33. The purpose of the database is to prevent insurers from using skewed methodologies to calculate payments. *Id.* ¶ 134. In 2015, United's legal obligation to utilize FAIR Health under the 2009 Agreement ended. *Id.* ¶¶ 97, 137.

Shortly thereafter, United sought out the services of MultiPlan for purposes of determining rates. *Id.* ¶¶ 98, 138–40. The agreement between the two companies forms the basis of the RICO enterprise that Plaintiffs allege exists. According to Plaintiffs, United and MultiPlan formed an ongoing informal organization with the common purpose of developing and implementing a scheme to underpay out-of-network emergency medical services. *Id.* ¶¶ 101–04. Plaintiffs claim that the enterprise formed by the two companies shared a common purpose that includes financial gain as the direct result of the scheme. *Id.* ¶ 108. Plaintiffs also claim that the two companies have a relationship that includes contracts, coordination of efforts, and money-sharing plans, which are detailed in "Whitepapers" that provide the roadmap for how the companies reached the rates they charged. *Id.* ¶¶ 109–12.

As detailed in the Complaint, United would send "target prices" to MultiPlan, and MultiPlan would then arrive at a number under that rate. *See id.* ¶¶ 113, 142–61. It does so by sending claim information to MultiPlan through an electronic data interchange program that allows United to communicate claims information, "[r]outing to designated repricing tool," the benchmark target price; and the percentile of Data iSight's proprietary database to use to set a benchmark rate. *Id.* ¶ 183. The key to this enterprise is MultiPlan's Data iSight, which Plaintiffs allege provides the mechanism by which MultiPlan achieves the new benchmark prices while ignoring the usual and customary rates that were supposed to be used; in the process, Plaintiffs argue, MultiPlan relies on purposely faulty data. *Id.* ¶¶ 114, 152–58, 180–86. Data iSight first

sorts claims information based on type of care. *Id.* ¶¶ 187–89. From there, it implements an algorithm that "edits" and recalculates payment rates through a process known internally at MultiPlan as "DiP," or "Data iSight Professional." *Id.* ¶¶ 188–212. After receiving a number through the DiP process, that rate is compared to a target payment amount provided by United, known as the "meet or beat" price. *Id.* ¶¶ 181–82, 221. United would then pay the lowest of three numbers: the target price, the billed amount, or the DiP rate. *Id.* ¶¶ 181–82, 215–20. United compensates MultiPlan based on the amount by which the claims were underpaid—that is, MultiPlan was paid a fee equal to between 6% and 9% of the difference between the target amount that United sent and the amount of the new, lower payment that MultiPlan calculated using Data iSight. *Id.* ¶¶ 115, 218–19. Both companies profit: United profits by lowering its costs, while MultiPlan profits when United shares money obtained through the scheme. *See id.* ¶¶ 116–18. Plaintiffs argue that the scheme has been ongoing for years and that it continues to operate. *Id.* ¶¶ 124–30.

After the rate is calculated and sent back to United, United sends Provider Remittance Advice letters ("PRAs") that provided a detailed explanation of the price reductions. *Id.* ¶¶ 222–25. While those letters reveal that Data iSight was used, Plaintiffs claim that the description of the system was designed to deceive Providers into accepting the reduced rates. *Id.* Along similar lines, the Data iSight Portal information describes a transparent basis for the reductions in billed amounts, but in doing so contains numerous misrepresentations. *Id.* The thrust of Plaintiffs' argument is that the entire system is designed to conceal how the scheme actually operates. *Id.* ¶¶ 222–36.

In order to coordinate the use of Data iSight, MultiPlan and United met frequently and exchanged internal non-public documents called "Whitepapers." *Id.* ¶¶ 237–43. Some of these

meetings occurred at annual events hosted by the Client Advisory Board of MultiPlan that were attended by MultiPlan executives. *Id.* ¶¶ 244–46. There, MultiPlan would market the profits that could be gained by using their system. *Id.* ¶ 247. And in those meetings, MultiPlan allegedly detailed how the use of the DiP technology would provide a veneer of independence that, among other things, would allow the parties to avoid liability for intentional underpayments. *Id.* ¶¶ 237–56. In addition, Defendants would discuss situations where patients or providers pushed back and agreed that the DiP methodology and rate could be presented as a "fair" and "transparent" justification for the rate. *Id.* ¶ 255. Through it all, the parties depended on keeping the terms and methodologies of DiP secret. *Id.* ¶ 256. Similar meetings took place at "MultiPlan's secret road shows," where MultiPlan's CAB would again provide detailed descriptions of the methodology, receive input from clients like United, and otherwise discuss the specifics of the scheme. *Id.* ¶¶ 257–62.

The "Whitepapers" are secret internal documents produced by MultiPlan that explain how the DiP methodology can be implemented to justify United's target price, regardless of what the language of a patient's health plan mandates. *Id.* ¶ 264. United's executives reviewed those Whitepapers, provided feedback, and use the information contained in them to structure United's relationship with MultiPlan. *Id.* ¶ 265. At times, United's representatives provide direction to MultiPlan with respect to the information contained in the Whitepapers in order to ensure that the DiP methodology will work as advertised. *Id.* ¶¶ 258–62. According to Plaintiffs, the collaboration provides a "partial blueprint" of the RICO enterprise that both parties contribute to. *Id.* ¶¶ 263–69.

The core of Plaintiffs' claims of mail and wire fraud rely on allegations of material misrepresentations regarding how United and MultiPlan reach the rates that they pay to

providers.  These allegations include general misrepresentations regarding how rates are calculated (and failure to disclose the system described above).  They also include related misrepresentations regarding the use of geographic adjustments; Data iSight claims to readjust based on geography and the labor costs in the providers' area, but in practice, Data iSight does not adjust for geographic differences.  *Id.* ¶ 308–11.  Instead, its payment rates across six states were identical despite different costs of living, expenses of providing care, and other relevant metrics.  *Id.* ¶¶ 308–14.

The cornerstone of Defendants' schemes is the PRAs, which are mailed to providers.  The PRAs, Plaintiffs allege, misstate the pricing methodologies used.  For example, one of the PRAs described Data iSight as using an actual database of "paid" claim data to determine the rate of payment without disclosing how the DiP calculation actually works.  *See id.* ¶¶ 366–79.  The Complaint details many such examples of misrepresentations contained in the PRAs and through other means designed to deceive Plaintiffs regarding how the rates were calculated.  *See id.* ¶¶ 366–772.  They note that the PRAs failed to mention that the DiP calculation is adjusted and manipulated, that the data used is "national" generic data and not geography-specific, and that MultiPlan reverse engineers rates rather than calculating them through fair means.  *Id.* ¶ 375.

After Plaintiffs contacted Defendants regarding the rates, Defendants allegedly obfuscated how the rates were calculated.  *See id.* ¶¶ 275–307.  These misrepresentations were made through a variety of fora, including through Data iSight's online portal; at no point, claim Plaintiffs, have Defendants disclosed the "meet or beat" mechanism or the process of editing claims in order to generate reduced prices.  *Id.* ¶¶ 275–307, 335–60.  Plaintiffs' examples of misrepresentations also repeatedly detail that they consulted the Data iSight website, on United's urging, and were deceived by the information contained there.  *E.g.*, *id.* ¶¶ 377, 391, 405.

In sum, Plaintiffs allege that Defendants are engaged in a "nationwide scheme injuring thousands of other ER providers" in addition to Plaintiffs.  *Id.* ¶¶ 788–90.  They claim further that United's failure to compensate Plaintiffs at a reasonable rate enriches United, whose insureds will continue to use Plaintiffs' services, which Plaintiffs are obligated to provide.  *Id.* ¶¶ 794–99.

### B.  Procedural history

Plaintiffs initially filed this action against Defendants United and Multiplan on November 2, 2020, alleging five causes of action.  Compl. ¶¶ 800–63.  As to both Defendants, Plaintiffs alleged a violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c) (Count One), participation in a RICO conspiracy, 18 U.S.C. § 1964(d) (Count Two), and a request for a declaratory judgment, 28 U.S.C. § 2201 (Count Five).  Compl. ¶¶ 800–35, 857–63.  As to United, Plaintiffs also alleged two violations of New York law: a claim for breach of an implied-in-fact contract (Count Three) and a claim for unjust enrichment (Count Four).  *Id.* ¶¶ 836–56.

On January 25, 2021, United and Multiplan each filed a motion to dismiss the Complaint. United Motion, Dkt. No. 28; United Br., Dkt. No. 29; Multiplan Motion, Dkt. No. 30.  Plaintiffs on February 8, 2021, declined the Court's invitation to amend the Complaint.  Dkt. Nos. 31, 37. Plaintiffs filed oppositions to Defendants' motions, Pls. United Opp'n Br., 38; Pls. Multiplan Opp'n Br., Dkt. No. 39, and Defendants filed replies, Multiplan Reply, Dkt. No. 45; United Reply, Dkt. No. 47.  Plaintiffs on March 19, 2021, filed a notice of two supplemental authorities, Pls. Suppl. Auths., Dkt. No. 48, to which United responded, United Suppl. Auths. Resp., Dkt. No. 56.

### II.     Legal standard

When considering a motion to dismiss for failure to state a claim, courts "construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true." *York v. Ass'n of Bar of City of N.Y.,* 286 F.3d 122, 125 (2d Cir. 2002). Federal Rule of Civil Procedure 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). To survive a Rule 12(b)(6) motion, a plaintiff must allege facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). The complaint's factual allegations must be sufficient to "nudge[ ]" the plaintiff's claims "from conceivable to plausible." *Iqbal,* 556 U.S. at 680 (quoting *Twombly,* 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "In addition to the allegations in the complaint itself, a court may consider documents attached as exhibits, incorporated by reference, or relied upon by the plaintiff in bringing suit, as well as any judicially noticeable matters." *ACE Sec. Corp. Home Equity Loan Tr. v. DB Structured Prods.,* 5 F. Supp. 3d 543, 551 (S.D.N.Y. 2014).

### III.   Discussion

Plaintiffs allege that both Defendants are liable for violating the federal RICO and for participating in a RICO conspiracy. Compl. ¶¶ 800–835. They also seek declaratory relief as to all Defendants that would establish the appropriate payment rates and methodology to be used in order to prevent further harm. Specifically, they seek a determination (i) that United has an obligation to pay Plaintiffs for the services rendered at rates equal to the reasonable value of the emergency services rendered; (ii) that the rates calculated by MultiPlan using the Data iSight

service are fraudulent; and (iii) that the rates paid by United for the claims at issue are inadequate and violate United's obligation to pay Plaintiffs for their services rendered at a reasonable value. *Id.* ¶¶ 857–63.  Finally, they bring state law claims of breach of implied-in-fact contract and unjust enrichment under New York state law.  *Id.* ¶¶ 836–56.

### A.  Plaintiffs fail to state a claim under RICO

The Court begins with Plaintiffs' RICO claim against both Defendants.  Together, Defendants' attack nearly every elements of Plaintiffs' RICO claim.  United Br. at 7–14; MultiPlan Motion at 7–11.  But the Court need address only proximate causation.

### 1.  Applicable law

RICO creates a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962" of RICO.  18 U.S.C. § 1964(c).  Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  *Id.* § 1962(c).  The statute defines "racketeering activity" by reference to a variety of criminal offenses, including wire fraud and mail fraud.  *Id.* § 1961(1); *see also Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139–40 (2d Cir. 2018).  A "pattern of racketeering activity," as defined by Congress, "requires at least two acts of racketeering activity" that occur within ten years of each other.  18 U.S.C. § 1961(5).  But "while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a 'pattern.'"  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985).  When considering whether a plaintiff has alleged at least two acts of racketeering activity, "courts must take care to ensure that the plaintiff is not artificially fragmenting a

11

singular act into multiple acts simply to invoke RICO." *Schlaifer Nance & Co. v. Estate of Warhol,* 119 F.3d 91, 98 (2d Cir. 1997). Plaintiffs allege that Defendants violated the federal wire fraud and mail fraud statutes. The two statutes have roughly the same elements: "(1) a scheme to defraud, (2) money or property that is the object of the scheme, and (3) use of the wires [or mail communications] to further the scheme." *Empire Merchs.*, 902 F.3d at 139–40 (citation omitted); *see also Chanayil v. Gulati,* 169 F.3d 168, 170–71 (2d Cir. 1999).

RICO also requires that a plaintiff establish that the underlying § 1962 violation was "the proximate cause of his injury." *Empire Merchs.*, 902 F.3d at 140 (quoting *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010)). Proximate cause in the RICO context is not identical to the concept of proximate cause in the common law; rather, under RICO, a plaintiff must show "some 'direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)).

### 2. Plaintiffs fail to plead the proximate-cause requirement

Plaintiffs' RICO claim fails as a matter of law because Plaintiffs fail to plausibly state that the underlying RICO violations were the proximate cause of their injury. "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). More recently, a plurality of the Supreme Court explained that to establish proximate cause, a RICO plaintiff must show a causal connection between the predicate offense and the alleged harm. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10–11 (2010). Even drawing all inferences in Plaintiffs' favor, they have failed to plausibly allege that the mail and wire fraud violations proximately caused their injury.

Nowhere in the Complaint do Plaintiffs plead facts that establish that someone *relied* on the alleged fraud. It is undisputed that first-person reliance is not a prerequisite to predicating a RICO violation on mail or wire fraud. *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 648–650 (2008). But in *Bridge*, the Supreme Court went on to explain that it was *not* suggesting that "a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations," and it observed that "it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation." *Id.* at 658–59; *see also id.* ("[T]he complete absence of reliance may prevent the plaintiff from establishing proximate cause.").

After *Bridge*, the Second Circuit reaffirmed that "plaintiffs must also demonstrate reliance," even if not first-person reliance, "on a defendant's common misrepresentation to establish causation under RICO." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 119 (2d Cir. 2013). More recently, the Second Circuit observed that "[a]lthough reliance on the defendant's alleged misrepresentation is not an element of a RICO mail-fraud claim, the plaintiffs' theory of injury in most RICO mail-fraud cases will nevertheless depend on establishing that someone—whether the plaintiffs themselves or third parties—relied on the defendant's misrepresentation." *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015); *see also NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 196–97 & n.15 (2d Cir. 2019).[1] And district courts in this circuit have observed

---

[1] Plaintiffs cite for the contrary *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010), Pls. United Opp'n Br. at 12, but that case did not directly address the issue, and indeed found that "[third-party] reliance is a necessary part of the causation theory advanced by the plaintiffs," *Eli Lilly* at 133. And while the above binding authorities are sufficient to reach the conclusion here, the Court notes that other circuits impose the same reliance requirement. *E.g.*, *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1259 (9th Cir. 2019); *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1350 (11th Cir.

that a showing of *some* reliance is functionally a prerequisite to establish proximate cause. *E.g.*, *Ritchie v. N. Leasing Sys., Inc.*, No. 12-CV-4992 (KBF), 2016 WL 1241531, at *12 (S.D.N.Y. Mar. 28, 2016), *aff'd sub nom. Ritchie v. Taylor*, 701 F. App'x 45 (2d Cir. 2017); *FindTheBest.com, Inc. v. Lumen View Tech. LLC*, 20 F. Supp. 3d 451, 458–59 (S.D.N.Y. 2014).

Plaintiffs do not attempt to argue that they pled facts to support third-party reliance on the allegedly fraudulent statements. Instead, they claim that this case is an exception to the general rule that *some* reliance is required to prove causation because reliance is not a necessary part of their causation theory. Pl.'s United Opp'n Br. at 13. They observe that they were required to treat all patients, that United was required to pay for emergency services, and that neither had the ability to prevent the patients from seeking treatment, and they thus argue that there was no room for reliance to play a role. *Id.* The Court assumes that there are rare exceptions where a RICO plaintiff can establish proximate cause without any showing of reliance on any of the misrepresentations at the heart of the scheme.

But even drawing all inferences in Plaintiffs' favor, the facts alleged in the Complaint do not support the proposition that this is such a case. In the absence of reliance, it is not plausibly alleged how the scheme to defraud was a proximate cause of Plaintiffs' alleged injuries. According to Plaintiffs, Defendants engaged in a scheme to artificially misrepresent the sources of the rates that they would pay out to providers like Plaintiffs, and to further that scheme, they used mail and wire communications to obfuscate the mechanisms used to calculate those rates. Missing from Plaintiffs' analysis is an alternative theory of causation that links the misrepresentations at the heart of the scheme to defraud with the alleged losses they incurred. As the Second Circuit explained, "reliance will typically be a necessary step in the causal chain

---

2016).

linking the defendant's alleged misrepresentation to the plaintiffs' injury: if the person who was

allegedly deceived by the misrepresentation (plaintiff or not) would have acted in the same way

regardless of the misrepresentation, then the misrepresentation cannot be a but-for, much less

proximate, cause of the plaintiffs' injury." *Sergeants*, 806 F.3d at 87.

Phrased differently, the Complaint fails to plead facts to plausibly support the proposition

that Plaintiffs' injuries were a *direct* result of Defendants' misrepresentations, rather than of

other factors, like Plaintiffs' legal obligation to provide care. *See Anza*, 547 U.S. at 459. Indeed,

while not dispositive, the Complaint's concession that United disclosed that rates would decrease

further supports the proposition that Plaintiffs' injuries were not sufficiently the product of the

scheme to hide the repricing. *See* United Br. at 8 (citing Compl. ¶¶ 346–47).

The Court concludes that while the rare RICO fraud case may not require any allegations

of anyone's reliance on the alleged fraud, Plaintiffs have failed to articulate an alternative theory

of causation sufficient to satisfy the proximate-cause requirement. Notably, at least one other

district court has reached the same conclusion against these Defendants. *Fla. Emergency

Physicians Kang & Assocs., M.D., Inc. v. United Healthcare of Fla., Inc.*, No. 20-60757-CIV,

2021 WL 2525262, at *7 (S.D. Fla. Mar. 16, 2021).[2]

This deficiency defeats both Plaintiffs' RICO claim and their RICO-conspiracy claim

against Defendants. Because Plaintiffs alleged only RICO claims against Multiplan, it is

dismissed from this suit.

---

[2] Plaintiffs' supplemental authority, *LD v. United Behav. Health*, No. 4:20-CV-02254 YGR, 2021 WL 930624 (N.D. Cal. Mar. 11, 2021), is not to the contrary. That case found patients insured by United had adequately alleged RICO claims against United and Multiplan. *Id.* at *5 & n.7. That court had earlier concluded that the plaintiffs, who are not healthcare providers like Plaintiffs here, satisfied the proximate-cause requirement by alleging third-party reliance. *LD v. United Behav. Health*, 508 F. Supp. 3d 583, 601 (N.D. Cal. 2020).

15

### B.  ERISA does not preempt Plaintiffs' state-law claims

As to United, Plaintiffs also raised two New York state-law claims for breach of an implied-in-fact contract and for unjust enrichment.  Compl. ¶¶ 836–56.  United argues that Plaintiffs do not adequately plead their state-law claims.  *Id.* at 5–6, 22–25.  It also argues that these state-law claims are preempted by the Employment Retirement Income Security Act of 1974.  United Br. at 15–22.

The Court considers first whether ERISA preempts Plaintiffs' remaining claims.  As relevant here, ERISA can preempt state-law claims in two ways: express preemption and complete preemption.  *Wurtz v. Rawlings Co., LLC*, 761 F.3d 232, 238–39 (2d Cir. 2014).

#### 1.  Plaintiffs' state-law claims are not expressly preempted

 ERISA *expressly* preempts "any and all State laws" that "relate to any employee benefit plan" unless the state law "regulates insurance."  29 U.S.C. § 1144(a)–(b); *Wurtz*, 761 F.3d at 240.  This provision's purpose is to preempt any state law that "interferes with nationally uniform plan administration."  *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320 (2016) (quoting *Egelhoff v. Egelhoff*, 532 U.S. 141, 148 (2001)).  "[A] state law relates to an ERISA plan if it has a connection with or reference to such a plan."  *Rutledge v. Pharm. Care Mgmt. Ass'n*, 141 S. Ct. 474, 479 (2020) (quoting *Egelhoff*, 532 U.S. at 148).

But the Second Circuit has warned against a "very broad view of preemption."  *Gerosa v. Savasta & Co.*, 329 F.3d 317, 327 n.8 (2d Cir. 2003).  And "[c]ourts are reluctant to find that Congress intended to preempt state laws that do not affect the relationships among" "the core ERISA entities: beneficiaries, participants, administrators, employers, trustees and other fiduciaries, and the plan itself."  *Id.* at 324.

16

The Court concludes that Plaintiffs' state-law claims are not expressly preempted. First, United's asserted liability "does not 'derive' from 'the particular rights and obligations established by any benefit plan.'" *Stevenson v. Bank of N.Y. Co.*, 609 F.3d 56, 60 (2d Cir. 2010) (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 213 (2004)). Nor do Plaintiffs allege a violation of any plan provision. *Id.* at 61. Rather, as alleged, United's obligation to compensate Plaintiffs comes from, among other authorities, New York state law. *E.g.*, N.Y. Fin. Serv. Law § 605(a) (requiring that "the health care plan shall pay an amount that it determines is reasonable for the emergency services rendered by the non-participating physician").

Second, Plaintiffs' state-law claims do not "purport to require a plan administrator, employer, or beneficiary to follow a standard inconsistent with those provided by ERISA." *Stevenson*, 609 F.3d at 61. Instead, they "are in themselves neutral toward ERISA plans." *Id.* at 62. Tellingly, United does not contend that Plaintiffs' claims, if successful, would undermine "the uniformity of the administration of benefits that is ERISA's key concern" or require United to tailor its plans state-by-state. *Id.* at 61. At the least, Plaintiffs' claims would create no greater disuniformity than Arkansas's drug-pricing law recently upheld against an express-preemption challenge. *See Rutledge*, 141 S. Ct. at 480–81.

United responds that Plaintiffs' claims "require explicit reference to the terms of ERISA-governed benefit plans," supporting express preemption. United Br. at 16–18 (citing, e.g., *Stevenson v. Bank of N.Y. Co.*, 2007 WL 9815654, at *6 (S.D.N.Y. Mar. 30, 2007)). But the Second Circuit, in overturning the very precedent on which United relies, has made clear that mere "reference to ERISA plans" does not give rise to preemption when the claims "will not

*affect* the referenced plans, particularly not in a way that threatens ERISA's goal of uniformity."
*Stevenson*, 609 F.3d at 62 (emphasis added).[3]

The Court concludes that ERISA does not expressly preempt Plaintiffs' state-law claims.

### 2. Plaintiffs' state-law claims are not completely preempted

The scope of ERISA's *complete* preemption of state-law claims is defined by the two-prong *Davila* test. *Wurtz*, 761 F.3d at 241 (citing *Davila*, 542 U.S. at 210). Under *Davila*, "claims are completely preempted by ERISA if they are brought (i) by an individual who at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and (ii) under circumstances in which there is no other independent legal duty that is implicated by a defendant's actions." *Id.* (cleaned up). By demonstration, the *Davila* Court held that the state-law claims of a plan participant and a plan beneficiary, each of whom sought relief against their insurance company for the denial of plan benefits, were completely preempted. *Davila*, 542 U.S. at 211 ("[R]espondents complain only about denials of coverage promised under the terms of ERISA-regulated employee benefit plans. Upon the denial of benefits, respondents could have paid for the treatment themselves and then sought reimbursement through a § 502(a)(1)(B) action . . . .").

The Court concludes that neither prong of *Davila* is met here. First, Plaintiffs could not have brought their claim under ERISA. Section 502(a)(1)(B) of ERISA authorizes a plan "participant or beneficiary" to "recover benefits due to him under the terms of his plan, to

---

[3] Unfortunately, this is not the only authority upon which the attorneys representing United rely that is no longer good law. United also trumpeted its successful dismissal in *Emergency Grp. of Ariz. Pro. Corp. v. United Healthcare Inc.*, 448 F. Supp. 3d 1077, 1086 (D. Ariz. 2020), United Br. at 3, 21–22, without mentioning in its reply brief that the decision had since been reversed on appeal, *Emergency Grp. of Ariz. Pro. Corp. v. United Healthcare, Inc.*, 838 F. App'x 299, 300 (9th Cir. 2021).

enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(B); *see id.* § 1002(8) (defining a beneficiary as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder"). Plaintiffs are "physician practice groups who staff the emergency rooms" in New York hospitals and "out-of-network healthcare providers with United." Compl. ¶ 24. Such providers would not ordinarily qualify as participants or beneficiaries, but the Second Circuit has recognized an exception: "healthcare providers to whom a beneficiary has *assigned* his claim in exchange for health care" may sue as beneficiaries, *McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*, 857 F.3d 141, 146 (2d Cir. 2017) (emphasis added) (quoting *Montefiore Med. Ctr. v. Teamsters Loc. 272*, 642 F.3d 321, 329 (2d Cir. 2011)). United argues that exception applies here because Plaintiffs' billing of United is "only possible with an assignment of benefits." *Lodi Mem'l Hosp. Ass'n v. Tiger Lines, LLC*, 2015 WL 5009093, at *6 (E.D. Cal. Aug. 20, 2015). The Court finds such a conclusion unwarranted, or at least premature. It may consider only those allegations contained in the Complaint, which makes no claim that Plaintiffs were assigned benefits. And United's assertion that assignment *must* have occurred is belied by the Second Circuit's holding in *McCulloch*, which concluded that a plan's anti-assignment provision barred a provider's suit under Section 502. *See McCulloch*, 857 F.3d at 147–48; *see also Merrick v. UnitedHealth Grp. Inc.*, 175 F. Supp. 3d 110, 117–20 (S.D.N.Y. 2016) (finding that United's anti-assignment provisions prevented healthcare providers from pursuing a Section 502(a)(1)(B) action).[4]

---

[4] United may later introduce evidence on this issue, as the parties apparently did in *Lodi Memorial*. 2015 WL 5009093, at *6 (citing the "Plan Document, Ex. B"); *see also Enigma Mgmt. Corp. v. Multiplan, Inc.*, 994 F. Supp. 2d 290, 297 (E.D.N.Y. 2014) (submitting a declaration to demonstrate assignment).

The Court additionally concludes that the first *Davila* prong is not met because, like in *McCulloch*, Plaintiffs are out-of-network providers whose suit "does not depend on the specific terms of the relevant health care plan or on Aetna's determination of coverage or benefits pursuant to those terms." 857 F.3d at 149. Framed another way, Plaintiffs' claims are about the "amount of payment," not the "right to payment," and so not subject to preemption. *Montefiore*, 642 F.3d at 331.

Nor is the second *Davila* prong satisfied. Again, much like *McCulloch*, Plaintiffs' claims against United arise "not from an alleged violation of some right contained in the plan, but rather from a freestanding state-law duty." 857 F.3d at 150. Unlike in *Montefiore*, on which United relies, Plaintiffs "had no preexisting relationship with" United and were not "required by the plan to pre-approve coverage for [their services]." *Id.* (citing *Montefiore*, 642 F.3d at 332). As the Ninth Circuit recently concluded with respect to a nearly identical suit, because Plaintiffs "assert legal duties arising under an implied-in-fact contract" and unjust enrichment, and would exist "whether or not an ERISA plan existed," the claims are "based on independent legal duties," avoiding preemption. *Emergency Grp. of Ariz. Pro. Corp. v. United Healthcare, Inc.*, 838 F. App'x 299, 300 (9th Cir. 2021) (quoting *Marin Gen. Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941, 950 (9th Cir. 2009)).

Because at least one *Davila* prong is not satisfied, Plaintiffs' state-law claims are not completely preempted. *See Montefiore*, 642 F.3d at 328.[5]

### C.  Whether Plaintiffs adequately pleaded their state-law claims

---

[5] This conclusion is consistent with other district courts that have considered suits filed by out-of-network emergency healthcare providers. *E.g.*, *Fla. Emergency Physicians*, 2021 WL 2525262, at *10; *Emergency Servs. of Okla., PC v. Aetna Health, Inc.*, No. CIV-17-600-J, 2021 WL 3914255, at *3 (W.D. Okla. Aug. 24, 2021).

United argues that Plaintiffs fail to adequately plead either of their state-law claims because Plaintiffs do not identify information specific to each claim for which they seek compensation and because they do not plead facts sufficient to satisfy the elements of a claim for a breach of implied-in-fact contract or for unjust enrichment. The Court considers these three arguments in turn and concludes that Plaintiffs adequately pled a claim for unjust enrichment but not a claim for breach of an implied-in-fact contract.

### 1. Plaintiffs provided adequate claim-specific identifying information

Plaintiffs allege that United "under paid Plaintiffs on thousands of claims" for services rendered to patients with United plans. Compl. ¶ 786; *see also id.* ¶ 21. But, United notes, Plaintiffs' Complaint provides specific details for only a sample of these thousands of claims. *Id.* ¶¶ 366–406, 416–513, 524–63, 572–655, 661–772. "Without factual allegations regarding the benefit plans, members, and specific claims," United contends it "cannot possibly identify the specific health benefit claims at issue, and cannot adequately plead the specific defenses that they expect to raise in response to the causes of action tied to those individual benefit claims," requiring dismissal. United Br. 5–6; *see also* United Reply at 1 (arguing that, but for the plans, United would be "a stranger to the transactions" in the Complaint).

The Court disagrees. Both authorities cited by United in which a court required more specific claim information involved actions by healthcare providers under Section 502(a)(1)(B) of ERISA to recoup payments under plaintiffs' insurance plans. *See MC1 Healthcare, Inc. v. United Health Grp., Inc.*, No. 3:17-CV-01909 (KAD), 2019 WL 2015949, at *2, *8 (D. Conn. May 7, 2019); *Michael E. Jones M.D., P.C. v. UnitedHealth Grp., Inc.*, No. 19-CV-7972 (VEC), 2020 WL 4895675, at *3 (S.D.N.Y. Aug. 19, 2020). As explained, Plaintiffs do not, and could not, bring suit against United under ERISA. Plaintiffs need not plead specific details of United's

plans because Plaintiffs have not alleged entitlement to recoup payments under those plans.  *See* Pls. United Opp'n Br. at 4.

### 2.  Plaintiffs did not adequately plead a claim for breach of an implied-in-fact contract

Under New York law,[6] "to make a claim for breach of contract, a plaintiff must allege: (1) the existence of an agreement between itself and the defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by the defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Ancile Inv. Co. Ltd. v. Archer Daniels Midland Co.*, 784 F. Supp. 2d 296, 303 (S.D.N.Y. 2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)). With respect to the first element, "a complaint must 'allege the essential terms of the parties' purported contract in nonconclusory language, including the specific provisions of the contract upon which liability is predicated." *Childers v. N.Y. & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 312 (S.D.N.Y. 2014) (internal quotation marks omitted) (quoting *Sirohi v. Trs. of Columbia Univ.*, 162 F.3d 148, at *2 (2d Cir. 1998) (summary order)).  "A complaint 'fails to sufficiently plead the existence of a contract' if it does not provide 'factual allegations regarding, inter alia, the formation of the contract, the date it took place, and the contract's major terms.'" *Id.* (quoting *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand*, 455 F. App'x 102, 104 (2d Cir. 2012) (summary order)).

---

[6]  The parties assume that New York law applies to Plaintiffs' implied-contract and unjust-enrichment claims, citing only cases applying New York law throughout their briefing.  No party argues that the substantive law of another jurisdiction should govern. Accordingly, the Court will apply New York law. *See Texaco A/S (Denmark) v. Com. Ins. Co. of Newark*, 160 F.3d 124, 128 (2d Cir. 1998) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.") (internal quotation marks omitted).

"[A]bsent a written agreement between the parties, a contract may be implied where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 455 (S.D.N.Y. 2014). "An implied-in-fact contract is 'just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct.'" *Ellis v. Provident Life & Accident Ins. Co.*, 3 F. Supp. 2d 399, 409 (S.D.N.Y. 1998 (quoting Jemzura v. Jemzura, 330 N.E.2d 414, 420 (N.Y. 1975)). Accordingly, "[a]n implied-in-fact contract requires all of the elements required of any valid contract, including consideration, mutual assent, legal capacity, and legal subject matter." *Murray v. Northrop Grumman Info. Tech., Inc.*, 444 F.3d 169, 178 (2d Cir. 2006).

United first argues that Plaintiffs failed to plead an implied-in-fact contract because there was no "meeting of the minds" as to reimbursement rates. United Br. at 23. In fact, United notes, the Complaint alleges that Plaintiffs *rejected* the reimbursement rates that United proposed in attempting to negotiate a written contract. Compl. ¶¶ 347–49, 357. United additionally argues that Plaintiffs failed to plead any consideration for its implied-contract claim because Plaintiffs provided service out of a pre-existing legal obligation and because United's insureds, not United itself, received any benefit of those services. United Br. at 23–24.

Even drawing all inferences in Plaintiffs' favor, the Court agrees with United. First, Plaintiffs do not plead consideration because Plaintiffs provide healthcare services to patients not in exchange for United's payments but instead out of "a pre-existing legal obligation," which "does not amount to consideration." *Hinterberger v. Cath. Health Sys., Inc.*, 536 F. App'x 14, 17 (2d Cir. 2013) (quoting *Murray*, 444 F.3d at 178). Plaintiffs attempt to address this deficiency by suggesting that because the parties knew they "would be required to deal with one

23

another, . . . their actions demonstrate their intent to be bound." Pls. United Opp'n Br. at 23. This claim simply misapplies New York law. *Goncalves v. Regent Int'l Hotels, Ltd.*, 447 N.E.2d 693, 700 (N.Y. 1983) ("A promise to perform an existing legal obligation is not valid consideration to provide a basis for a contract"). Notably, the case law that Plaintiffs cite for support involved implied-in-*law* contracts (i.e., claims for unjust enrichment), not implied-in-*fact* contracts. *See N.Y.C. Health & Hosps. Corp. v. Wellcare of N.Y., Inc.*, 937 N.Y.S.2d 540, 544 (Sup. Ct. 2011); *River Park Hosp., Inc. v. BlueCross BlueShield of Tenn., Inc.*, 173 S.W.3d 43, 59 (Tenn. Ct. App. 2002) ("[T]he terms 'unjust enrichment' and 'contract implied in law' are used virtually interchangeably.").

Second, the Complaint does not plead a necessary meeting of the minds as to the price of services, which under New York law is an essential contract term. *See Gorodensky v. Mitsubishi Pulp Sales (MC), Inc.*, 92 F. Supp. 2d 249, 256 (S.D.N.Y. 2000) ("Once the price becomes uncertain, the contract becomes devoid of a critical term." (cleaned up)); *e.g.*, *Cent. Fed. Sav., F.S.B. v. Nat'l Westminster Bank, U.S.A.*, 574 N.Y.S.2d 18, 19 (N.Y. App. Div. 1991) ("Essential terms such as ultimate price were left open. Clearly, there was no 'meeting of the minds' to support the existence of an enforceable contract."); *Lapine v. Seinfeld*, 918 N.Y.S.2d 313, 318 (Sup. Ct. 2011) (stating that "price is an essential element of a contract").

### 3. Plaintiffs adequately plead an unjust-enrichment claim

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006). "The theory of unjust enrichment lies as a quasi-

contract claim. It is an obligation the law creates *in the absence of any agreement*." *Id.* (quoting *Goldman v. Metro. Life Ins. Co.*, 841 N.E.2d 742, 746 (N.Y. 2005)).

United's only response to Plaintiffs' unjust-enrichment claim is that it received no benefit from Plaintiffs' services, only United's insureds did. United Reply at 24–25. But this objection is unpersuasive. New York courts have found, consistent with the courts of several other states, that "where, as here, a hospital is required by law to treat patients in an emergency room, an insurance company is unjustly enriched if it fails to pay the hospital in full for the costs incurred in rendering the necessary treatment to the insurer's enrollees." *Wellcare*, 937 N.Y.S.2d at 545. As the Third Circuit recently explained, the insurer's benefit "is not the provision of the healthcare services *per se*, but rather the discharge of the obligation the insurer owes to its insured." *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 240–41 (3d Cir. 2020) (citing *Rabinowitz v. Mass. Bonding & Ins. Co.*, 197 A. 44, 47 (N.J. 1938)). Other federal courts have reached the same conclusion for similar reasons. *E.g.*, *El Paso Healthcare Sys., LTD v. Molina Healthcare of N.M., Inc.*, 683 F. Supp. 2d 454, 461 (W.D. Tex. 2010) ("While it is true that the immediate beneficiaries of the medical services were the patients, and not Molina, that company did receive the benefit of having its obligations to its plan members, and to the state in the interests of plan members, discharged."); *Fla. Emergency Physicians*, 2021 WL 2525262, at *12; *Cal. Spine & Neurosurgery Inst. v. Oxford Health Ins. Inc.*, No. 19-CV-03533-DMR, 2019 WL 6171040, at *6 (N.D. Cal. Nov. 20, 2019) (collecting cases). That is exactly the theory Plaintiffs pled here. Compl. ¶¶ 850–51.

United cites no persuasive authority to the contrary. United Br. 24–25. First, *Travelers Indemnity Co. of Connecticut v. Losco Group, Inc.*, 150 F. Supp. 2d 556, 562–63 (S.D.N.Y. 2001), which did not involve healthcare services, held that an insurer does not benefit when

services are provided to the insured at the insured's "behest." Yet here, Plaintiffs have alleged that their provision of services is compelled by law. *See Sasson Plastic Surgery, LLC v. UnitedHealthcare of N.Y., Inc.*, No. 17-CV-1674, 2021 WL 1224883, at *15 (E.D.N.Y. Mar. 31, 2021); *Wellcare*, 937 N.Y.S.2d at 546. Second, *MC1 Healthcare, Inc. v. United Health Group, Inc.*, No. 3:17-CV-01909 (KAD), 2019 WL 2015949, at *10 (D. Conn. May 7, 2019), interprets Connecticut, not New York law and so does not consider the *Wellcare* court's clear holding.

Last, short on law, United appeals to policy, arguing that recognizing Plaintiffs' claim would permit providers to "grossly inflate their bills." United Reply at 10. But that is not so. As alleged, United's duty is to pay Plaintiffs a "reasonable" rate for their services, Compl. ¶¶ 65–82, not to pay whatever amount Plaintiffs decide to bill United. Moreover, an equally unappealing outcome could result from United's position that Plaintiffs have no recourse if United fails to reasonably compensate them, which would conceivably incentivize insurers like United to pay as little as possible while Plaintiffs remain obligated to treat United's insureds.

### D. The Court will not dismiss Plaintiffs' claim for declaratory judgment

Last, Plaintiffs request, in Count Five of the Complaint, a determination of United's obligation to pay Plaintiffs a reasonable rate and that United's rates are fraudulent, citing as authority the Declaratory Judgment Act, 28 U.S.C. § 2201. Compl. ¶¶ 858, 862. A declaratory judgment action requires "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996) (cleaned up). At least at this stage, Plaintiffs' allegations satisfy that standard.

United contends that the request is duplicative of Plaintiffs' other claims. United Br. at 25 (citing *Fleisher v. Phx. Life Ins. Co.*, 858 F. Supp. 2d 290, 302 (S.D.N.Y. 2012)). The Court

concludes that such a determination is premature.  It therefore declines to dismiss Plaintiffs'
declaratory-judgment claim.

## IV.    CONCLUSION

For the reasons above, the Court GRANTS in part and DENIES in part Defendants'
motions to dismiss.  The Court dismisses Plaintiffs' RICO claims, Counts One and Two of the
Complaint, as to both Defendants and Plaintiffs' claim for breach of an implied-in-fact-contract,
Count Three, as to United.  It does not dismiss Plaintiffs' unjust-enrichment or declaratory-
judgment claims.

The Court, having already provided Plaintiffs an opportunity to amend the Complaint
after Defendants filed their motions, Dkt. No. 31, denies Plaintiffs' request for leave to amend,
Pls. Multiplan Opp'n Br. at 23; *see F5 Cap. v. Pappas*, 856 F.3d 61, 90 (2d Cir. 2017)
(upholding denial of leave to amend where plaintiff had "an opportunity to amend in response to
full briefing of the defendants' motion to dismiss" and did not "its own briefing on the motion
. . . explain how it proposed to amend the complaint to cure its defects").

The Court continues to have jurisdiction over this action.  Though the Court dismisses
Plaintiffs' federal causes of action,[7] upon which this Court originally based jurisdiction, it
appears the Court now has diversity jurisdiction as between Plaintiffs and United.  *See* Compl.
¶¶ 24–30; *Wright v. Musanti*, 887 F.3d 577, 585 (2d Cir. 2018).

By October 19, 2021, United shall file an answer to the complaint.  Further, the parties
shall jointly file by October 19, 2021, a proposed case management plan.

This resolves docket numbers 28 and 30.

---

[7] Plaintiffs' declaratory-judgment claim, alone, is insufficient to confer federal-question
jurisdiction.  *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012).

SO ORDERED.

Dated:   September 28, 2021
         New York, New York

_____
ALISON J. NATHAN
United States District Judge

28