## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF
## NEW YORK

| | |
|---|---|
| EMERGENCY PHYSICIAN SERVICES OF NEW YORK, ET AL., <br><br> Plaintiffs, <br><br> -against- <br><br> UNITEDHEALTH GROUP, INC., ET AL., <br><br> Defendants. | Civil Action No. 1:20-cv-09183-JGK |

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTIONS FOR SUMMARY JUDGMENT

Pursuant to L. Civil Rule 56.1, Defendants UnitedHealth Group, Inc. ("UHG"); United HealthCare Services, Inc. ("UHC"); UMR, Inc. ("UMR"); UnitedHealthcare Service LLC ("UHS"); UnitedHealthcare Insurance Company ("UHIC"); and Oxford Health Plans LLC ("Oxford") (collectively, "Defendants"), by and through undersigned counsel, respectfully submit the following statement of material facts as to which there is no genuine issue to be tried.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### Procedural History

1.     Plaintiffs Emergency Physician Services of New York ("Emergency Physician Services"), Buffalo Emergency Associates ("BEA"), Exigence Medical of Binghamton ("Exigence"), and Emergency Care Services of New York ("Emergency Care Services") (collectively "TeamHealth Plaintiffs"), along with Exigence Medical of Jamestown, filed their original complaint against UHG and MultiPlan, Inc. ("MultiPlan") in the above-captioned case on or about November 2, 2020, generally alleging that they were being underpaid for the services

provided to members of health plans insured or administered by Defendants.  *See* DN-1.

TeamHealth Plaintiffs did not identify the specific health-benefit claims that they were disputing

in the original complaint.

2.      UHG moved to dismiss the original complaint on January 25, 2021, arguing *inter

alia* that TeamHealth Plaintiffs failed to state a claim under the RICO Act; that TeamHealth

Plaintiffs' state-law claims are preempted by ERISA; and that the complaint fails to plausibly

plead a claim for relief under state law.  *See* DN-29.  MultiPlan also moved to dismiss on

January 25, 2021.  *See* DN-30.

3.      The Court, on September 28, 2021, granted in part and denied in part the motions

to dismiss.  The Court dismissed TeamHealth Plaintiffs' RICO claims as to both UHG and

MultiPlan, and TeamHealth Plaintiffs' implied-in-fact contract claims as to UHG, leaving UHG

as the only defendant in the suit.  It did not dismiss TeamHealth Plaintiffs' unjust enrichment or

declaratory judgment claims.  The Court also denied TeamHealth Plaintiffs' request for leave to

amend their complaint.  *See* DN-65.

4.      UHG filed its answer on October 25, 2021.  *See* DN-74.

5.      On February 16, 2022, the parties filed two letters on the status of discovery,

indicating that the parties agreed that TeamHealth Plaintiffs could amend their complaint to add

defendants affiliated with UHG who had adjudicated the disputed health-benefit claims.  *See*

DN-93; DN-94.  On February 23, 2022, the Court ordered TeamHealth Plaintiffs to file their

amended complaint by February 24, 2022.  DN-95.

6.      TeamHealth Plaintiffs filed the operative complaint against Defendants on

February 24, 2022, dropping Exigence Medical of Jamestown as a plaintiff and MultiPlan as a

defendant.  The operative complaint asserted two causes of actions against all Defendants: unjust enrichment under New York Law and declaratory relief.  *See* DN-97 ("FAC").

7.     Defendants filed their answer and affirmative defenses to the FAC on March 10, 2022.  *See* DN-111  ("Answer").

8.     Defendants moved for judgment on the pleadings as to UHG on March 10, 2022, arguing that UHG was not a proper party to the action and TeamHealth Plaintiffs could not pierce the corporate veil to bring claims against UHG for the alleged actions of its subsidiaries. *See* DN-113.  In response, TeamHealth Plaintiffs argued that they were not trying to pierce the corporate veil, but instead were bringing a direct unjust enrichment claim against UHG.  *See* DN-127.  The Court denied the motion on September 6, 2022.  *See* DN-190.

9.     Defendants moved for summary judgment on September 1, 2022, arguing that TeamHealth Plaintiffs were collaterally estopped from bringing their unjust enrichment claims against Defendants.  *See* DN-184.  The Court denied the motion on April 4, 2023.  *See* DN-396.

10.     On November 7, 2022, TeamHealth Plaintiffs moved for discovery on additional claims that TeamHealth Plaintiffs sought to place at issue on June 30, 2022, four months after amending their complaint, including claims occurring between August 1, 2021 and December 31, 2021.  *See* DN-218.  Magistrate Judge Netburn denied TeamHealth Plaintiffs' motion.  *See* DN-220.  TeamHealth Plaintiffs appealed the order.  *See* DN-228.  The Court held that TeamHealth Plaintiffs could pursue claims that TeamHealth Plaintiffs had newly identified on June 30, 2022 if the claim occurred between January 1, 2018 and July 31, 2021, but could not pursue entirely new claims that occurred between August 1, 2021 and December 31, 2021.  *See* DN-293.

**Background Facts on the Parties, Their Historical Relationship, and Failed Negotiations**

11.    Defendants UHC, UMR, UHS, UHIC, and Oxford insure or act as claims administrator for certain health-benefit plans.  *See* FAC ¶¶ 8-12.

12.    Defendant UHG is the corporate parent of UHS and Oxford.  Answer ¶ 16.  UHG is a holding company that does not insure or act as a claim administrator for any health-benefit plans.  *See* DN-114 at 1; Declaration of Greg Jacob ("Jacob Decl.") Ex. 1, Response to Interrogatory No. 3; Jacob Decl. Ex. 2 at 71:21-24 (referring to UHG as a holding company), 186:1-6 ("Q  Does UHG process claims or set or determine reimbursement rates of out-of-network services, as far as you know?  A  It does not."); 187:22-188:2 ("Q  Now, to what extent does UnitedHealth Group contract with healthcare providers, as far as you know?  A  []  UnitedHealth Group does not contract with providers.").

13.    Defendants UHIC and Oxford act both as an insurer for fully-funded plans, and as a claims administrator for self-funded plans.  Jacob Decl. Ex. 3 ¶¶ 15-16.  For fully-insured plans, the plan sponsor, such as an employer or union, purchases insurance, and the insurer both administers the plan and pays for covered plan benefits out of the insurer's funds.  Jacob Decl. Ex. 3 ¶ 16.  Fully-insured plan sponsors pay a premium for coverage, and in exchange, the employee becomes the carrier's insured.  *See id.*  The insurer is contractually obligated to pay specified monetary benefits toward covered health-benefit claims for its insured.  *Id.*  For self-funded plans, the plan sponsor is responsible for covering the cost for any covered plan benefits with the plan sponsor's own funds, and the plan sponsor separately pays  administrative fees to a third-party administrator ("TPA") for adjudicating claims and for providing other administrative services to the plan.  *Id.* ¶ 15.

14.     Defendants UHC, UHS, and UMR act only as TPAs.  *Id.* ¶ 15.  They do not act as insurers.

15.     TeamHealth Plaintiffs are for-profit emergency-provider staffing companies.  *See* Jacob Decl. Ex. 4; Jacob Decl. Ex. 5 at 14:8-12 (BEA contracted with facilities to provide staffing for emergency departments); 32:20-34:1 (testimony regarding BEA applies to all four TeamHealth Plaintiffs).  TeamHealth Plaintiffs, through its professional providers such as doctors and nurse practitioners, "provided emergency care to more than 7,500 patients … covered by commercial insurance plans sold and/or administered by United[.]"  *See* FAC ¶ 19; Jacob Decl. Ex. 5 at 14:8-24 (BEA staffed hospitals with clinicians who provided services to commercial patients); 32:20-34:1 (testimony regarding BEA applies to all four TeamHealth Plaintiffs).

16.     TeamHealth Plaintiffs have repeatedly affirmed that TeamHealth Plaintiffs render emergency-medicine services to Defendants' members, not to Defendants themselves.  *See, e.g.*, FAC ¶¶ 19, 25 (Plaintiffs provided the emergency care to the  United members (emphasis added here and to all following parentheticals); 26 (referring to "the emergency care provided to United's Members"); 28-29 (similar); 64-65 (similar); DN-209 at 4 ("Provider Plaintiffs will treat United's members").  *See, e.g.*, Jacob Decl. Ex. 6 at 27:1-8 (describing wrap networks as applying where there is no "direct contract in place with the provider rendering services for their member").

17.     These services are performed at the behest of patients; Defendants do not request them.  *See* Jacob Decl. Ex. 7 at (testifying that TeamHealth Plaintiffs are "patient focused" because the insurer does not matter for the emergency medicine care being rendered), 118:9-16 (TeamHealth Plaintiffs "want to provide quality services to patients"), 120:9-121:11 (explaining

TeamHealth Plaintiffs "serv[e]" their "client[s], the hospital[s]" and the "patients," not

Defendants).  There is no evidence that Defendants requested that TeamHealth Plaintiffs provide

the services at issue with respect to any of the disputed claims.

18.    TeamHealth Plaintiffs employ or independently contract with providers to staff

the emergency rooms at facilities with which TeamHealth Plaintiffs have contracted.  *See* Jacob

Decl. Ex. 5 at 271:21-273:13.  The majority of TeamHealth Plaintiffs use independent

contractors rather than employees.  *Id.*

19.    

*See* Jacob Decl. Ex. 5 at 174:11-13

; 185:4-8 (Q You testified that Emergency Care

Services of New York and Emergency Physician Services of New York were organically grown

by TeamHealth; is that correct?  A  That's my understanding, yes.).

20.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *Id.* at 174:4-175:4.

21.    TeamHealth, in turn, is owned by a private-equity consortium backed by the

Blackstone Group.  *See* Jacob Decl. Ex. 8.

22.    Blackstone regularly receives information on TeamHealth Plaintiffs, including

monthly financial reports, from TeamHealth.  *See, e.g.*, Jacob Decl. Ex. 9 (email from Paul

Bevilacqua to Alex Katz (Blackstone) and others attaching a ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮).  Blackstone also provides TeamHealth information about Defendants'

business practices that Blackstone learned from UHC in its capacity as the TPA for Blackstone's

portfolio companies.  *See, e.g.*, Jacob Decl. Ex. 10 (email chain between Andreas Mang

(Blackstone) and Kent Bristow regarding ██████████████████████████
██████████████████████████████.

23.     Blackstone provides healthcare management to its portfolio companies, including

TeamHealth and its affiliates, through Equity Healthcare.  Jacob Decl. Ex. 11 at 50:2-7.  Equity

Healthcare offers plans administered by two TPAs:  UHC and Aetna.  *Id.* 133:25-134:8; Jacob

Decl. Ex. 12 (Health Program Agreement between Equity Healthcare and UHC).  Until January

1, 2020, TeamHealth and its affiliates offered plans administered by UHC.  *See* Jacob Decl. Ex.

11 at 246:14-19; Jacob Decl. Ex. 6 at 317:7-10.

24.     TeamHealth, through its subsidiaries, provides a number of services to

TeamHealth Plaintiffs.  *See, e.g.*, Jacob Decl. Ex. 5 at 111:5-15 (TeamHealth Plaintiffs use legal

counsel from TeamHealth and use outside counsel hired by TeamHealth); 188:12-22

█████████████████████████████████████████████████████████████;

274:1-275:5 (TeamHealth provided health and retirement plans to employees and independent

contractors of TeamHealth Plaintiffs).  ██████████████████████████████

██████████████████████████.  *See* Jacob Decl. Ex. 5 at 45:21-47:9 ████████

██████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████.  *See also*

*id.* 91:16-20 (Q.  Mr.  Bristow, when you set the billed charges for the medical groups, is it your

goal for the billed charges to reflect the reasonable value of the services rendered?  A.  Yes.).

25.     TeamHealth Plaintiffs and TeamHealth-affiliated entities executed several

agreements controlling the relationship between TeamHealth Plaintiffs and TeamHealth.  Jacob

Decl. Ex. 5 at 171:8-172:2 (████████████████████████████████████



172:16-173:9

. *See, e.g.*, Jacob Decl. Ex. 13 (Provider Leasing Agreement between Northeast ER Physicians, P.A. and BEA); Jacob Decl. Ex. 14 (Professional and Support Services Agreement between BEA and Emergency Physician Associates, LLC).

26.    The Professional and Support Services Agreements that each plaintiff entered into

. Jacob Decl. Ex. 14 at -008-09.  *See also* Jacob Decl. Ex. 5 at 190:4-192:20 (

.

27.    One needs to understand the costs to provide emergency-medicine services in order to determine the value of those services to the customer.  *See* Jacob Decl. Ex. 15 at 79:20-80:18 (testifying that it is important for TeamHealth to "have an understanding of the cost structure" because without that understanding, then TeamHealth cannot "understand what the value proposition is to [the] customers … or service performance" for patients).

28.     TeamHealth claims that it does not consider its costs to provide emergency medicine services when setting TeamHealth Plaintiffs' billed charges.  *See* Jacob Decl. Ex. 6 at 73:16-74:8.

29.     TeamHealth negotiated network agreement terms on behalf of Emergency Physician Services.  *See, e.g.*, Jacob Decl. Ex. 16 (email chain between Brandye Duff (UHC) and Paul Bevilacqua (TeamHealth) ███████████████████████████████████████████ ███████████████ ); Jacob Decl. Ex. 17 (email chain between Bevilacqua and Bristow where ██████████████████████████████████████████████████████████ .

30.     During negotiations, TeamHealth and UHC negotiated separate network rates for UHC and for Oxford.  *See, e.g.*, Jacob Decl. Exs. 18-19.  *See also* Jacob Decl. Ex. 20 at -364.

31.     On January 31, 2017, Brandye Duff of UHC sent Paul Bevilacqua, Stephen Murtaugh, Randy Blum, and James Rybak of TeamHealth a proposal for an updated contract between the parties.  *See* Jacob Decl. Ex. 21.

32.     Mr. Bevilacqua followed up with questions about UHC's and Oxford's comparative business levels.  He eventually provided a counteroffer for the proposed UHC rates. Jacob Decl. Ex. 18.

33.     TeamHealth replied that ████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████ Ms. Duff replied that ████████████████████████ ██████████████████████████████████████████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████

Mr. Bevilacqua replied: ███████████████████████  The parties continued to

negotiate over fee escalators.  Jacob Decl. Ex. 16.



    34.    UHC agreed to TeamHealth's proposal for

████████████████████████  According to Mr. Bevilacqua, he ███████████

Mr. Bristow asked Mr. Bevilacqua to

Mr. Bevilacqua explained that

Jacob Decl. Ex. 22.

    35.    The parties signed an agreement effective July 1, 2017 with a term of three years.

Jacob Decl. Ex. 23 at -149, 165.  Kent Bristow, Senior Vice President, TeamHealth, signed the

contract on behalf of Emergency Physician Services.  *Id.* at -169.

    36.    In October 2017, Miles Snowden of TeamHealth reached out to Dan Rosenthal of

UHC to discuss a national agreement between the parties, including for in-network rates.  Jacob

Decl. Ex. 24.  The parties met in December 2017 to discuss their relationship.  Jacob Decl. Ex.

25.  TeamHealth requested that UHC not apply its Benchmark Pricing Program on any claims

from out-of-network TeamHealth-affiliated provider groups, like TeamHealth Plaintiffs BEA,

Emergency Care Services, and Exigence, while the parties negotiated in good faith.  UHC agreed

to do so.  *Id.*

    37.    Throughout 2018, the parties negotiated for rates for emergency services for ten

states, not including New York.  *See, e.g.*, Jacob Decl. Ex. 26.  The parties were unable to come

to an agreement.

38.    In March 2019, Bob Galvin, CEO of EquityHealth and Partner, Blackstone, reached out to Dan Schumacher, then President and CEO of UHC, to set up a meeting to discuss reopening negotiations between the parties.  Jacob Decl. Ex. 27.  That meeting occurred at Blackstone's New York offices on April 18, 2019 (the "April 2019 Meeting").  Jacob Decl. Ex. 28.  Mr. Schumacher attended on behalf of UHC, while Dr. Galvin, Leif Murphy, CEO, TeamHealth, and Neil Simpkins, Partner, Blackstone, attended on behalf of TeamHealth.  *Id.*

39.    Prior to the meeting, Mr. Murphy sent Mr. Schumacher a letter ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████  *See* Jacob Decl. Ex. 29; Jacob Decl. Ex. 30 ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████  Mr.

Murphy also sent a PowerPoint that ████████████████████████████

████████████████████████████████████████████████.

Jacob Decl. Ex. 31.

40.    During the April 2019 Meeting, Mr. Murphy told Mr. Schumacher:





Jacob Decl. Ex. 28.

41.    In July 2019, the parties reopened negotiations, exchanging proposals for a national blended rate for emergency services.  *See* Jacob Decl. Exs. 32-33.  The negotiations included rates for services provided by TeamHealth Plaintiffs.  During the negotiations, TeamHealth repeatedly threatened Defendants with the loss of TeamHealth's ASO business if the parties were unable to reach an agreement.  *See* Jacob Decl. Ex. 34 at 169:14-170:16.  The parties never reached an agreement for a national contract.

42.    Defendants informed TeamHealth that the average out-of-network reimbursement rates paid by health benefit plans insured or administered by Defendants was expected to decrease in 2018 and 2019.  *See* Jacob Decl. Ex. 28 (Leif Murphy's notes from April 2019 meeting where ████████████████████████████████████████████ ████████████████████); Jacob Decl. Ex. 31 at -015 (April 2019 TeamHealth presentation noting that █████████████████████████████████████ ██████████████████████████████████████████████ █████████████).

43.    UHC terminated the agreement with Emergency Physician Services at the end of its complete three year term.  Jacob Decl. Ex. 35 (May 29, 2019 letter from Sandra Galian, UHC to Emergency Physician Services giving notice of termination effective July 1, 2020).

44.    The parties continued to negotiate a new state-specific contract for Emergency

Physician Services throughout 2020.  *See, e.g.*, Jacob Decl. Ex. 36.  The parties never reached an

agreement.

45.    Three of the four TeamHealth Plaintiffs also had a contract with the POMCO

Select ("POMCO") network, which UMR purchased in 2017.  Jacob Decl. Ex. 37 (June 1, 2015

contract between POMCO and TeamHealth Plaintiff Emergency Care Services of New York);

Jacob Decl. Ex. 38 (June 10, 2017 amendment to contract between POMCO and TeamHealth

Plaintiff Emergency Care Services of New York); Jacob Decl. Ex. 39 (June 2010 contract

between POMCO and TeamHealth Plaintiffs Exigence Medical of Binghamton and Buffalo

Emergency Associates).

46.    Each of the POMCO network contracts remains in effect until one of the parties

provides notice of termination.  Jacob Decl. Ex. 37 at -524; Jacob Decl. Ex. 39 at -258.

47.    POMCO is a third-party administrator located in Syracuse, New York, see Jacob

Decl. Ex. 39, which UMR acquired in 2017.  Jacob Decl. Ex. 40 at 30:22.

**The Empire Plan**

48.    The Empire Plan is a health plan offered by the New York State Health Insurance

Program to eligible state employees.  Jacob Decl. Ex. 41.  UHC acts as the TPA for the Empire

Plan.  *See, e.g.*, Jacob Decl. Ex. 42.

49.    In 2020, New York State's Office of the New York State Comptroller published a

study concerning the out-of-network reimbursement rates paid by the Empire Plan.  Jacob Decl.

Ex. 43.  The study examined the effect of the Empire Plan's collectively bargained plan

reimbursement methodology, reimbursement based on the 90th percentile of the FAIR Health

charges database, on its out-of-network payment rates, and recommended that the Empire Plan

consider adopting "better reimbursement methodologies" that are not "based on provider-driven charges," "thereby benefiting Empire Plan members and the State's taxpayers by lowering the Empire Plan's health care premiums, while continuing to provide the same level of medical services to Empire Plan members." *Id.*

50.    The study also found:

a.    The charge database is provider driven, so "there are significant risks" that reimbursement rates will be too high because "providers in a particular region may bill higher than necessary for a service, knowing that the [reimbursement] rate is based on a percentile derived from provider billings (charges) in that region, thereby driving up the [reimbursement] rate for that service in that region," *id.* at 23;

b.    "Auditors found no evidence that increases ... in [reimbursement] rates stemmed from a predictable source (e.g., an increase in claims or medical care cost-of-living). As a result, there does not appear to be any readily identifiable factors to explain these differences other than the provider-driven nature of [reimbursement] rates, which, as stated, are based on provider charges for services," *id.* at 21; and

c.    "Because the [reimbursement rate] is based on provider-driven charges and [reimbursement] rates tend to be significantly higher than other rates, auditors estimate that New York State is paying more in out-of-network reimbursements than it would under various other reimbursement methodologies," *id.* at 22.

51. On July 1, 2023, the Empire Plan changed its reimbursement methodology from a percentage of billed charges to 275% of the Medicare fee schedule. Jacob Decl. Ex. 44.

**FAIR Health**

52.    FAIR Health provided testimony and analyses as a non-retained expert in this case.  Jacob Decl. Ex. 45 at 1.

53.    FAIR Health provides data and data tools to stakeholders throughout the healthcare sector.  *Id.* at 3.  FAIR Health maintains various databases, including databases for billed charges in certain geographic areas and the allowed amounts in those same areas.  *See* Jacob Decl. Ex. 3 ¶ 41; Jacob Decl. Ex. 46.

54.    FAIR Health 

Nor does FAIR Health

"  Jacob Decl. Ex. 45 at 6.  *See also* Jacob Decl. Ex. 47 at -662 (printout of 2018 FAIR Health webpage stating:  "FAIR Health does not set UCR rates or out-of-network reimbursement rates for insurers.").

**Facility Contracts**

55.    TeamHealth Plaintiffs voluntarily contract with facilities for the exclusive right to provide emergency services at that facility.  *See, e.g.*, Jacob Decl. Ex. 5 at 14:8-12 (TeamHealth Plaintiffs had contracts with hospitals to staff those hospitals' emergency departments); Jacob Decl. Ex. 48 at 130:23-131:2 (TeamHealth Plaintiffs are the exclusive providers of emergency services at all at-issue facilities).

56.    Pursuant to these facility contracts,

*See, e.g.*, Jacob Decl. Ex. 49 at 006

*See, e.g.*, *id.* at 005



57.    Through some of these arrangements, the facilities ███████████████████ ██████████████████████████████████████████.  *See, e.g.*, Jacob Decl. Ex. 50 at -603 ███████████████████████████████

58.    The purpose of these subsidies is to help cover TeamHealth Plaintiffs' costs for rendering the at-issue emergency-medicine services at the facilities.  Jacob Decl. Ex. 48 at 52:11-17 (describing facility subsidies:  "when we bid on a contract and we project how much revenue we'll get from billing the patients and we project what our costs will be, if there's not enough revenue, we'll have to request a subsidy from the client.").  *See also* Jacob Decl. Ex. 7 at 146:19-149:1 (testifying that "anticipating if there is a required subsidy" occurs given the "cost that the ER physicians bear" to fulfill obligations under EMTALA).

59.    Other agreements ███████████████████████████████



████████████████████    *See, e.g.*, Jacob Decl. Ex. 51 at -342-343 ████████████████████



*See also* Jacob Decl. Ex. 3 ¶¶ 106, 121 ████████████████████

60.     TeamHealth Plaintiffs negotiate cost-plus provisions, in which the facility agrees to cover TeamHealth Plaintiffs costs, with a goal of obtaining a 6-10% profit margin above their costs to provide services.  Jacob Decl. Ex. 7 at 79:9-18 (Q  Do you know what the range of margin that you typically obtain on a cost-plus contract would be? … A  I would say somewhere between, you know, 10 to 6 percent probably in some cases.).

61.     The Emergency Medical Treatment and Active Labor Act ("EMTALA") applies to hospitals with an emergency department.  Jacob Decl. Ex. 3 ¶ 71.  *See also* Jacob Decl. Ex. 5 at 27:17-22 (acknowledging that facilities have an "EMTALA obligation").

62.     By virtue of the contracts between TeamHealth Plaintiffs and the facilities whose emergency departments they staff, EMTALA applies to the providers who provide services in those emergency departments.  *See* Jacob Decl. Ex. 6 at 166:3-9 (Q.  If your TeamHealth-affiliated group contracts with a hospital to staff its emergency room, does that group take on the responsibility of the hospital under EMTALA to treat all patients that come to that emergency room without regard to their insurance status?  A.  Yes.); Jacob Decl. Ex. 7 at 145:8-22 (agreeing

that when hospitals subject to EMTALA "outsource to TeamHealth," TeamHealth "take[s] that responsibility on for the hospital").

63.    EMTALA does not apply to TeamHealth Plaintiffs themselves. Jacob Decl. Ex.7 at 145:15-17 (clarifying that TeamHealth Plaintiffs are not subject to EMTALA themselves because it is "the physician and clinical staff, as well as the hospital, [that] are subject to the federal EMTALA rules").

64.    Hospitals that are subject to EMTALA receive "additional Medicare funding to help cover that cost" for which TeamHealth Plaintiffs are ineligible because they are not hospitals. *Id.* at 238:23-240:13.

**TeamHealth Plaintiffs' Costs**

65.    TeamHealth Plaintiffs produced data showing their costs of providing services at each of the facilities at which the at-issue services were performed (the "Costs Data"). Jacob Decl. Ex. 52 (TeamHealth Plaintiffs' Emergency Medicine Expenses by Hospital, 2017-2021).

66.    TeamHealth Plaintiffs' costs are physician compensation, malpractice insurance, and billing expenses. Jacob Decl. Ex. 6 at 112:15-19.

67.    One of Defendants' expert witnesses, Bruce Deal, analyzed the Costs Data and found that TeamHealth Plaintiffs' billed charges were ███████████████████████████████ ████████████████████. Jacob Decl. Ex. 3 ¶ 33, Fig. 6.

68.    TeamHealth Plaintiffs' billed charges were ███████████████████████████ ████████████ *Id.*

69.    Mr. Deal also found that Defendants' reimbursement was equal to ████████████ ██████ the TeamHealth Plaintiffs' costs. *Id.* From 2018 through 2021, TeamHealth Plaintiffs' average costs ████████████████████████████████████████████████████████

████████, while Defendants' average allowed reimbursements during that period ████

████████████████████████████████████████  *Id.* ¶ 108,

Figure 12.

70.    TeamHealth Plaintiffs also produced an ████████████████████

███████████████████████████████████████████████

██████████████████████████████████  Jacob Decl.

Ex. 53 (email from D. Jones to K. Bristow and J. Carman attaching █████████████

████████████; Jacob Decl. Ex. 54 (cost per visit analysis).  The analysis, ██████

███████████████████████████████████.  Jacob

Decl. Ex. 54.  Mr. Jones also █████████████████████████████

████████████████████████████████████████.

Jacob Decl. Ex. 55.

71.    ████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████  *See* Jacob Decl. Ex. 7 at 330:20-331:4; Jacob Decl. Ex. 55

(showing ████████████████████████████).

72.    They also shows ████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████.  Jacob Decl. Ex. 54.

According to the analysis, TeamHealth Plaintiffs receive ████████████████████



. *Id.*; Jacob Decl. Ex. 3 ¶ 118, Figure 13. *See also*

Jacob Decl. Ex. 3 ¶¶ 121-122 (███████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

73.     Defendants allowed, on average, ████████ per disputed claim.  Jacob Decl. Ex. 3 ¶

118, Figure 13.  Defendants have thus already allowed ████ per disputed claim above the "break

even" amount and ████ above TeamHealth's average cost per visit.  *Id.* ¶¶ 118, Figure 13, 122.

74.     TeamHealth Plaintiffs' full billed charges results in a ██████████ profit

margin.  *Id.* ¶ 33, Figure 6.

75.     TeamHealth Plaintiffs only put at issue ██████ claims out of the ██████

commercial claims submitted by the TeamHealth Plaintiffs to Defendants between January 1,

2018 through December 31, 2021.  Jacob Decl. Ex. 56 ¶ 62, Figure 8.  38,603 of the 55,084

claims were adjudicated as network claims; the remainder were adjudicated as out-of-network

claims.  *Id.*  The average allowed amount on the disputed claims is ██████, while the average

allowed amount of the non-disputed claims is ██████.  *Id.*  Across all claims submitted to

Defendants, Defendants allowed on average ██████.  *Id.*

76.     TeamHealth Plaintiffs expect commercial insurers like Defendants to subsidize

the costs that TeamHealth Plaintiffs incur from treating uninsured and government-insured

patients.  Jacob Decl. Ex. 7 at 327:1-328:4 ███████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████.  *See also* Jacob Decl. Ex. 34 at 34:16-35:3 ("[W]e have to obtain fair

reimbursement from commercial [payors] to ensure that we can cover the costs of providing care

to those uninsured or underinsured patients."), 42:2-5 ("It so happens that those market rates cross-subsidize the other [non-commercial] categories."), 45:16-46:15 (testifying that TeamHealth Plaintiffs negotiate subsidies for treatment of self-pay, Medicaid, or Medicare patients with hospitals and that "[t]o break even with our direct and indirect costs," TeamHealth Plaintiffs seek to collect revenue from commercial visits"); Jacob Decl. Ex. 7 at 323:7-330:14 (testifying that ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████; Jacob Decl. Ex. 31 (listing ██████████████████████████████

██████████████████████████████████████████████).

77.    TeamHealth Plaintiffs have ██████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████ *See* Jacob Decl. Ex. 7 at 333:14-335:10.

78.    TeamHealth Plaintiffs expect Defendants ████████████████████

███████████████████████████████████████████████████████

████████████████████████████ *See, e.g.*, Jacob Decl. Ex. 57 (██████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████; Jacob Decl. Ex. 31 ██████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████; Jacob Decl. Ex. 58 █████████████████████████

████████████████████; Jacob Decl. Ex. 6 at 162:18-163:6 ████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████.

79.    TeamHealth Plaintiffs' corporate representative testified that ██████████

████████████████████████████████████████████████████████████████████

████████████████████████████. Jacob Decl. Ex. 6 at 67:11-68:1 ████████████████

██████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

███████████████████. TeamHealth Plaintiffs are not obligated to continue to contract with

any facility and can terminate facility contracts at any time with required notice. *See id.* at

146:9-21. TeamHealth Plaintiffs did not terminate facility agreements with the facilities that

required TeamHealth Plaintiffs be in-network with BCBS because the agreements were

profitable. *See id.* at 147:13-148:1.

80.    TeamHealth Plaintiffs provide the same quality of services to all patients, whether

they are self-pay, government insureds, or commercial insureds. In other words, the value of the

services TeamHealth Plaintiffs provide does not depend on the insurance status of the patient.

Jacob Decl. Ex. 7 at 235:14-236:15. *See also* Jacob Decl. Ex. 59 (showing ███████████

██████████████████████████; Jacob Decl. Ex. 11 at 273:23-275:3 (explaining

██████████████████████████████████████████████████████████████████

██████████████████████████; Jacob Decl. Ex. 7 at 109:10-21 (testifying

that TeamHealth Plaintiffs are "patient focused" because the insurer does not matter for the

emergency-medicine care being rendered), 118:9-16 (TeamHealth Plaintiffs "want to provide

quality services to patients"), 120:9-121:11 (explaining TeamHealth Plaintiffs "serv[e]" their

"client[s], the hospital[s]" and the "patients," not Defendants), 143:23-144:2 (testifying that

"billing and reimbursement is extraordinarily complex, because ... the[] ... patients [are] seen and

treated" without regard to insurance), 145:8-11 (testifying that there is a "responsibility to treat

all patients" regardless of the insurer), 148:5-7 (testifying that patients receive the value of the

services rendered), 234:17-235:20 (testifying that patients are "seen" or "taken care of" and

receive the "same quality and standard of treatment" without regard to Defendants because

TeamHealth Plaintiffs assess patients' ability to pay and who their insurer may be "well after the

fact, well after the care is already delivered").

81.     TeamHealth Plaintiffs do not inquire into the insurance status of patients before

rendering emergency-medicine services.  Jacob Decl. Ex. 5 at 16:13-16.

82.     In internal communications, TeamHealth Plaintiffs have expressed that a

reimbursement rate of 250% of Medicare would cover their costs.  *See* Jacob Decl. Ex. 60

(internal TeamHealth email from Bevilacqua noting ███████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████.

**Plan Documents and Assignment of Benefits Forms**

83.     For fully-insured plans, plan benefits are described in a document called a

Certificate of Coverage ("COC").

84.     For self-funded plans, plan benefits are described in a document called a

Summary Plan Document ("SPD") and Defendants' claim adjudication and other administrative

services are described in a document called an Administrative Services Agreement ("ASA").

85.    COCs and SPDs are plan documents that spell out the plan benefits for members, including the monetary benefits available under the plans.  *See, e.g.*, Jacob Decl. Ex. 61 at -797 (explaining the plan has a responsibility to "pay" for medical services and an insured's "Benefit[]" is defined as "right to payment").  These monetary benefits include payments toward payment for in-network services and for out-of-network services, including out-of-network emergency services.  *See, e.g., id.* at -720 (Ironform COC, detailing in-network reimbursement as "our contracted fee(s) with the provider" and out-of-network emergency services reimbursement as "the higher of:  The median amount negotiated with Network providers for the same services; 110% of the published rates allowed by the Centers for Medicare and Medicaid Services (CMS) for the same or similar service within the geographic market; The amount that would be paid under Medicare … for the same service."); Jacob Decl. Ex. 62 at -709 (Ethical Culture Fieldston School COC, detailing in-network reimbursement as "our contracted fee(s) with that provider" and out-of-network emergency services reimbursement as "billed charges unless a lower amount is negotiated by us or authorized by state law."); Jacob Decl. Ex. 63 at -245 (Kinder Morgan SPD, detailing out-of-network emergency services reimbursement as "the higher of:  The median amount **negotiated with Network providers** for the same service; or 110% of the published rates allowed by the Centers for Medicare and Medicaid Services (CMS) for the same or similar service within the geographic market" (emphasis added)); Jacob Decl. Ex. 64 at -171 (New York State Nurses Association SPD, detailing in-network reimbursement as "the amount Oxford negotiated with the In-Network Provider" and out-of-network emergency services reimbursement as "70 percent of the reasonable and customary rate based on information provided by a third-party vendor based on the geographic area where the services were rendered. . . . You must pay the amount by which the Out-of-Network Provider's charge exceeds Oxford's

Eligible Expenses."); Jacob Decl. Ex. 65 at -934 (AT&T SPD detailing in-network reimbursement as "the Negotiated Rate determined by the Benefits Administrator" and out-of-network emergency reimbursement as "[t]he highest of the:  Median Allowable Charge for Network Emergency Services; Reasonable and Customary (R&C) (or similar amount determined using the Program's general method for determining payments for Non-Network Services); or Amount that would be allowable under Medicare; but not more than the Provider bills for the Services.").[1]

86.     ASAs specify that the self-insured employer remains financially responsible for all health-benefit claims.  Jacob Decl. Ex. 66 at -373 ███████████████████

███████████████████████████████████████████████████████████

███████████████████████████), -380 ████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████.  This includes additional reimbursement demanded or obtained through litigation.  *Id.* at -385 ████████████████████████████████████

███████████████████████████████████████████  The TPA is responsible for adjudicating claims by implementing the self-insured employer's selected plan benefits.  *See id.* at -314, -390.  The ASA also describes the fees that the TPA collects for the services it provides. *See, e.g.*, *id.* at -396-398.  The ASAs do not promise that Defendants will provide medical services, or ensure that medical services will be provided.  *See generally id.* at -388-395

████████████████████████████████████████████████████████).

87.     The plan documents recognize that Defendants' members, *not* Defendants, receive services from providers like those associated with TeamHealth Plaintiffs.  *See, e.g.*,

---

[1] With thousands of claims and health benefit plans at issue, Defendants do not attach all of the at-issue health benefit plans as exhibits.  ERISA preemption of common law unjust enrichment claims does not depend on a plan's particular out-of-network benefit language.

Jacob Decl. Ex. 67 at -506 ("If you have an emergency admission due to a condition you reasonably believe puts your life in danger ... you, your representative, the physician, or the hospital, must telephone us within two days following the day of the emergency admission"); -509 ("Whether or not you have to pay the difference between our allowance and the bill will depend on the provider *you use*.") (emphasis added).

88.    Defendants are required to adjudicate benefits in accordance with the plan documents, including the reimbursement methodology specified in the plan documents for out-of-network emergency services.  Jacob Decl. Ex. 68 at 154:1-16 ▮▮▮▮▮▮▮



Jacob Decl. Ex. 69 at 80:25-81:4 ▮▮

; *id.* at 98:3-9 ▮▮▮▮▮

; *id.* at 222:17-24 ▮▮▮

; Jacob Decl. Ex. 70 (email chain between Mang and Bristow regarding ▮▮▮▮▮

).

89.    The plan documents do not contain provisions that promise to provide medical services to members.  *See, e.g.*, Jacob Decl. Ex. 64 at -752 ("Oxford does not provide medical

services or make treatment decisions."). *See also* Jacob Decl. Ex. 40 at 34:7-14 █████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████) (emphasis added); *id.* 40:24-41:3

████████████████████████████████████████████████████████████████████

███████████████████████) (emphasis added).

90.     Employers use health-benefit packages to recruit or retain employees.  Jacob

Decl. Ex. 71 at 14.  Plan sponsors choose which type of plan, fully-insured or self-funded, they

wish to offer.  *See id.* at 9.

91.     Plan sponsors select the methodology that will be used to calculate monetary

benefits for out-of-network emergency claims.  Jacob Decl. Ex. 69 at 79:16-22 ███████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████), 80:4-7 ("the client will elect which programs

apply for their policy or for that individual policy, and . . . those programs then are set up in the

claims processing system."), 281:19-282:3 (███████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████  Jacob Decl. Ex. 72 at 164:14-21 ███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

27

████████████████████████████████████████████████████████████

████████

92.     In evaluating whether to contract with a TPA, plan sponsors evaluate, among

other things, the TPA's available methodologies for pricing out-of-network claims ("out-of-

network programs").  *See* Jacob Decl. Ex. 71 at 16.

93.     Defendants offer various out-of-network programs to help control plan sponsors'

medical costs for such services.  *See, e.g.*, Jacob Decl. Ex. 69 at 259:22-260:24 ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

94.     TeamHealth Plaintiffs acknowledge that it is standard in the industry for insurers

and/or plan administrators to offer out-of-network programs like the ones Defendants offer to

their customers and to charge fees for administering those programs.  *See* Jacob Decl. Ex. 11 at

193:23-194:25.  *See also id.* at 168:17-169:3 (████████████████████████████████████

████████████████████████████████████; Jacob Decl. Ex. 74 (████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████.  *Cf* Jacob Decl. Ex. 68 at 305:9-306:11

████████████████████████████████████████████████████████████

████████████████████████████████████

95.     According to the former CEO of Equity Healthcare, ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████  Jacob Decl. Ex. 11 at 163:17-165:22; *id*. at 201:5-19 ("simply because a

provider selected a charge and put it on a claim form" does not establish "reasonable value of the service" since a provider could be "charging an unfair and exorbitant amount").

96.    Dr. Galvin testified that the "shared savings program" is in fact "an instrumental and integral part of the services provided by" Defendants to Blackstone's portfolio companies. Jacob Decl. Ex. 12 at -030; Jacob Decl. Ex. 11 at 208:18-23 ("The reason shared savings is integral ... is, you know, first to protect against balancing billing and ... to stop, you know, to kind of reduce, you know, kind of unfair outrageous charges by out-of-network providers.").

97.    It is common in the TPA industry for TPAs that offer shared savings programs to receive administrative fees for their servicers that are calculated as a percentage of the difference between the amount billed by the provider and the amount allowed for the claim. *See* Jacob Decl. Ex. 72 at 64:5-15; Jacob Decl. Ex. 11 at 193:23-194:25 (not unique to have "administrative services fees for shared savings programs based on a savings methodology" and is instead "industry practice").

98.    Only some clients select the shared savings program as the methodology for reimbursing out-of-network emergency claims. *See* Jacob Decl. Ex. 75 at 37:13-19 (describing plan document language present "if the client is signing up for shared savings"); Jacob Decl. Ex. 69 at 104:18-20 ("[I]f a client elects the Shared Savings Program, the wrap network discount would be assessed first."); Jacob Decl. Ex. 40 at 122:4-123:2 (explaining UMR has "customers that come to us for administrative solutions. Some of those [] administrative solutions are out-of-network programs," including "out-of-network programs include[ing] MultiPlan Data iSight tools.")

99.    Plan sponsors negotiate administrative fees they are willing to pay for services associated with administering shared savings programs with plan administrators. Plan sponsors

can negotiate for the associated administrative fees to be calculated on different bases, including "per member per month" fees, or fees that are calculated as a specified percentage of the difference between the amount billed by the provider and the amount allowed for the claim, or a mixture of both.  *See* Jacob Decl. Ex. 72 at 61:19-62:14; Jacob Decl. Ex. 11 at 195:2-8 (Q Okay, and these savings fees that are reflected here in this row for shared savings, those fees are negotiated fees with UnitedHealthcare just like the monthly per member per month administrative services fees we talked about above, correct?  A  They were negotiated.).  *See also* Jacob Decl. Ex. 11 at 195:22-196:10 (Q  Okay, and so some clients might choose to have a higher fixed per member per month administrative service fee at a lower shared savings fee, and other clients may choose to have a higher shared [savings] fee in exchange for a lower per member per month administrative service fee? . . A  Of the several hundred companies I have worked with, I can think of about two or three that have chosen that.); *id.* 196:15-197:5 (▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇).

100.    When members of health-benefit plans solicit services from network physicians that are contracted with the insurer and/or TPA at contractually negotiated rates, the health benefit plan accesses the negotiated network rates when determining the plan's monetary benefit, which the physician has agreed to accept as reimbursement.  Those physicians are "in-network" physicians.

101.    In evaluating whether to retain a TPA, plan sponsors evaluate, among other things, the strength and value of the available network.  *See* Jacob Decl. Ex. 71 at 16. Defendants offer a broad network to their clients and seek to grow their network whenever possible.  *See, e.g.*, Jacob Decl. Ex. 69 at 259:22-260:24 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

██████████████████████████████████████████████████████

██████████████████████████████████; Jacob Decl. Ex. 40 at 63:23-64:19 ████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████

    102.    Defendants design their health-benefit plans to incentivize patients to use in-network services. *See, e.g.*, Jacob Decl. Ex. 77 (████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████.

TeamHealth and its affiliates had access to UHC's network when it used UHC as the TPA for its health plan. *See* Jacob Decl. Ex. 12 at -025 ██████████████████████████████

████████████████████████████████████████████

    103.    At the time patients present for treatment, facilities have patients sign Assignment of Benefit forms ("AOBs"), which vary from facility to facility. *See* Jacob Decl. Ex. 6 at

187:16-188:18. TeamHealth Plaintiffs rely on the AOB that the facility provides to the patient to acquire any right they may have to the patient's benefit under the plan. *Id.*

104.    TeamHealth Plaintiffs produced various Assignment of Benefit forms ("AOBs") they assert are representative of the AOBs their patients sign at the at-issue facilities. *See* Jacob Decl. Ex. 79 (requesting production of AOBs for at-issue claims, as requested by Defendants' Request for Production No. 31); Jacob Decl. Ex. 80 (agreeing to "continue meeting and conferring with Defendants regarding production of **exemplar hospital registration forms**, created by the hospitals where services were provided to United's members, for the at-issue claims") (emphasis added); Jacob Decl. Ex. 81 (enclosing production of "**exemplar patient registration forms**") (emphasis added).

105.    The produced exemplar AOBs for the following facilities ██████████████████████ ██████████████████████████████████████

a.    Jacob Decl. Ex. 82 (AOBs for Kenmore Mercy Hospital, Mercy Hospital of Buffalo, Sisters of Charity Hospital, and Sisters of Charity Hospital – St. Joseph Campus, ████████████████████████████

b.    Jacob Decl. Ex. 83 (AOB for St. Elizabeth Medical Center ████████████ ███████████████████; Jacob Decl. Ex. 84 (same); Jacob Decl. Ex. 85 (same);

c.    Jacob Decl. Ex. 86 (AOB for Mount St. Mary's ████████████████ ██████████████);

d.    Jacob Decl. Ex. 87 (AOB for Claxton Hepburn Medical Center ██████████ ███████████████████████████;

e.  Jacob Decl. Ex. 88 (AOB for Faxton-St. Luke's Healthcare ████████ ████████; Jacob Decl. Ex. 89 (same); Jacob Decl. Ex. 90 (same); Jacob Decl. Ex. 91 (same); Jacob Decl. Ex. 92 (same); Jacob Decl. Ex. 93 (same);

f.  Jacob Decl. Ex. 94 (AOB for Orleans Community Health ████████ ████████); Jacob Decl. Ex. 95 (same); Jacob Decl. Ex. 96 (same); Jacob Decl. Ex. 97 (same);

g.  Jacob Decl. Ex. 98 (AOB for Rome Memorial Hospital ████████ ████████ Jacob Decl. Ex. 99 (same); Jacob Decl. Ex. 100 (same); Jacob Decl. Ex. 101 (same); Jacob Decl. Ex.102 (same); and

h.  Jacob Decl. Ex. 103 (AOB for St. Mary's Healthcare ████████ ████████); Jacob Decl. Ex. 104 (AOB for St. Mary's Healthcare ████████ ████████.

106.  For the claims associated with these facilities, ████████ ████████.  In other words, for ████ of the disputed claims, the AOB ████████.  *See* Declaration of Bruce Deal dated September 1, 2023 ("Deal Decl.") at ¶¶ 17-18.

**The Disputed Claims**

107.  Plaintiff did not identify any disputed claims until November 5, 2021.  *See* DN-185 ¶ 19.

108.  During discovery, TeamHealth Plaintiffs produced claims data reflecting the health-benefit claims that they contend were underpaid and disputed; the most recent production

by TeamHealth Plaintiffs of its disputed claims data was made on April 19, 2023 and labeled

Jacob Decl. Ex. 105 ("Disputed Claims Spreadsheet").  *See* Jacob Decl. Ex. 106.  TeamHealth

Plaintiffs' production establishes that they dispute the reimbursements for ▋ health-benefit

claims corresponding to ▋ services.  *See* Deal Decl. ¶ 7.

109.    The health-benefit claims in dispute in the case were all for covered emergency

services.  *See* FAC ¶ 19; Jacob Decl. Ex. 5 at 31:2-8 (explaining plan documents "all cover

emergency-medicine services").

110.    In the course of discovery, Defendants also produced claims data, maintained in

the regular and ordinary course of their business, reflecting health claims submitted by

TeamHealth Plaintiffs to the Defendants or affiliates ("Defendants' Claims Data") during the

relevant time period of January 2018 through December 2021.  *See* Jacob Decl. Exs. 107-113.

111.    Defendants' Claims Data reflects information such as the name of the patient, the

dates of service, the CPT codes and amounts billed, the amounts allowed in the administration of

the claim, the name of the health plan providing coverage for the services, and whether the health

plan is governed by ERISA or the Federal Employees Health Benefit Act, 5.U.S.C. § 8904 *et*

*seq.* ("FEHBA") and the state in which the health plan was issued.  *See* Jacob Decl. Exs. 107-

113.

112.    One of Defendants' expert witnesses, Bruce Deal, analyzed the data produced by

the parties, linked the data and was able to identify ▋ of the ▋ claims in dispute.  *See*

Deal Decl. ¶ 4.

113.    The claims data produced by both parties identifies disputed benefit claims that

were allowed by health plans governed by ERISA and FEHBA.  Specifically, TeamHealth

Plaintiffs are disputing reimbursements for ▋ claims that are covered by health plans

governed by ERISA.  *See* Jacob Decl. Exs. 107-113.  TeamHealth Plaintiffs are disputing

reimbursement for ▮▮▮ claims that are covered by fully-insured plans and 6,391 claims covered

by self-insured plans.  *See* Jacob Decl. Exs. 105, 107-113.  TeamHealth Plaintiffs are disputing

reimbursements for 13 claims that are covered by health plans governed by FEHBA.  *See* Jacob

Decl. Exs. 105, 107-113.

     114.    Defendants' contractual obligations under FEHBA-governed health-benefit plans

set terms for payment for services, processing of claims, reconsideration of claims, timeframes

for adjudication of claims, and remedies for denial of claims, all of which are governed by the

FEHBA plan documents.  *See* Jacob Decl. Ex. 114 at -171, -180, -191, -193, -255-59.  The plans

state that the plan's reimbursement may not fully satisfy an out-of-network providers' billed

charges.  *See id.* at -193.  Generally, these health-benefit plans note that their allowed

reimbursement amounts "may be different from other plans."  *Id.* at -494. The contract also vests

the U.S. Office of Personnel and Management ("OPM") with the authority to make final

determinations on appeal, not Defendants.  *Id.* at -571-72.

     115.    TeamHealth Plaintiffs also produced claim-level data for services they provided at

the at-issue facilities covered by commercial payors other than Defendants ("TeamHealth

Plaintiffs' Commercial Data").  *See* Jacob Decl. Ex. 3 ¶ 18.

     116.    Mr. Deal analyzed TeamHealth Plaintiffs' Commercial Data and found that

TeamHealth Plaintiffs received ▮▮▮ per disputed claim from participating payors, when

benchmarking based on the mix of emergency services disputed in this matter Jacob Decl. Ex. 3

¶ 87.  Mr. Deal found that the allowed amounts on participating claims ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶

82.

117.    He also found that, ███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ *Id.* ¶

7.ii.

118.    He also found that, of the approximately ████████ health-benefit claims that

TeamHealth Plaintiffs submitted to commercial payors from January 2018 through December

2021, only ████████ were paid at full billed charges.  Deal Decl. ¶ 31; Jacob Decl. Ex. 3 ¶

36.  *See also* Jacob Decl. Ex. 3 ¶ 38 ████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████

119.    On average, TeamHealth Plaintiffs charge ████████ for emergency-medicine services,

which, based on the FAIR Health charges database to which TeamHealth Plaintiffs point as

evidence that their charges are reasonable, is ████████████████████████

████████████████████████████████████████████.  Jacob Decl. Ex.

3 ¶ 42.

120.    According to TeamHealth Plaintiffs' expert, ██████████████████████

████████████████████████████.  Jacob Decl. Ex. 115 at 21

████████████████████████████████████████████████████████████

██████████████████████████ *See also* Jacob Decl. Ex. 6 at 81:12-14 ("we

believe our full billed charges are a reasonable value for the services that we're providing").

TeamHealth Plaintiffs claim that they consider the Fair Health 80th percentile (among various

other factors) when setting their billed charges.  Jacob Decl. Ex. 5 at 49:10-18 ████████████



121.    Contrary to this assertion, Mr. Deal found that ███████████████ ██████████████████████████████████████████ Jacob Decl. Ex. 3 ¶

7.ii.  He also found that, ██████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████. *See* Jacob

Decl. Ex. 3 ¶ 34 (for example, ████████████████████

██████████████████████████████████████████

████████████████████████████████████

█████████████████████████████

Dated:  September 1, 2023

Respectfully submitted,

*/s/ Greg Jacob*
K. Lee Blalack, II (*pro hac vice*)
Greg Jacob (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C.  20006
(202) 383-5300
lblalack@omm.com
gjacob@omm.com

Ethan Scapellati
O'MELVENY & MYERS LLP
7 Times Square
New York, New York  10036
(212) 326-2000
escapellati@omm.com

*Counsel for Defendants*